# 23-7608

## In the
## United States Court of Appeals
## For the Second Circuit

MEHUL TRIVEDI,

*Plaintiff-Appellant,*

– v. –

ST. PETER'S HEALTH PARTNERS MEDICAL ASSOCIATES, P.C.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK (SYRACUSE)

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFF-APPELLANT

TULLY RINCKEY, PLLC
*Attorneys for Plaintiff-Appellant*
441 New Karner Road
Albany, New York 12205
(518) 218-7100
ashoikhetbrod@fedattorney.com

APPELLATE INNOVATIONS
(914) 948-2240

20724

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................... iii

PRELIMINARY STATEMENT ...............................................................1

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES...............................................................2

BRIEF STATEMENT OF THE CASE ......................................................2

SUMMARY OF ARGUMENT .................................................................5

STATEMENT OF FACTS .......................................................................6

ARGUMENT

POINT I

     SUMMARY JUDGMENT WAS IMPROPER BECAUSE
     THERE ARE GENUINE ISSUES OF MATERIAL FACTS
     IN DISPUTE TO REQUIRE A TRIAL...........................................18

     A. Dr. Trivedi Established a *Prima Facie* Case of Retaliation....................20

         1. *Dr. Trivedi Engaged in Protected Activity and
           St. Peter's was Aware of that Protected Activity*............................22

         2. *Dr. Trivedi Suffered An Adverse Employment Action* .....................27

         3. *There Is A Causal Connection Between the
           Protected Activity and Plaintiff's Termination*.................................27

     B. The District Court Erred in Ignoring the Cat's Paw Theory....................31

     C. St. Peter's Reasons for the Dr. Trivedi's Termination are Pretextual......35

     D. Dr. Trivedi Established a *Prima Facie* Case of Discrimination .............38

i

      1. *Dr. Trivedi Was A Member of The Protected Class and Qualified For His Position* .......................................................39

      2. *Dr. Trivedi Was Subjected to Adverse Employment Actions*............39

      3. *The Termination Occurred Under Circumstances That Infer Discrimination* ..................................................................43

      4. *St. Peter's Stated Reasons For Dr. Trivedi's Termination Were Pretextual* ...........................................................47

POINT II

    ST. PETER'S SPOLIATION OF EVIDENCE RAISES AN INFERENCE OF DISCRIMINATION ...................................................50

CONCLUSION.........................................................................................53

CERTIFICATE OF COMPLIANCE.......................................................54

# TABLE OF AUTHORITIES

**Page**

## Cases:

*Abboud v. Cty. of Onondaga, N.Y.,*
    341 F. Supp. 3d 164 (N.D.N.Y. 2018) ............................................................39

*Akiona v. United States,*
    938 F.2d 158 (9th Cir. 1991) ..........................................................................51

*Anderson v. Liberty Lobby Inc.,*
    477 U.S. 242 (1986) .......................................................................................19

*Azkour v. Haouzi,*
    2012 WL 1658349 (S.D.N.Y. May 11, 2012) ................................................38

*Bader v. Special Metals Corp.,*
    985 F. Supp. 2d 291 (N.D.N.Y. 2013) ...........................................................29

*Bain v. Wal-Mart Stores, Inc.,*
    585 F. Supp. 2d 449 (W.D.N.Y. 2008) ..........................................................30

*Bennett v. Progressive Corp.,*
    225 F. Supp. 2d, 190 (N.D.N.Y. 2002) ..........................................................24

*Benzinger v. Lukoil Pan Ams., LLC,*
    447 F. Supp. 3d 99 (S.D.N.Y 2020) ...............................................................26

*Boun v. Spindler,*
    65 F.4th 64 (2d Cir. 2023) .......................................................................41, 42

*Burlington Industries, Inc. v. Ellerth,*
    524 U.S. 742 (1998) .......................................................................................42

*Campbell v. Bottling Grp, LLC,*
    814 F. App'x 630 (2d Cir. 2020) ....................................................................26

*Chauhan v. MM Hotel Mgmt. LLC,*
    2019 WL 6118006 (E.D.N.Y. Nov 18, 2019)................................................26

*Cifra v. Gen. Elec. Co.,*
    252 F.3d 205 (2d Cir. 2001)................................................................30

*Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,*
    444 F.3d 158 (2d Cir. 2006)..............................................................30

*Colon v. New York City Housing Authority,*
    2021 WL 2159758 (S.D.N.Y. May 26, 2021) ...................................24

*Cones v. Shalala,*
    199 F.3d 512 (D.C. Cir. 2000) ..........................................................42

*Cox v. Quick & Reilly, Inc.,*
    401 F. Supp. 2d 203 (N.D.N.Y. 2005)..............................................28

*Dansler-Hill v. Rochester Inst. of Tech.,*
    764 F. Supp. 2d 577 (W.D.N.Y. 2011) .............................................21

*Dantuono v. Davis Vision, Inc.,*
    2009 WL 5196151 (E.D.N.Y. Dec. 29, 2009) ..................................29

*Delaney v. Bank of Am. Corp.,*
    766 F.3d 163 (2d Cir. 2014)..............................................................18

*Demoret v. Zegarelli,*
    451 F.3d 140 (2d Cir. 2006)..............................................................40

*Feingold v. New York,*
    366 F.3d 138 (2d Cir. 2004)..............................................................22

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.,*
    136 F.3d 276 (2d Cir. 1998)........................................................21, 24

*Global Network Commc'nc, Inc. v. City of New York,*
    562 F.3d 145 (2d Cir. 2009)..............................................................19

*Gordon v. New York City Bd. Of Educ.,*
    232 F.3d 111 (2d Cir. 2000)..............................................................28

*Gorman-Bakos v. Cornell Coop. Extension of Schenectady County,*
    252 F.3d 545 (2d Cir. 2001).................................................................28

*Gorzynski v. JetBlue Airways Corp.,*
    596 F.3d 93 (2d Cir. 2010).................................................................28

*Graham v. Long Island R.R.,*
    230 F.3d 34 (2d Cir. 2000).................................................................43

*Guilbert v. Gardner,*
    480 F.3d 140 (2d Cir. 2007)...............................................................19

*Hanfland v. Brennan,*
    2015 WL 6134177 (W.D.N.Y. Oct. 16, 2015) ...................................26

*Hicks v. Baines,*
    593 F.3d 159 (2d Cir 2010)...............................................20, 22, 36

*Humphrey v. County of Nassau,*
    2009 WL 875534 (E.D.N.Y. Mar. 30, 2009) ....................................30

*Jin v. Metro. Life Ins.,*
    310 F.3d 84 (2d Cir. 2002).................................................................42

*Johnson v. Goord,*
    445 F.3d 532 (2d Cir. 2006)...............................................................20

*Jute v. Hamilton Sundstrand Corp.,*
    420 F.3d 173 (2d Cir. 2005)...............................................................22

*Kaytor v. Electric Boat Corp.,*
    609 F.3d 537 (2d Cir. 2010)...............................................................19

*Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,*
    716 F.3d 10 (2d Cir. 2013).................................................................21

*Kronisch v. United States,*
    150 F.3d 112 (2d Cir. 1998)...............................................................51

*Lacasse v. Lorillard Tobacco Co., Inc.,*
    2008 WL 11446826  (E.D.N.Y. Oct. 17, 2008) ................................................29

*Lawrence v. Mehlman,*
    389 F. App'x 54 (2d Cir. 2010) ........................................................40

*Lewis v.  City of Chicago,*
    496 F.3d 645 (7th Cir. 2007).............................................................42

*Littlejohn v. City of N.Y.,*
    795 F.3d 297 (2d Cir. 2015)..............................................................43

*Lore v. City of Syracuse,*
    670 F.3d 127 (2d Cir. 2012)..............................................................21

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,*
    263 F.3d 208 (2d Cir. 2001)..............................................................28

*Matima v. Celli,*
    228 F.3d 68 (2d Cir. 2000)...............................................................24

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ..............................................................20, 38

*McKenzie v. Big Apple Training, Inc.,*
    2023 WL 4866041 (S.D.N.Y. July 31, 2023) ....................................26

*McMenemy v. City of Rochester,*
    241 F.3d 279 (2d Cir. 2001)..............................................................21

*Morales v. Bottling Group, LLC,*
    374 F. Supp. 3d 257 (W.D.N.Y.) ....................................................25

*Mumm v. Charter Township of Superior,*
    727 F. App'x 110 (6th Cir. 2018) ....................................................35

*Naumovski v. Norris,*
    934 F.3d 200 (2d Cir. 2019)..............................................................45

*Rasmy v. Marriott Int'l, Inc.,*
2017 WL 773604 (S.D.N.Y. Feb. 24, 2017) ....................................................29

*Reed v. A.W. Lawrence & Co., Inc.,*
95 F.3d 1170 (2d Cir. 1996) ...............................................................21, 29

*Reeves v. Sanderson Plumbing Products, Inc.,*
530 U.S. 133 (2000) ...........................................................................19

*Sanders v. Univ. of Idaho, Coll. of L.,*
634 F. Supp. 3d 936 (D. Idaho 2022) ..............................................................51

*Silvestri v. General Motors,*
271 F.3d 583 (4th Cir. 2001) ...............................................................51

*Staub v. Proctor Hosp.,*
562 U.S. 411 (2011) ..........................................................................34

*Summa v. Hofstra Univ.,*
708 F.3d 115 (2d Cir. 2013) ...............................................................21, 30

*Sumner v. U.S. Postal Serv.,*
899 F.2d 203 (2d Cir. 1990) ...............................................................24

*Terry v. Ashcroft,*
336 F.3d 128 (2d Cir. 2003) ...............................................................27

*Torres v. Pisano,*
116 F.3d 625 (2d Cir. 1997) ...............................................................20

*United States v. Kitsap Physicians Service,*
314 F.3d 995 (9th Cir. 2002) ...............................................................51

*United States v. Rem,*
38 F.3d 634 (2d Cir. 1994) ...............................................................20

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*
133 S. Ct. 2517 (2013) .................................................................35, 36

*Vasquez v. Empress Ambulance Serv., Inc.,*
    835 F.3d 267 (2d Cir. 2016).................................................32, 33, 34

*Vega v. Hempstead Union Free Sch. Dist.,*
    801 F.3d 72 (2d Cir. 2015)............................................................27

*VKK Corp. v. Nat'l Football League,*
    244 F.3d 114 (2d Cir. 2001)...........................................................20

*Weinstock v. Columbia Univ.,*
    224 F.3d 33 (2d Cir. 2000)............................................................22

*Ya–Chen Chen v. City Univ. of New York,*
    805 F.3d 59 (2d Cir. 2015)............................................................35

*Zann Kwan v. Andalex Grp. LLC,*
    737 F.3d 834 (2d Cir. 2013)......................................... 19, 21, 35-36

*Zhou v. State Univ. of New York Inst. of Tech.,*
    499 F. App'x 105 (2d Cir. 2012) ...................................................24

## Rules, Laws and Statutes:

28 U.S.C. § 1291 .............................................................................2

28 U.S.C. § 1331 .............................................................................1

28 U.S.C. § 1367 .............................................................................1

28 U.S.C. § 2201 .............................................................................2

28 U.S.C. § 2202 .............................................................................2

42 U.S.C. § 1981 ......................................................1, 17, 20, 38

42 U.S.C. § 2000e-5(f)(3) ................................................................1

Fed. R. Civ. P. 56(a)..................................................................19, 20

N.Y. Exec. Law § 296......................................................................1

New York State Human Rights Law, Article 15 .......................................1

## PRELIMINARY STATEMENT

Plaintiff-Appellant Mehul Trivedi appeals from the Decision and Order and Judgment of the United States District Court for the Northern District of New York (Thomas J. McAvoy, Senior Judge), dated September 29, 2023, which granted Defendant-Appellee's motion for summary judgment.

The judgment below should be reversed, and the Second Circuit should remand for trial. Plaintiff-Appellant established a *prima facie* case of retaliation and discrimination. Defendant-Appellee failed to carry its burden to demonstrate legitimate, non-discriminatory reasons for its actions, and its purported reasons established pretext for discrimination and retaliation.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Plaintiff-Appellant's claims arose out of Defendant-Appellee's violation of federal statutes, Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e-5(f)(3) ("Title VII") and 42 U.S.C. § 1981 ("§ 1981"). The district court had supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 and the New York State Human Rights Law, Article 15, N.Y. Exec. Law § 296, et seq. ("NYSHRL"), because the state law claims were so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution. Jurisdiction for declaratory and other relief was invoked

pursuant to 28 U.S.C. §§ 2201 and 2202. The Second Circuit has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291. Plaintiff-Appellant filed a timely notice of appeal on October 27, 2023. The appeal is from a final order that disposed of all Plaintiff-Appellant's claims in this action against the Defendant-Appellee.

## STATEMENT OF THE ISSUES

1.      The district court erred in granting Defendant-Appellee's Motion for Summary Judgment for failure to establish a *prima facie* case of discrimination or retaliation under the relevant statutes.

2.      The district court erred in failing to find that there were numerous genuine issues of material fact that precluded granting summary judgment to the Defendant-Appellee.

3.      The district court erred in failing to apply the cat's paw theory to Plaintiff-Appellant's discrimination and retaliation claims.

4.      The district court erred in failing to draw a negative inference due to Defendant-Appellee's spoliation of all documentation related to the purported investigation conducted by Human Resources.

## BRIEF STATEMENT OF THE CASE

Plaintiff-Appellant, Dr. Mehul Trivedi ("Plaintiff-Appellant" or "Dr. Trivedi"), was a long-term employee of Defendant-Appellee, St. Peter's Health Partners Medical Associates, P.C. ("Defendant-Appellee" or "St. Peters"). Dr.

Trivedi, who is of Indian descent, was employed for approximately ten (10) years under various iterations of St. Peter's, the last being St. Peter's Medical Health Associates, P.C. During that time, Dr. Trivedi built a busy and successful bariatric practice at St. Peter's Hospital. He won multiple awards in his practice, including Top Doctor, accreditation as a Center of Excellence and Women's Choice awards.

Dr. Trivedi was able to build a successful practice, despite the fact that he was not provided with a partner or an additional doctor in his practice. Instead, St. Peter's hired another bariatric surgeon, Dr. Matthew McDonald ("Dr. McDonald") (Caucasian), and placed him in direct competition with Dr. Trivedi in a practice mere minutes away from Dr. Trivedi's practice. In 2017, Dr. McDonald was provided with almost unlimited resources, including hiring an additional Caucasian doctor, and growing the practice to some seventeen (17) employees, as opposed to Dr. Trivedi's seven (7) employees. One of Dr. McDonald's doctors, Dr. Carol Santoro ("Dr. Santoro") (Caucasian), lodged complaints about Dr. Trivedi's competence in 2017. A list of approximately ten (10) patient cases from a seven (7) to eight (8) year period was provided as an attempt to substantiate the allegation. Dr. Trivedi responded to each of the claims to the satisfaction of management.

In 2018, complaints about Dr. Trivedi's competence were raised again, and a nearly identical list was presented by Dr. McDonald to management. Even though these concerns had already been laid to rest, it was decided to have an outside

3

consultant review the cases. Dr. Trivedi was never spoken to by this outside consultant, although the consultant had discussions with Dr. McDonald about the allegations. Dr. Trivedi was allowed to respond to the report only after the fact, pointing to multiple errors that the outside consultant made, including the fact he had erroneously identified surgical techniques that Dr. Trivedi never employed.

Again, it seemed that the issue had been resolved. Dr. Trivedi was asked to sign a new employment contract with St. Peter's in October 2018, *after* the allegations and *after* both the internal review in 2017 and the outside review in 2018. However, in January 2019, Dr. Trivedi was advised that he needed to complete certain steps to improve himself, including taking leave to observe another bariatric surgeon. Dr. Trivedi then met with Dr. Steven Hanks, Chief Medical Officer for the Acute Care Albany Division of St. Peter's and then-Chief Clinical Officer for all of St. Peter's after July 2018, and asked if these actions were being taken because of the color of his skin. Dr. Hanks did not respond to Dr. Trivedi's concerns of discrimination and no investigation was done into that complaint. Dr. Trivedi successfully completed the requested observations with the outside bariatric surgeon and was told by that surgeon that he was an excellent surgeon.

On March 17, 2019, Dr. Trivedi contacted Human Resources to complain about the ongoing harassment, bullying, and false statements being made about

him. He advised of the two (2) year harassment campaign that had been waged against him by Drs. McDonald and Santoro. On March 25, 2019, it was determined that Dr. Trivedi would be terminated, and, on May 1, 2019, Dr. Trivedi was advised of his termination. No one ever followed up with Dr. Trivedi regarding his complaints of discrimination and retaliation, and he was not informed of the results of any alleged investigation. Dr. Trivedi was summarily terminated under the guise of a provision in his October 2018 employment agreement, signed *after* St. Peter's knew and investigated allegations against Dr. Trivedi, and only *after* Dr. Trivedi engaged in protected activity of opposing discrimination in the workplace.

## **SUMMARY OF ARGUMENT**

The district court improperly granted summary judgment in favor of the St. Peter's. Dr. Trivedi established a *prima facie* case of retaliation and discrimination under the relevant statutes. The district court failed to draw all reasonable inferences in favor of Dr. Trivedi, the non-moving party, ignoring much of the proof that the disparate treatment he encountered was based upon his race, color and national origin. The district court also ignored Dr. Trivedi's arguments under the cat's paw theory and the inference that must be drawn from the spoliation of documents related to the alleged investigation into Dr. Trivedi's complaints. The district court further misstated the content of Dr. Trivedi's conversation with Dr. Sudeep J. Ross, Chief Medical Officer for St. Peter's, so that it could dismiss those

5

complaints as inadmissible hearsay. The district court ultimately rewarded the misconduct of St. Peter's management in not reporting or investigating Dr. Trivedi's complaints when it determined such failure precluded the retaliation claim.

## STATEMENT OF FACTS

Dr. Trivedi was a long-term employee of St. Peter's, having been employed for approximately ten (10) years under various iterations of St. Peter's, the last being St. Peter's Medical Health Associates, P.C. [JA-284].[1] In that time, he created a new bariatric surgery program. Dr. Trivedi's practice was built up over that time period to include a Physician's Assistant, an Office Manager, two Medical Assistants, and a Bariatric Program Coordinator/Nutritionist. [JA-286]. Dr. Trivedi requested additional mid-level providers, but he was denied. [JA-322]. As St. Peter's underwent changes, Dr. Trivedi was transitioned from St. Peter's Hospital to St. Peter's Health Partners Medical Associates and Physicians. [JA-287]. On October 22, 2018, Dr. Trivedi was required to execute a new Physician Employment Agreement. [JA-285].

During his tenure, Dr. Trivedi requested St. Peter's to find him a partner. Dr. Trivedi had no one to be on-call as there were no other bariatric surgeons in his group. General surgeons could not be on-call as they did not have enough

---

[1] "JA" refers to the Joint Appendix.

experience in bariatric surgery and their malpractice insurance would not cover this. [JA-311]. Dr. Trivedi briefly had an individual in 2016 when an endocrine surgeon was hired, who also happened to have some bariatric surgery experience, but she was terminated in less than a year. [JA-312-313]. She was of Filipino descent. [JA-261].

Dr. Trivedi, again, requested that a partner be hired, but the search was called off without explanation. [JA-313-314]. Anna Bauer ("Bauer"), Director of Human Resources testified that such a search would be done through a committee (of which she felt Dr. Trivedi should be a part of, as well as their senior leadership team). There was a separate physician recruitment team for this task. [JA-360-361]. Eric Baier ("Baier"), President of St. Peter's, acknowledged that Dr. Trivedi was having difficulty having back-up on-call because general surgeons could not provide backup coverage for a bariatric surgeon. [JA-378]. Baier testified that, in his opinion, there was not enough business in Albany to warrant hiring a second physician. [JA-367-368]. However, this excuse was demonstrably untrue as Dr. Trivedi consistently had more income and surgeries than Dr. McDonald, despite the fact Dr. Trivedi had ten (10) less people in his practice. [JA-380-384]. Dr. Trivedi's Albany program had a higher profit/loss than Dr. McDonald's Troy program for the years 2016, 2017, and 2018. [JA-391-392], and Dr. Trivedi performed more surgeries than Dr. McDonald. [JA-382].

In 2017, Dr. Trivedi's bariatrics program underwent a full review in preparation for accreditation as a Center of Excellence. It was a thorough and comprehensive review. They looked at every aspect of the program, including Dr. Trivedi's preoperative protocols, his post-operative protocols, and his operative techniques. They also looked at his outcomes across the 1,500 plus bariatric patients. They looked at specific complications and an independent, outside bariatric surgeon reviewed the complications in detail between the office and the hospital records. They looked at x-rays, radiology reports, the totality of the situation, and they deemed that the overall mortality and morbidity rate was well below the national norms and standards and that the cases had been managed within the standard of care. [JA-292-293]. This was in addition to a Top Doctor Award that Dr. Trivedi had already received in 2015. [JA-398].

In 2016, Dr. McDonald was hired by St. Peter's. He was not hired as a partner to Dr. Trivedi, but Dr. McDonald was set up in direct competition to Dr. Trivedi's bariatrics program. [JA-288-290]. Dr. McDonald's office was minutes from Dr. Trivedi's office. Both practices drew patients from the same region. [JA-365]. In Fall 2018, a second bariatric surgeon, Dr. Samuel Hykin ("Dr. Hykin") (Caucasian), was hired into Dr. McDonald's practice. [JA-367]. Baier claimed that Dr. Hykin was hired because it was felt there was enough business to warrant hiring a second Bariatric Surgeon. [JA-368]. However, this was also demonstrably

8

untrue as Dr. Trivedi was performing more procedures at the time [JA-380-384]. Dr. McDonald's competing practice now had three (3) Physicians: two (2) Bariatric Surgeons (both Caucasian), and one (1) Nutritionist, Dr. Carol Santoro (Caucasian), compared to Dr. Trivedi being solo. Further, Dr. McDonald's program was provided with multiple support staff and mid-level providers. [JA-323, JA-380-384]. St. Peter's marketed Dr. McDonald's program as a comprehensive metabolic care service site. [JA-380]. That program had no particular awards, in contrast to Dr. Trivedi's office having received the Women's Choice Award, the Center of Excellence Award and a Top Doctor Award for Dr. Trivedi. [JA-266].

Dr. Trivedi expressed to Dr. Hanks, then-Chief Clinical Officer for St. Peter's, on multiple occasions, that he would be willing to collaborate with Dr. McDonald to establish them as peers, but that never materialized. [JA-309-310]. Baier noted that he was sure that Dr. Trivedi indicated that he would be happy to collaborate with Dr. McDonald and to grow the program with him. By contrast, Dr. McDonald informed Baier he did not want to collaborate with Dr. Trivedi or grow the program with him. Dr. McDonald never received any repercussions for these breaches of professional and collegial behavior while Dr. Trivedi was still employed. [JA-323-324].

Dr. McDonald complained about Dr. Trivedi's competence. When he reviewed the list of cases identified by Dr. McDonald, Dr. Trivedi noticed that it was a limited, older sample that had been cherry-picked over a seven-to-eight-year period. [JA-293]. The list had originally come up in 2017. Dr. Hanks testified that, around that time, he was presented a list of approximately ten (10) names by Dr. Santoro, that she expressed concern about the quality of care being provided by Dr. Trivedi, and she indicated that they should be investigated. [JA-401-402]. Dr. Hanks testified that her specific concerns were that the number of patients who required long-term TPN (total parenteral nutrition) seemed excessive and that she had concerns about patients' leak rates. [JA-402]. Dr. Santoro adamantly denied that she made any specific list of Dr. Trivedi's patients or made complaints about Dr. Trivedi. She claimed that any concerns came up only peripherally. Dr. Santoro stated she made a list of all patients who were on TPN and their provider, which she gave to Dr. Hanks, and that it was handwritten. Dr. Santoro claimed she did not express any concerns about Dr. Trivedi's skills and that she was not a surgeon. She stated it was Dr. Hanks who raised the issue to her. [JA-411-413].

Dr. Garber, then-Chief of Staff, requested that Dr. Hanks review the cases directly with Dr. Trivedi. [JA-291]. Dr. Trivedi responded to all of the complaints with Drs. Hanks and John Taggert, Chief of Surgery, with detailed case explanations as to each one of the patients with explanations of any complications.

[JA-294-295]. It was determined that Dr. Trivedi's complication rate was low, better than national standards, and that all the identified cases were managed within the standard of care. [JA-295]. Both Drs. Taggert and Hanks expressed they were quite satisfied and determined that there was no need for any further action to be taken. [JA-295-296].

However, in 2018, a nearly identical list of patients was again presented, this time by Dr. McDonald. Although the matter had already been fully and previously investigated in Dr. Trivedi's favor, an outside physician, Dr. Ramachandra, was asked to review the cases by Dr. Hanks. [JA-404-405]. Dr. Ramachandra never spoke with Dr. Trivedi during this review; however, he did speak with Dr. McDonald. [JA-297]. Dr. Ramachandra provided his report, and it was only at that point that Dr. Trivedi was given the opportunity to comment by Dr. Hanks. [JA-299]. Dr. Trivedi noted that Dr. Ramachandra spoke only with Dr. McDonald, who had a conflict of interest as he was the party responsible for making the complaint against Dr. Trivedi and provided the list. [JA-300]. Dr. Trivedi also noted the flaws and factual inaccuracies in Dr. Ramachandra's review. [JA-415-428].

Dr. Trivedi then met with Drs. Hanks, Taggert, Ross, Barbara Brazis (Chief of General Surgery), Tyler Chenel (a Physician's Assistant), and Beth Wyman (a Physician's Assistant) on July 11, 2018. [JA-301]. They all agreed that the complication rate was an invalid conclusion as it failed to consider the number of

overall surgeries. [JA-301-302]. They expressed that they believed the report was flawed and that no further action would be taken. [JA-302]. In fact, Drs. McDonald and Hykin had a much higher complication rate than Dr. Trivedi. [JA-338].

In October 2018, a patient of Dr. Trivedi died post-surgery. Even though it was concluded that Dr. Ramachandra's report was flawed, Dr. Ramachandra was asked to review that case as well. [JA-303]. Dr. Alan Sanders, Chief Clinical Officer, stated he sought Dr. Ramachandra to perform the review as he had completed the prior review and was familiar with Dr. Trivedi's work. [JA-431]. Dr. Sanders looked at the prior review and obtained Dr. Ramachandra's contact information from it. [JA-431-432]. Dr. Trivedi was not provided with Dr. Ramachandra's review and no one at St. Peter's discussed the review with Dr. Trivedi. [JA-304]. Dr. Trivedi discussed the case with Drs. Taggert, Brazis and Sanders. [JA-305]. He also participated in a root cause analysis. [JA-305]. Dr. Trivedi asked for an in-depth review by an outside investigator other than Dr. Ramachandra; however, that request was denied. [JA-306].

Dr. Trivedi was presented with a letter dated January 10, 2019, by Drs. Ross and Sanders, which was signed by Drs. Sanders and Taggert. [JA-48-50, JA-307]. The letter alleged concerns and had an action plan for Dr. Trivedi to follow. Afterwards, Dr. Trivedi met with Dr. Ross wherein Dr. Ross stated he believed the letter was unjust and was based upon discrimination. [JA-316]. In that meeting, Dr.

Trivedi also discussed with Dr. Ross how he felt that the action plan was related to the color of his skin. [JA-263-264]. Dr. Trivedi responded to the letter on February 4, 2019 by email. [JA-52-53]. Dr. Trivedi began to fulfill the action points that had been requested. [JA-318]. He fully complied with observing another surgeon. [JA-318].

Dr. Trivedi also told Dr. Hanks he believed his treatment was due to his skin color. [JA-317, JA-325, JA-333]. Dr. Hanks acknowledged that he had a vague recollection of Dr. Trivedi complaining that he believed these actions were being taken against him because of his race. [JA-407]. Dr. Hanks did not respond to the complaint. [JA-325]. Dr. Hanks had no recollection of responding to Dr. Trivedi's concerns of race discrimination. [JA-407-408].

St. Peter's has an EEOC/Non-Discrimination Policy that prohibits discrimination and states: "Managers are responsible for complying with all aspects of this policy, for investigating and addressing issues in a timely manner and consulting with Human Resources, as necessary" and "[c]olleagues are required to address any matter of concern with their immediate supervisor or a member of the Human Resources Department." [JA-436]. Dr. Hanks did not investigate nor address Dr. Trivedi's complaint that his treatment was due to the color of his skin or consult with Human Resources. [JA-407-408]. Bauer, the Director of Human Resources, testified that she first discussed Dr. Trivedi with Dr.

13

Hanks in March 2019, when she contacted him about Dr. Trivedi's March 17, 2019 complaint to her. [JA-345].

Dr. Trivedi frequently attempted to have conversations with Drs. Hanks, Ross and Taggert about the illegitimate reasons he was being targeted to no avail. [JA-315-316]. On March 17, 2019, after having a conversation with Bauer, Dr. Trivedi emailed Bauer. [JA-97-98, JA-331]. Dr. Trivedi was exasperated at his complaints being ignored. [JA-332]. Dr. Trivedi met with Bauer and advised her that he was being treated differently. [JA-264-265]. He never heard back from Bauer about an investigation. [JA-334, JA-337]. Bauer claimed that she met with close to fifteen (15) to twenty (20) people, kept notes and wrote a report that recommended some sort of counseling for Dr. McDonald with regard to making disparaging remarks about Dr. Trivedi. [JA-343-344, JA-346-347]. All of that material went missing, even the electronic versions. [JA-344, JA-359]. Bauer testified that she determined that Dr. Trivedi had made his concerns known to senior leadership, such as Drs. Hanks and Ross. [JA-348].

On March 18, 2019, Bauer met with Tammy Dunham (Director of Operations), Kellie Valenti (Chief Operating Officer), Baier (President), and Dr. Ross (Chief Medical Officer) regarding the Trivedi/McDonald investigation. [JA-351-353]. This was followed up with an email from Bauer to Rik Baier, Tammy Durham, Kellie Valenti, Eric Farrell, Esq., and Drs. Hanks and Ross, requesting

documents related to the investigation. [JA-355-356, JA-440-441]. Bauer received documentation regarding the counseling provided to Dr. McDonald in the summer of 2018. [JA-357].

St. Peter's Executive Committee held a meeting on March 25, 2019 with Eric Farrell, their attorney, by which "[t]here was a discussion around HR investigating issues around Dr. Trivedi" that referred to Bauer's investigation. [JA-349-350, JA-63-66]. At that same meeting, the Executive Committee recommended that they move forward with terminating Dr. Trivedi. [JA-33-36]. This was only one (1) week after Dr. Trivedi's written complaint to the head of Human Resources and Bauer's notice of this fact to St. Peter's President, Director of Operations, Chief Medical Officer, and Chief Operating Officer at an in-person meeting. [JA-351-353]. Dr. Ross was present at this meeting and was aware that Dr. Trivedi had a conversation with him that the January 2019 letter and the other actions being taken against were because of the color of his skin. [JA-63].

Dr. Trivedi also observed that other physicians of Middle Eastern descent were dismissed from St. Peter's: Drs. Mane, Ali-Hasan and a third surgeon. In addition, Dr. Ross, who was also of Middle Eastern descent, had left. [JA-336]. Dr. Ali-Hasan complained about his treatment at St. Peter's. [JA-362]. Dr. Folek, of Filipino descent, was also fired. [JA-261].

15

Dr. Trivedi made complaints for more than one (1) year about Dr. McDonald to Drs. William Kowal ("Dr. Kowal"), Hanks, and Ross, as well as Baier and Bauer. [JA-326]. He indicated that Dr. McDonald had made false allegations regarding his results, accused him of manipulation of data, and had stated Dr. Trivedi did not know what he was doing. In addition, Dr. McDonald was privy to the supposedly confidential January 2019 letter and he made public statements that he was happy that Dr. Trivedi was being made to observe another surgeon, and that he was happy that Dr. Trivedi was going to be fired. [JA-327]. Dr. Trivedi complained by email to Drs. Hanks, Taggert, Brazis and Ross about the complaints being made against him. [JA-328, JA-415]. When he followed up on his concerns with Drs. Ross, Taggert and Hanks, there was no response. [JA-329]. He also followed up with Baier and he would get vague responses, not indicating one way or another whether it was being dealt with. [JA-330-331].

Baier testified that there would be a recommendation from the Health Partner's Departmental Joint Operating Committee ("JOC") and that would be presented to the Executive Committee of the Board. He stated the JOC was not required to involve Dr. Trivedi and would decide on the termination after a discussion at their meeting. [JA-371]. Baier stated that the Executive Committee had the authority to terminate the employment agreement without cause and without having Board approval. [JA-372, JA-375]. Baier stated there was no

16

reason not to present the termination decision to the Board other than from a timing perspective. [JA-376]. This was not in keeping with the process that Dr. Trivedi testified was used in 2017, where such decisions went to the full Board. [JA-265] It conflicted with the language in the Bariatric Surgery Strategy which indicated that Proposal 1 was to "Terminate Dr. Trivedi's employment based on results of investigations, and Board Approval." [JA-380] (emphasis added). St. Peter's made the decision to bypass the Board and to rubber-stamp the decision through the Executive Committee. [JA-265].

On May 1, 2019, Dr. Trivedi was told by Baier and Dr. Kowal that he was being terminated. [JA-319]. Baier told him that he "wasn't a good fit." [JA-320]. No one in the medical group performed any kind of investigation. [JA-366]. They were so eager to rush the termination that, despite it being of no economic benefit to St. Peter's, a proposal was made to have Ellis-based surgeons operate out of St. Peter's Hospital. [JA-373-374]. Dr. Trivedi continued to perform his duties as he was paid for the next four (4) months based on the terms of his employment agreement. [JA-321].

Dr. Trivedi timely filed a Complaint in the Northern District of New York on June 2, 2020, alleging violations pursuant to Title VII, § 1981, and the NYSHRL due to his race, color, national origin and in retaliation for his protected activities. [JA-10-21]. After the close of discovery, St. Peter's filed a Motion for

Summary Judgment, with a Supporting Declarations by Adam P. Mastroleo, Esq., Steven Hanks, M.D., Alan Sanders, M.D., John Taggart, M.D., Jason Heckman, M.D., and William Kowal, M.D., with attached Exhibits, a Statement of Material Facts, and a Memorandum of Law. [JA-32-231]. Dr. Trivedi opposed the Motion with Declarations of Karen Sanders and Mehul Trivedi, M.D., with attached Exhibits, a Response to the Statement of Facts, and a Memorandum of Law. [JA-232-451]. St. Peter's submitted an additional Declaration by Adam P. Mastroleo, Esq. and a Reply Memorandum of Law in further support of the Motion to For Summary Judgment. [JA-452-466]. The Honorable Thomas J. McAvoy, Senior United States District Court Judge for the Northern District of New York, granted the Motion for Summary Judgment and dismissed the case. [JA-467-514].

## ARGUMENT

## POINT I

### SUMMARY JUDGMENT WAS IMPROPER BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACTS IN DISPUTE TO REQUIRE A TRIAL.

Summary judgment will only be affirmed when "the evidence… demonstrates 'that there are no genuine issues of material fact and that the judgment is warranted as a matter of law." *Delaney v. Bank of Am. Corp*., 766 F.3d 163, 167 (2d Cir. 2014) (quoting *Global Network Commc'nc, Inc. v. City of New*

*York,* 562 F.3d 145, 150 (2d Cir. 2009)); *see* Fed. R. Civ. P. 56(a). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Kwan v. Andalex Grp. LLC*, 737 F.3d 843, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). When analyzing the evidence on summary judgment, the evidence should be construed "in the light most favorable to the nonmoving party." *Guilbert*, 480 F.3d at 145.

Additionally, "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in" the nonmovant's favor. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986). Summary judgment "is inappropriate when the admissible materials in the records make it arguable that the claim has merit." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (internal quotation makes omitted).

In determining whether there are genuine issues of material fact, "the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) ("the standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under

19

each is the same," requiring the court to "review all of the evidence in the record" (internal quotation marks omitted)).

The Second Circuit reviews "the district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 118 (2d Cir. 2001). Like the district court, the Circuit is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006) (internal quotation marks omitted). The Circuit does not "weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact." *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). A party is only entitled to summary judgment if he "shows that there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A.    Dr. Trivedi Established a *Prima Facie* Case of Retaliation

Plaintiff has established a *prima facie* case of retaliation under Title VII, § 1981 and the NYSHRL.[2] A retaliation claim under Title VII is evaluated using the three-step framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A *prima facie* case of retaliation is established by showing: "(1) [the

---

[2] Retaliation claims under § 1981, Title VII and the NYSHRL are analyzed according to the same principles. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir 2010); *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997).

20

employee] engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (internal quotation marks omitted); *see also Dansler-Hill v. Rochester Inst. of Tech.*, 764 F. Supp. 2d 577, 581 (W.D.N.Y. 2011). "To prevail on a retaliation claim, 'the plaintiff need not prove that [his] underlying complaint of discrimination had merit,' but only that it was motivated by a 'good faith, reasonable belief that the underlying employment practice was unlawful.'" *Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Lore v. City of Syracuse,* 670 F.3d 127, 157 (2d Cir. 2012); *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir. 1996)). A plaintiff "is 'required to have had a good faith, reasonable belief that [he] was opposing an employment practice made unlawful by Title VII.'" *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,* 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *McMenemy v. City of Rochester,* 241 F.3d 279, 285 (2d Cir. 2001)). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir. 1998).

If a plaintiff successfully establishes a *prima facie* case of retaliation, the burden shifts to the defendant to "articulate a legitimate, non-retaliatory reason for

the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 173 (2d Cir. 2005)). The plaintiff can then show that the reasons given by the employer are pre-textual, and the reason for the adverse action was retaliation. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).

    1.    *Dr. Trivedi Engaged in Protected Activity and St. Peter's was Aware of that Protected Activity*

Dr. Trivedi engaged in protected activity when he informed Dr. Hanks in January 2019 that he felt that the January 10, 2019 letter he received was due to his skin color. Despite the policies that require managers to either investigate or report such issues to Human Resources, Dr. Hanks did neither. [JA-435-437]. Dr. Trivedi specifically brought up the color of his skin with Dr. Hanks, who at that time was Chief Clinical Officer for St. Peter's Health Partners and a member of the Executive Committee. [JA-34, JA-63]. As such, he would have been under a duty to inform Human Resources about the complaint. [JA-435-437]. Further, Dr. Trivedi conversed with Dr. Ross, the Chief Medical Officer, in mid-January, and they discussed that the January 10 letter was a result of Dr. Trivedi's skin color. [JA-263-264, JA 316]. As Dr. Trivedi's supervisor, this knowledge is imputed to St. Peter's. *See, Feingold v. New* York, 366 F.3d 138, 152 (2d Cir. 2004) ("'When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue

for complaint or knew of the harassment but did nothing about it.'" Here, [plaintiff] has provided evidence that both his immediate supervisor and the supervisor for the entire TVB were aware that he was experiencing a hostile work environment, yet neither took any action either to disapprove of or to remedy the situation. Accordingly, [plaintiff] has alleged sufficient facts to permit a trier-of-fact to find a specific basis for imputing the discriminatory conduct to the DMV.") (internal citations omitted). Dr. Trivedi's discussions were clearly about discrimination based upon his protected categories.

The district court erred in determining that Dr. Trivedi's complaints to Dr. Ross, who was the Chief Medical Officer and Dr. Trivedi's supervisor, were inadmissible hearsay by concentrating merely on Dr. Trivedi's statement that Dr. Ross stated that he believed Dr. Trivedi was being subjected to discrimination. The district court completely ignored that it was a mutual discussion by which Dr. Trivedi stated to Dr. Ross that he believed that the January 10 letter was given to him as a result of his skin color. [JA-506-507].

Dr. Trivedi further engaged in protected activity when he reported to Human Resources on March 17, 2019 that he had been undergoing workplace harassment and bullying for two (2) years. [JA-97]. As noted in his email to Bauer, during those two (2) years, Dr. Trivedi made multiple complaints to Drs. Hanks, Ross, and Sanders. An informal objection to unlawful discrimination to a management

team constitutes a protected activity. *Bennett v. Progressive Corp.,* 225 F. Supp. 2d, 190, 211 (N.D.N.Y. 2002) (citing *Matima v. Celli,* 228 F.3d 68, 78 (2d Cir. 2000); *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990)). Failing to "use the word discrimination in complaining does not change the court's analysis for retaliation." *Zhou v. State Univ. of New York Inst. of Tech.,* 499 F. App'x 105, 108 (2d Cir. 2012) (summary order). The Second Circuit has held that an employee need not specifically use the word "discrimination." Rather, an employee need only put forward evidence that they had a good faith belief that the complained of mistreatment was based on a discriminatory basis and that the employer was aware that the complaint was directed at the alleged unlawful conduct. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). As in *Zhou*, *supra*, where the plaintiff complained that Asian faculty members were being harassed, here, Dr. Trivedi's complained expressly to Drs. Hanks and Ross that his treatment was the result of the color of his skin. [JA- 316-317, JA-325, JA-333]. He also made clear in his email that there had been ongoing harassment and unfair treatment. [JA-97-98]. This raises a triable issue of fact on the question of notice to support the necessity of a trial and the district court erred in finding St. Peter's did not have notice.

In *Colon v. New York City Housing Authority,* 2021 WL 2159758 (S.D.N.Y. May 26, 2021), the district court found that the plaintiff's complaints to Human

Resources and management about the attempt to transfer an employee because of the desire to have a Spanish Manager was potentially illegal and racial were sufficient to put the employer on notice the complaint was about discrimination. *Id.* at *14. Here, in 2018, Dr. Trivedi stated that being targeted by Dr. McDonald was not legal. [JA-41-42]. In his March 17, 2019 email to Bauer, Dr. Trivedi brought up the following concerns: "This is a summary and may not do justice to everything that has been going on for over two years, '*workplace harassment*', 'bullying', "libel, slander and *harassment*', 'falsely made allegations', 'assault on myself and my practice', 'false assertions and misinformation[.]' "I have repeatedly tried to bring this to the attention of the senior leadership to no avail[.] I tried not to rock the boat, hoped that fairness, reason, logic and most of all integrity would prevail", "the 'witch hunt' continues unabated", "broken every code of conduct and the 'core values' at St. Peters", "hope for truth, fairness and justice to prevail." [JA-97-98] (emphasis added). Dr. Trivedi, after having his explicit complaints about the targeting being based upon the color of his skin ignored, continued to try to act as a team player.

The lower court cited to a litany of district court decisions to counter strong Second Circuit precedent that an employee need not specifically refer to discrimination or retaliation. These district court cases are not on point. For example, in *Morales v. Bottling Group, LLC*, 374 F. Supp. 3d 257 (W.D.N.Y.),

*aff'd sub nom. Campbell v. Bottling Grp,* LLC, 814 F. App'x 630 (2d Cir. 2020) (summary order), the plaintiff complained in two meetings that he was being treated differently and unfairly and he did not give any specific examples of the unfairness. In *Hanfland v. Brennan*, 2015 WL 6134177 (W.D.N.Y. Oct. 16, 2015) that plaintiff complained about the questionable character of a co-worker, that the co-worker had violated Post Office policies, there was harassment, and she had a right to free speech. In *McKenzie v. Big Apple Training, Inc.*, 2023 WL 4866041 (S.D.N.Y. July 31, 2023), that plaintiff did not make a complaint, but instead had merely responded to a request to allow a student to re-take an exam which she viewed as dishonest. In *Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99 (S.D.N.Y 2020), that plaintiff complained about her own overtime and pay to a supervisor in the context of a meeting wherein the plaintiff asked for a raise and more responsibility. In *Chauhan v. MM Hotel Mgmt. LLC*, 2019 WL 6118006 (E.D.N.Y. Nov 18, 2019), the court found the plaintiff's complaints asserted discriminatory conduct and denied the motion to dismiss the retaliation claim.

Here, the district court read Dr. Trivedi's complaints myopically in determining that St. Peter's could not have retaliated as St. Peter's was not on notice that the complaints were based on discrimination. This disregards Dr. Trivedi's express complaints to Drs. Ross (Chief Medical Officer) and Hanks (Chief Clinical Officer) that Dr. Trivedi's treatment was the result of his skin color.

It also disregards that, after his express complaints of discrimination were not acted upon by those supervisory and management officials, he then complained to the head of Human Resources. In that complaint, Dr. Trivedi specifically stated that he had attempted to bring this to the attention of senior leadership. He stated that the conduct was not legal. [JA-97-98]. St. Peter's should not be rewarded for management's burying of complaints of discrimination as they had a duty under both the employer's policies and under the law to properly investigate and stop acts of discrimination and retaliation.

### 2.  *Dr. Trivedi Suffered An Adverse Employment Action*

It is not disputed that Dr. Trivedi suffered an adverse employment action in that his employment was terminated, which satisfies this element of the *prima facie* analysis. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).

### 3.  *There Is A Causal Connection Between the Protected Activity and Plaintiff's Termination*

A causal connection between the protected conduct and an adverse action can be shown in two (2) ways:

> [P]roof of a causal connection can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.

27

*Gordon v. New York City Bd. Of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). There is no "bright line test to define the temporal relationship . . . [that would] establish a causal relationship[;]" however, "'the causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" *Cox v. Quick & Reilly, Inc.*, 401 F. Supp. 2d 203, 218 (N.D.N.Y. 2005) (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001)).

It was determined that Dr. Trivedi would be terminated at an Executive Committee meeting on March 25, 2019, a mere few months after the January 2019 conversations with Drs. Hank and Ross and only eight (8) days after Dr. Trivedi's email to Human Resources. It was also eight (8) days after Bauer informed St. Peter's President, Director of Operations, Chief Medical Officer and Chief Operating Officer of Dr. Trivedi's complaints in an in-person meeting. [JA-351-353]. This close proximity in time between the complaints and the termination establishes the necessary link for causation. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal

relationship."); *see also Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir. 1996) (finding sufficient evidence of causation where a "mere" twelve days elapsed between plaintiff's protected activity and her termination); *Rasmy v. Marriott Int'l, Inc*., 2017 WL 773604 (S.D.N.Y. Feb. 24, 2017) (motion to dismiss denied where the plaintiff complained to Human Resources, it did not investigate and instead retaliated against him by terminating his employment.); *Bader v. Special Metals Corp*., 985 F. Supp. 2d 291 (N.D.N.Y. 2013) (where Human Resources found no discrimination in its investigation, the court determined there was a material issue of fact as to whether plaintiff was retaliated against when she was disciplined five (5) days after the investigative report and demoted eight (8) days after the investigative report); *Dantuono v. Davis Vision, Inc*., 2009 WL 5196151 (E.D.N.Y. Dec. 29, 2009) (summary judgment denied where there were issues of material fact in dispute where plaintiff participated in protected activity when she complained to Human Resources about her treatment due to her pregnancy and within a month, she was issued a new job description that required her to lift ten pounds which she was not allowed to do, due to her pregnancy); *Lacasse v. Lorillard Tobacco Co., Inc*., 2008 WL 11446826 (E.D.N.Y. Oct. 17, 2008) (plaintiff made a *prima facie* case of retaliation where plaintiff filed formal complaints with Human Resources and then his employment was terminated).

The district court also erroneously stated that "[i]t is well settled that temporal proximity alone is insufficient to overcome an employer's legitimate nondiscriminatory reason for terminating a plaintiff's employment" relying on *Bain v. Wal-Mart Stores, Inc.,* 585 F. Supp. 2d 449, 454 (W.D.N.Y. 2008). [JA-507]. Meanwhile, a plaintiff can allege a causal connection between an adverse action and the protected activity by alleging a sufficiently close temporal relationship of the two. *Summa,* 708 F.3d at 128 (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001)). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Humphrey v. County of Nassau*, 2009 WL 875534, at *15 (E.D.N.Y. Mar. 30, 2009) (quoting *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 168 (2d Cir. 2006)). The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action. This has allowed [the Second Circuit] to exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Summa*, 708 F.3d at 128. Here, it was only eight (8) days after Dr. Trivedi contacted Human Resources that he was terminated.

Dr. Trivedi has not relied solely on temporal proximity, but also pointed to St. Peter's failure to follow its past procedure of taking terminations to the Board, giving an employee the opportunity to address the charges, and rushing to terminate when Dr. Trivedi was not even notified of his termination until over one (1) month later. Retaliatory animus can be inferred from the Executive Board's refusal to follow its own procedures to terminate Dr. Trivedi a mere eight (8) days after his written complaint to Human Resources. The Executive Meeting minutes establish that it was aware of an investigation. [JA-63-66]. Despite that in the past the Board would consider a termination, Baier indicated it was not done on this occasion because they wanted to implement the decision of the JOC as soon as possible. [JA-376]. Again, drawing all inferences in favor of Dr. Trivedi, as the non-moving party, the fact that Dr. Trivedi was not informed of the decision until May 1, 2019, more than one (1) month later, a retaliatory inference can be drawn that Baier's claim that the Board did not consider the termination because the timing was allegedly of great importance is false. The fact that St. Peters deviated from its prior practice solely in Dr. Trivedi's case in not allowing him to address the Board or answer the charges in any way creates an inference of retaliation.

B.     The District Court Erred in Ignoring the Cat's Paw Theory

The district court completely ignored Dr. Trivedi's arguments under the "cat's paw" theory regarding the retaliation claim. The Second Circuit held that the

"cat's paw" theory applies to retaliation claims under Title VII. *See Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267 (2d Cir. 2016). In *Vasquez*, the Second Circuit held that "agency principles permit the retaliatory intent of Vasquez's co-worker to be imputed, as a result of Empress's alleged negligence, to Empress." *Id.* at 272-73. Adopting the "cat's paw" theory, this Court held that a plaintiff may succeed on a Title VII claim even "absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the decision-making process." *Id.* at 275. The Circuit further held that the complaint sufficiently pled negligence by virtue of the allegations that Empress had credited the co-worker's accusations "to the exclusion of all other evidence, and specifically declin[ed] to examine contrary evidence tendered by Vasquez, when it knew or, with reasonable investigation, should have known of [the co-worker]'s retaliatory animus—caused [the co-worker]'s accusations to form the sole basis for Empress's decision to terminate Vasquez." *Id.* at 273-74.

Here, the district court failed to discuss or analyze this theory as it related to Dr. Trivedi's retaliation claims. Dr. McDonald was given the same outsized role in the termination of Dr. Trivedi. Dr. Trivedi had complained to management on multiple occasions about Dr. McDonald's conduct in targeting him. Dr. McDonald's complaints against Dr. Trivedi were accepted, even though he and his

proxy rehashed virtually the same complaints that had already been investigated and laid to rest the year before. St. Peter's compounded the outsize role of Dr. McDonald in that Dr. McDonald was consulted by the reviewing doctor to further embellish his complaints against Dr. Trivedi, despite the fact Dr. Trivedi was not allowed to even speak with Dr. Ramachandra about his care of the patients. Then, like in *Vasquez*, *supra*, evidence contrary to Dr. McDonald's assertions was disregarded. St. Peter's completely ignored that Dr. Trivedi's practice and protocols had been extensively vetted when his practice earned the Center of Excellence Award in 2017. St. Peter's also ignored Dr. Trivedi's exhaustive and detailed response to the report. This is not a situation where Dr. Trivedi simply disagreed with the report. Rather, he showed how the reviewing doctor was flat out wrong as to the operative techniques he used and the medical standards that applied. St. Peter's ignored these fallacies in the report and used the same reviewer to conduct a second review, despite his bias against Dr. Trivedi and Dr. Trivedi's request for a neutral reviewer.

Under the cat's paw theory, motive may be imputed to the final decision maker if that decision maker's adverse employment action was proximately caused by the subordinate who had a discriminatory motive and was intended to bring about the adverse employment action. *See Vasquez, supra*. Here, the JOC adopted the allegations of Drs. McDonald and Santoro and this resulted in Dr. Trivedi's

termination. These cases are reviewed under the mixed-motive causation standard. *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011); *Vasquez*, 835 F.3d at 272-73. Dr. Trivedi would not have been under investigation but-for the repeated and false complaints of Drs. McDonald and Santoro. It is telling that St. Peter's adopted the discriminatory allegations of Drs. McDonald and Santoro to the exclusion of all other evidence and that it refused to follow the procedures it had utilized in 2017 by refusing to allow Dr. Trivedi to rebut the complaints against him or have the recommendation to terminate reviewed by the Board. Instead, St. Peter's opted to rush the termination decision to the Executive Committee and completely bypassed the Board. While the district court attempts to excuse St. Peter's claim that there was nothing to prevent it from refusing Dr. Trivedi a chance to defend himself, this fails to draw all inferences in favor of Dr. Trivedi, the non-moving party. Deviating from past practice establishes an inference that it was done for discriminatory or retaliatory reasons. *See EEOC Guidance, Section 15, Race and Color Discrimination* ("Relevant personnel policies. An employer's deviation from an applicable personnel policy, or a past practice, can support an inference of a discriminatory motive. Conversely, acting in conformance with a consistently applied nondiscriminatory policy or practice would suggest there is no such motive.").

Further, at the time of his termination, the Executive Committee was on notice of the pending investigation into Dr. Trivedi's complaints. [JA-64]. Dr. Trivedi's complaints to Bauer were read myopically to exclude any consideration of discrimination. An employee does not have to use "magic words" to complain about discrimination for it to lay the basis for a retaliation claim. *Mumm v. Charter Township of Superior*, 727 F. App'x 110, 113 (6th Cir. 2018) (summary order). Further, the Court should also infer that discrimination was a part of the investigation as a negative inference should be drawn due to the destruction of all the records related to the Human Resources investigation, including all notes, the final report and the electronic record, as discussed more fully below.

C.   St. Peter's Reasons for the Dr. Trivedi's Termination are Pretextual

As Dr. Trivedi has established a *prima facie* case of retaliation, St. Peter's must show legitimate, non-retaliatory reasons for the adverse action. Dr. Trivedi must then show that the "legitimate, non-retaliatory reason" offered by the employer is mere pretext, and that the employer's "desire to retaliate" was the real "but-for cause of the challenged employment action." *Ya–Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70, 73 (2d Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013)). To be actionable, the retaliation must have been the "'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d

834, 845 (2d Cir. 2013) (quoting *Nassar*, 133 S. Ct. at 2526, 2533)); *but see Hicks v. Baines*, 593 F.3d 164, 165 (2d Cir. 2010) (discussing plaintiff's burden to demonstrate that "retaliatory motive played a part in the adverse employment actions even if it was not the sole cause" (internal quotation marks omitted)).

St. Peter's claimed it could terminate Dr. Trivedi for no reason under his employment contract. In addition, it argued that it was reasonable to be concerned about Dr. Trivedi's skills and collegiality. However, there are numerous genuine issues of material fact that preclude summary judgment regarding these claimed reasons. St. Peter's rushed to terminate Dr. Trivedi within a week of his complaint to the Director of Human Resources, who relayed his complaint to the highest management officials in St. Peter's. [JA-97-98, JA-331, JA-351-353] Despite claiming that the Board was bypassed because time was of the essence, St. Peter's then failed to advise Dr. Trivedi of his termination for another five (5) weeks. [JA-372, JA-375-376]. An inference can be drawn from this delay that St. Peter's was attempting to make it appear that there was no temporal link between his complaints and his termination. The Executive Committee ignored that an investigation had recently been commenced and had not been completed in its rush to expedite the termination. [JA-380]. St. Peter's ignored its past practice in having terminations reviewed by the Board, as opposed to the Executive Committee, in order to force through the termination as quickly as possible. [JA-265]. In addition,

even though the investigation was pending, and in direct contradiction to past practice, Dr. Trivedi was not notified of the termination recommendation and was not allowed to present a defense. [JA-64, JA-265]. This all points to pretext that was ignored by the district court.

Further evidence of pretext that the district court ignored is the fact that Dr. Trivedi was terminated while Dr. McDonald was only counseled, despite the fact both were accused of the same purported issues – lack of collegiality and questionable clinical skills. [JA-344, JA-347]. It was not until after Dr. McDonald's Caucasian partner made complaints against Dr. McDonald that these concerns were believed and acted upon by St. Peter's. [JA-266]. Dr. McDonald's lack of collegiality and questionable clinical skills were already at issue when St. Peter's rushed to terminate Dr. Trivedi. Yet, Dr. McDonald just received a second "counseling", while Dr. Trivedi was terminated. [JA-344, JA-347].

Yet another example of pretext that the district court ignored was that, despite the fact St. Peter's argued that one of the reasons it terminated Dr. Trivedi was his questionable clinical skills, Dr. Trivedi was not notified of his termination for over a month, and he continued to practice without any clinical oversight through August 2019. [JA-321]. Clearly, the inference is that St. Peter's did not actually have any concerns about his clinical skills and that retaliation was the real reason for his termination.

In addition, the claims that Dr. Trivedi was not collegial and that resulted in his inability to have call coverage are also demonstrably false. The district court should have found material issues of fact regarding pretext in that even Baier acknowledged that general surgeons could not cover for bariatric surgeons as it was outside their area of expertise. [JA-378]. St. Peter's refused to hire another bariatric surgeon in Dr. Trivedi's practice, but quickly hired one for Dr. McDonald's practice. [JA-266]. As such, St. Peter's ignored all evidence to the contrary to act upon Dr. McDonald's discriminatory complaints.

Based on the foregoing, the district court erred in not determining that Dr. Trivedi had established a *prima facie* case of retaliation. Genuine issues of material fact existed where the district court should have ordered a trial so that a reasonable fact finder could determine, based upon the proximity of time between the complaints and the termination and upon pretext, that retaliation occurred.

D.    Dr. Trivedi Established a *Prima Facie* Case of Discrimination

Discrimination claims under Title VII, the NYSHRL, and § 1981 fall under the familiar burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3] Under the burden-shifting analysis, Dr. Trivedi must show (i) membership in the protected class; (ii) qualifications for the position; (iii)

---

[3] Because § 1981 discrimination claims are analyzed under the same burden-shifting framework as Title VII claims, a separate analysis for each Title VII and § 1981 claims is not generally needed. *See, e.g., Azkour v. Haouzi*, 2012 WL 1658349 (S.D.N.Y. May 11, 2012).

an adverse employment action; and (iv) circumstances surrounding that action giving rise to an inference of discrimination. *Id.*

### 1. Dr. Trivedi Was A Member of The Protected Class and Qualified For His Position

Dr. Trivedi has alleged that his termination was the result of discrimination based upon race, color, and national origin. Dr. Trivedi met the first prong in that he was a member of a protected class being of Indian descent. Further, Dr. Trivedi was qualified for his position in that he was a physician who developed a successful bariatric program on his own that received multiple awards and accolades and had been employed for ten (10) years. In addition, he was terminated under the "no cause" provision of the employment contract, indicating that St. Peter's, despite its multiple investigations, was aware that Dr. Trivedi could not be terminated for cause. [JA-321].

### 2. Dr. Trivedi Was Subjected to Adverse Employment Actions

An adverse employment action is a materially adverse change in the terms and conditions of employment ... [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Abboud v. Cty. of Onondaga, N.Y.*, 341 F. Supp. 3d 164, 179 (N.D.N.Y. 2018) (citation omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other

indices ... unique to a particular situation." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (internal quotation marks and citation omitted). "Reprimands or negative evaluation letters may, in some circumstances, constitute adverse employment action ... and whether they do is typically a question of fact for the jury[.]" *Lawrence v. Mehlman*, 389 F. App'x 54, 56 (2d Cir. 2010) (summary order) (internal quotation marks and citations omitted).

Dr. Trivedi was subjected to multiple adverse employment actions. From the moment St. Peter's brought in Dr. McDonald, a Caucasian bariatric surgeon, he was provided with almost unlimited resources. [JA-266]. While Dr. Trivedi was required to work with minimal staff, Dr. McDonald's practice was given more than twice the support staff and was being marketed as the premier bariatric program in the Capital area. Dr. McDonald's practice was hyped despite the fact it was Dr. Trivedi's long-standing practice that had won multiple awards for excellence. [JA-380-384].

During this same time frame, Dr. Trivedi discovered that the search for his partner had been cancelled, even though physicians' curriculum vitaes had already been received. Dr. Trivedi was given no explanation for this unilateral decision by St. Peter's and only found out about it after he persisted in asking the status. [JA-313]. By contrast, Dr. Hykin was hired in Fall 2018 into Dr. McDonald's practice. Dr. Trivedi's practice, which had been in existence since 2009, had six (6)

employees and only one (1) physician. During the short time they overlapped, Dr. McDonald's practice was grown to fourteen (14) employees and three (3) Caucasian physicians. [JA-380-384].

This was an adverse action as St. Peter's claimed that the failure of Dr. Trivedi to have coverage was the second reason for his termination, ostensibly because his peers would not provide on-call coverage. [JA-35-36]. The failure to provide a partner, while allowing one for the new practice, establishes that St. Peter's unilateral discontinuance of the process of finding a partner for the Albany practice eventually became part of the reason used for Dr. Trivedi's termination.

Further, Dr. Trivedi was subjected to two (2) investigations based solely upon the complaints of Drs. Santoro and McDonald. These reviews are analogous to reprimands as they drew negative conclusions, and these reviews were then explicitly relied upon by St. Peter's as a basis for the termination of Dr. Trivedi's contract. As these reviews resulted in Dr. Trivedi's termination, they were also adverse actions.

The district court reasoned that this treatment of Dr. Trivedi could not constitute adverse actions. This ignores the Second Circuit's holding in *Boun v. Spindler*, 65 F.4th 64 (2d Cir. 2023), where this Court took an expansive look at what qualifies as an adverse employment action:

> Any decision by an employer, including the denial of a workplace opportunity that materially affects the terms and conditions

41

of employment, can constitute an adverse employment action. *See generally Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (emphasizing that "no particular type of personnel action is automatically excluded from serving as the basis of a cause of action under Title VII, as long as the person is aggrieved by the action" (alteration adopted) (internal quotation marks and citation omitted)); *see also Lewis v. City of Chicago*, 496 F.3d 645, 654 (7th Cir. 2007) ("A strict adherence to labels leads to a meaningless cry of phrases such as 'bonus' or 'salary' without reaching the critical issue of whether the alleged discrimination caused a material change in the employment relationship.").

*Id.* at 76.

Here, Dr. Trivedi lost compensation and prestige as his bariatric practice was denied personnel and support, while his newly hired Caucasian counterpart was given basically unlimited resources. "[D]enials of workplace opportunities that affect the terms and conditions of employment can similarly qualify as an adverse employment action. *See Jin v. Metro. Life Ins.*, 310 F.3d 84, 93 (2d Cir. 2002) (emphasizing that the list of examples contained in the Supreme Court's definition of "tangible employment actions" in *Ellerth* was "non-exclusive"); *Boun*, 65 F.4th at 76. Not only did this disparate treatment between Dr. Trivedi and Dr. McDonald result in a decrease in compensation that could be earned by Dr. Trivedi, a loss of prestige in his practice, and limitations on his ability to earn, but it also required Dr. Trivedi to work basically 24/7 as he, unlike Dr. McDonald, was refused a partner who could be on call.

In sum, there can be no dispute that Dr. Trivedi was subjected to adverse employment actions.

3. *The Termination Occurred Under Circumstances That Infer Discrimination*

Dr. Trivedi was terminated under circumstances that give rise to an inference of discrimination that can be drawn from the disparate treatment between Drs. Trivedi and McDonald. *See Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015) (discriminatory motivation may be shown by "the more favorable treatment of employees not in the protected group.").

The district court erred in claiming that Dr. McDonald is not an appropriate comparator to Dr. Trivedi. Pursuant to *Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir. 2000), "[a] plaintiff may raise . . . an inference [of discrimination] by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Id.* at 39. Such comparators must be similarly situated "in all material respects"—they must be "subject to the same performance evaluation and discipline standards" and must have engaged in "comparable conduct." *Id*. at 39-40. Here, Drs. Trivedi and McDonald were both employees of St. Peter's as bariatric surgeons and ran bariatric surgery practices for St. Peter's in close proximity. They were subjected to the same code of conduct and oversight by the Surgical JOC and St. Peter's

management. Drs. Trivedi and McDonald performed roughly the same number of surgeries. As such, they were "similarly situated" to be comparators.

Dr. Trivedi was a long-term employee who built a successful bariatric practice from scratch. His complications rate was below national average and, until October 2018, he had never had a patient death, despite thousands of surgeries. Despite this, when Drs. Santoro and McDonald, both Caucasians and similarly situated individuals, raised issues about Dr. Trivedi's competence, Dr. Trivedi was immediately investigated, not once, but twice, solely at their behest. Despite being equals, Dr. McDonald was lavished with virtually unlimited resources, while Dr. Trivedi was forced to work without a partner and without additional personnel.

When Dr. Trivedi was not terminated after the first complaint, the same complaint was made with almost the exact same list of patients, approximately one (1) year later. Again, even though Dr. Trivedi was a long-term employee with an established record, had already addressed these issues, and had already had his practice fully vetted by an outside bariatric surgeon when he won the Center of Excellence Award, it was determined to have an outside reviewer look into the allegations. During this review, Dr. Trivedi was not allowed to speak to the reviewer, while Dr. McDonald, who lodged the complaint, was consulted at length by the reviewer. This was clearly a conflict of interest as it was Dr. McDonald who had made the complaints in the first place. Once he was given the report, Dr.

Trivedi was able to show demonstrably false statements in the report, such as where the reviewer did not even identify the correct technique that Dr. Trivedi had performed and cited standards that were not in effect in Albany (or nationally for that matter). Certainly allowing Dr. McDonald to have the reviewer's ear and not allowing Dr. Trivedi the same opportunity is yet another way that Dr. Trivedi was subjected to disparate treatment.

The cat's paw theory also applies to discrimination claims. The Second Circuit has held that "if an employee 'manipulates an employer into acting as a mere conduit for his retaliatory [or discriminatory] intent,' the employee's intent can be imputed to the employer under a 'negligence' *(i.e.*, a 'knew or should have known') standard." *See Naumovski v. Norris*, 934 F.3d 200, 220 (2d Cir. 2019). Here, Drs. McDonald and Santoro were allowed to smear Dr. Trivedi. While St. Peter's may argue that this cannot be imputed upon them because there was an outside reviewer, the whole process was tainted by the fact that the complaints had already been investigated and found unsubstantiated, that Dr. McDonald had lodged it personally, and that the outside reviewer then spoke to Dr. McDonald about the claims of wrongdoing without giving Dr. Trivedi the same opportunity. When Dr. Trivedi attempted to refute the findings in the report with explanations, nothing was done to investigate Dr. Trivedi's contentions. Instead, the report stood. The same reviewer was then used again for a second report about the issue with the

patient who died in October 2018, despite Dr. Trivedi's express objections because of the reviewer's preconceived notions and bias. [JA-263].

Dr. Trivedi also personally observed that St. Peter's had a hostile environment for individuals of Indian and Middle Eastern descent. He observed the termination of three doctors who were of those nationalities. [JA-336, JA-362]. Dr. Ross indicated he believed there was discrimination at St. Peter's. [JA- 316]. In addition, the endocrine surgeon who provided Dr. Trivedi some support was terminated after a short time. [JA-261]. She was of Filipino descent. [JA-261]. All of these individuals were non-Caucasian.

The district court erred in failing to find that there were genuine issues of material fact that would allow a jury to infer discrimination in the manner in which Dr. Trivedi's termination was carried out. St. Peter's claims that it "became aware" of the two reviews in 2018 and 2019. Yet, no one contacted Dr. Trivedi to discuss the reports or the conclusions. Dr. Trivedi was offered a new Employment Agreement *after* the reviews into the 2017 and 2018 complaints of Drs. McDonald and Santoro and *after* the patient death. The JOC meeting was held without Dr. Trivedi being given any notice. No notes regarding this alleged meeting of the JOC were produced and St. Peter's moving papers did not even identify when this meeting allegedly took place. Instead, there was a communication to Baier, the President, requesting Dr. Trivedi's termination. Baier stated he did not consider

submitting Dr. Trivedi's termination to the Board because of the timing and the desire to have the termination be reviewed at the Executive Meeting on March 25, 2019. This raises an inference of discrimination as there was a rush to approve the termination of Dr. Trivedi, after which he was not advised of the termination until May 1, 2019. The termination was "without cause" as it was clear there was no basis for a termination "for cause." [JA-370-371].

Further establishing an inference of discrimination that was not recognized by the district court was the fact that this was not the same process that was followed in 2017. In 2017, the Board considered terminating Dr. Trivedi after a recommendation by the JOC, not the Executive Committee, while here, after the secret vote by the JOC, it was rushed to the Executive Committee. The Executive Committee then relied solely on the information provided by Baier, which he received from the JOC, to rubber-stamp the termination. Unlike 2017, Dr. Trivedi was given no chance to plead his case.

Based on the foregoing, Dr. Trivedi raised genuine issues of material fact that show that he was subjected to disparate treatment and discrimination by St. Peter's and the district court erred in in granting summary judgment.

4. *St. Peter's Stated Reasons For Dr. Trivedi's Termination Were Pretextual*

This same evidence of disparate treatment also supports Dr. Trivedi's showing of pretext for St. Peter's adverse employment actions against him. St.

47

Peter's claims that there were significant issues with Dr. Trivedi's collegiality, asserting that Dr. Trivedi had difficulty obtaining coverage for on-call duties during his tenure. This reason is pretextual in that Dr. Trivedi has explained that General Surgeons could not provide this coverage as they were not experienced enough in bariatric surgery to do so. Even Baier acknowledged that Dr. Trivedi was having difficulty obtaining on-call coverage because General Surgeons could not provide backup coverage for a Bariatric Surgeon. [JA-378]. Dr. Trivedi further pointed out the problem was exacerbated by malpractice insurance, which would not provide coverage outside a surgeon's area of expertise. St. Peter's had knowledge of this and yet persisted in claiming the lack of on-call coverage was a result of collegiality, as opposed to medical standards. [JA-35-36].

Further showing pretext was St. Peter's unilateral decision to call off the search for a partner to work with Dr. Trivedi and the refusal to interview the two candidates that Dr. Trivedi had expressed interest in hiring. If the coverage issue was so critical, then the hiring process would have continued. The hiring of a second Bariatric Surgeon in Albany would have alleviated the on-call coverage concern and was entirely within the purview of St. Peter's to make happen. Dr. Trivedi had no control over this hiring and was helpless to remedy the unilateral decision by St. Peter's to suddenly cancel the search and refuse to interview candidates. The district court erred in not recognizing that these actions were

material issues of fact from which the jury could find pretext and that it was thus improper to grant summary judgment.

St. Peter's claims concerning Dr. Trivedi's lack of collegiality is further evidence of pretext that was ignored. Dr. Taggert testified regarding Dr. Trivedi's collegiality that "[t]hese are just general comments I received offhandedly from other physicians. But I receive those daily and I receive them on just about every surgeon on the staff. So Dr. Trivedi didn't really stand out in that regard." [JA-451]. Dr. Hanks testified that he understood with regard to other surgeons being willing to provide coverage, "just that [Dr. Trivedi] had difficulty." [JA-400]. Bauer testified that she found Dr. Trivedi to be "very nice." [JA-173]. Baier testified he found Dr. Trivedi to be "a pleasant person." Dr. Sanders testified that he could not recall any medical doctors complain to him about Dr. Trivedi's collegiality. Jennifer McArdle, Dr. Trivedi's Office Manager, emailed Bauer, advising her of Dr. Trivedi's professionalism and courtesy. [JA-444].

Further showing pretext was the way that the Board was circumvented so that the Executive Committee could approve Dr. Trivedi's termination. While Baier claims that the Executive Committee had this power, it was not the procedure followed in 2017. Moreover, the Bariatric Strategy that was prepared by Tammy Dunham, Director of Operations, specifically stated that the Board would approve the determination. [JA-380-384]. A reasonable fact-finder could use that

49

evidence to determine that going to the Executive Committee as opposed to the Board shows pretext.

The actions by St. Peter's in refusing to hire another doctor in Albany, the method to terminate Dr. Trivedi such that it was rushed to the Executive Committee and was not reviewed by the Board, as had been done in the past, show that the reasons for Dr. Trivedi's termination were pretextual. Further, Dr. Trivedi was offered a new employment contract after the 2017 and 2018 reviews.

As such, the district court erred in finding there were no issues of material fact in granting summary judgment to the Defendant-Appellee.

## POINT II

### ST. PETER'S SPOLIATION OF EVIDENCE RAISES AN INFERENCE OF DISCRIMINATION

Bauer testified during deposition that the entire investigative file, as well as the final report regarding the investigation into Dr. Trivedi's complaint, were gone. Even more disturbing was the fact that even the electronic files were also gone. [JA-359]. Bauer was not aware of when or how this occurred. A negative inference must be drawn in Dr. Trivedi's favor for the spoliation of this evidence. The Second Circuit, in finding that a district court erred in granting summary judgment to a defendant where there was spoliation of evidence, explained as follows: although "contrary to the district court, that a jury should be permitted (but not

required) to draw an adverse inference against [defendant] based on the destruction of MKULTRA documents. Further, we believe that, when combined with the possibility that a jury would choose to draw such an adverse inference, plaintiff's circumstantial evidence that he may have been one of the victims of the CIA's drug tests was enough . . . to entitle plaintiff to proceed to trial." *Kronisch v. U.S.*, 150 F.3d 112, 126 (2d Cir. 1998).

This case is similar to *Sanders v. Univ. of Idaho, Coll. of L.*, 634 F. Supp. 3d 936 (D. Idaho 2022). In that case, the defendant's Human Resources Department shredded the notes that were taken by an investigator of thirty-two (32) interviews with law school faculty and staff members during an investigation into alleged race and gender discrimination. The court found that:

> The duty to preserve relevant evidence commences prior to litigation once a defendant reasonably anticipates an action may be forthcoming. *See Silvestri v. General Motors*, 271 F.3d 583, 590 (4th Cir. 2001); *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998); *see also Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991) (defining inquiry as whether party that destroyed documents "was on notice that the [documents] had potential relevance to litigation"); *United States v. Kitsap Physicians Service*, 314 F.3d 995, 1001 (9th Cir. 2002) (discussing when defendant has a duty to preserve records prior to commencement of litigation).

*Sanders*, 634 F. Supp. 3d at 940-41. The *Sanders* court also noted that an important factor was that the defendant's attorneys were being consulted during this time frame, indicating further support for the conclusion that the defendants reasonably anticipated litigation. *Id.* Here, St. Peter's in-house counsel was included on the

emails related to the investigation and the gathering of evidence. He was further at the Executive Committee meeting where Dr. Trivedi was recommended for termination. As such, St. Peter's was certainly on notice that the investigation could result in litigation.

An inference of discrimination should be drawn as it is common practice to keep the results of Human Resources investigations. Here, not only was the physical file gone, but also the electronic file. At minimum, the fact that there was no record of an investigation into Dr. McDonald, a Caucasian, is indicative of the preferential treatment he received.

The district court discounted any relevance that this investigation would have for this case. The district court reasoned that the investigation was not relevant to any claims of discrimination or retaliation because Human Resources limited the investigation to general claims, not claims of discrimination. [JA-500-501]. However, the disappearance of both the physical and electronic file should be inferred in favor of the non-moving party. Further, the district court ignored the fact that Bauer had an in-person meeting with St. Peter's President, Director of Operations, Chief Medical Officer, and Chief Operating Officer in an in-person meeting and notes of that meeting, mere days before Dr. Trivedi's termination, are vital. The district court once again drew all inferences in favor of St. Peter's as opposed to Dr. Trivedi.

As such, the district court usurped the role of the jury and erred in granting summary judgment to the Defendant-Appellee.

## **CONCLUSION**

**THE ORDER APPEALED FROM SHOULD BE REVERSED, WITH COSTS, AND THE MATTER SHOULD BE REMANDED FOR TRIAL.**

Dated:  February 9, 2024
        Albany, New York

Respectfully submitted,

*/s/ Allen Arthur Shoikhetbrod*

_____
Allen Arthur Shoikhetbrod
Tully Rinckey, PLLC
*Attorney for Plaintiff-Appellant*
441 New Karner Road
Albany, New York 12205
Tel: (518) 218-7100
Fax: (518) 218-0496
ashoikhetbrod@fedattorney.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Allen Arthur Shoikhetbrod, in reliance upon the word count function of the word processing system used to prepare the brief, certify that the foregoing complies with the Federal Rules of Appellate Procedure 32 and Local Rule 32.1, in that the Principal Brief of Appellant Mehul Trivedi, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Rule of Federal Circuit Rule 32(b), contains 12,574 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) as it was prepared using Microsoft Word, 14-point font size, and Times New Roman style type.

Dated:      Albany, New York
              February 9, 2024


*/s/ Allen Arthur Shoikhetbrod*

_____
Allen Arthur Shoikhetbrod
Tully Rinckey, PLLC
*Attorney for Plaintiff-Appellant*

54

# SPECIAL APPENDIX

i

# Table of Contents

**Page**

Decision and Order of Honorable Thomas J. McAvoy,
  Dated September 29, 2023, Appealed From ............................SPA-1

Judgment of The United States District Court for the
  Northern District of New York, Dated September 29, 2023,
  Appealed From..........................................................................SPA-49

SPA-1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**MEHUL TRIVEDI,**

                                        **Plaintiff,**

        v.                                                        **1:20-cv-609**

**ST. PETER'S HEALTH PARTNERS**
**MEDICAL ASSOCIATES, P.C.,**

                                        **Defendant.**

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**DECISION & ORDER**

**I.      INTRODUCTION**

        Plaintiff Mehul Trivedi ("Dr. Trivedi" or "Plaintiff") commenced this employment

discrimination action against Defendant St. Peter's Health Partners Medical Associates,

P.C. (the "P.C." or "Defendant").  The action is brought pursuant to Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), the New York

State Human Rights Law, Article 15 §§ 296, *et seq.* ("NYSHRL"), and 42 U.S.C. § 1981

("§ 1981").  *See* Compl. ECF No. 1.  Plaintiff asserts claims of unlawful discrimination

and retaliation based upon his race, color and/or national origin.  *See id.*  Defendant

moves for summary judgment seeking to dismiss the Complaint in its entirety, ECF No.

45, Plaintiff opposes the motion, ECF No. 53, and Defendant files a Reply, ECF No. 56.

For the reasons that follow, the motion is granted.

**II.     STANDARD OF REVIEW**

SPA-2

The parties have evinced their understanding of the well-settled standard for deciding summary judgment motions in Title VII, NYSHRL, and § 1981 discrimination and retaliation actions.  Therefore, this standard will not be repeated.  Suffice it to say that where, as here, the intent of one party is in question but there is no direct evidence of discrimination, the Court must carefully examine the reasonable inferences that could be drawn from the totality of the circumstantial evidence and be cautious about granting summary judgment. *Schiano v. Quality Payroll Sys.,* 445 F.3d 597, 603 (2d Cir. 2006).  Nonetheless, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir. 2001); *see Schiano,* 445 F.3d at 603 ("[S]ummary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact.") (quoting *McLee v. Chrysler Corp.,* 109 F.3d 130, 135 (2d Cir.1997)).

III.    BACKGROUND[1]

**Plaintiff's Medical Practice & Employment by the P.C.**

Plaintiff, a bariatric surgeon, was a long-term employee of St. Peter's Hospital ("the Hospital" or "St. Peter's") having been employed for ten (10) years under various iterations of St. Peter's, the last being Defendant St. Peter's Health Partners Medical Associates, P.C. *See* Trivedi  Depo., p. 17.  The P.C. is a multi-specialty physician group with various medical practices operating under its corporate umbrella.  The P.C. employs many physicians, including but not limited to surgeons with differing specialties

---

[1]Where not indicated otherwise, the following facts are taken from Defendant's Statement of Material Facts ("Def. SMF") to which Plaintiff has admitted or failed to supply sufficient opposition. The Court views all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L.Ed.2d 686 (2007).

SPA-3

such as general surgeons, thoracic surgeons, colorectal surgeons and bariatric surgeons. The P.C.'s surgeons see patients in private office locations and also perform surgeries at different hospitals within the Albany area, including at St. Peter's Hospital in Albany, New York, and Samaritan Hospital in Troy, New York.

At all times relevant to the Complaint, Plaintiff was a bariatric surgeon employed by the P.C. In this role, Plaintiff performed surgeries at the Hospital, and also saw patients at a private medical office located in Albany. Plaintiff contends that while he was employed by St. Peter's, he built a busy and successful bariatric practice and won multiple awards in his practice, including Top Doctor, accreditation as a Center of Excellence, and Women's Choice awards. Plaintiff asserts that he built up the practice to include a physician's assistant, an office manager, two medical assistants, and a bariatric program coordinator/nutritionist. Trivedi Depo., p. 22. He further asserts that he requested additional mid-level providers, but he was denied. Trivedi Depo., p. 107.

Here, all physicians who have patients admitted to the Hospital are required to ensure there is coverage for those patients twenty-four hours per day/365 days per year. Plaintiff contends that during his tenue, he requested that the Defendant find him a partner so he had on-call coverage for his hospitalized patients if he was unavailable. Plaintiff maintains that general surgeons could not be on call for his patients because they did not have enough experience in bariatric surgery and their malpractice insurance would not cover this duty. Trivedi Depo., p. 78. Defendant presents evidence indicating that the problems Plaintiff had with finding on-call coverage was due, in large part, because Plaintiff had difficulty getting along with his peers.

SPA-4

For instance, Defendant points out that when Steven Hanks, M.D. ("Dr. Hanks") was first hired into the role of Chief Medical Officer in 2016, the outgoing Chief Medical Officer, Robert Cella, M.D., informed Hanks that Plaintiff had difficulty finding backup on-call coverage because he did not get along with his peers. Hanks Decl. ¶¶ 7-8.   To Dr. Hanks, Plaintiff's difficulty in obtaining backup coverage created potential patient safety concerns. *Id.* ¶  8.

Plaintiff contends that his ability to get along with his peers was not Dr. Cella's main concern.  Plaintiff indicates that Dr. Cella called a meeting between himself, Plaintiff, and Dr. Hanks in which he expressed no concern about Plaintiff's clinical proficiency and was very supportive of Plaintiff. Trivedi Dec., ¶ 81. Plaintiff contends that the goal during and after Dr. Cella's tenure was to obtain a partner for Plaintiff through a national search, but although a national search was commenced, Dr. Hanks eventually canceled the search. Trivedi Dec., ¶ 82.

The facts indicate the P.C. took steps to hire another surgeon to assist with Plaintiff's caseload. Trivedi Depo., p. 79.  In 2016, Jessica Folek, M.D. ("Dr. Folek"), an endocrinologist who had some bariatric surgery experience, was hired to provide cross-coverage for Plaintiff. *Id.*, pp. 78-79, 81.  But, Plaintiff contends, Dr. Folek, was not a partner because she is not a bariatric surgeon, and Plaintiff further notes that Dr. Folek, who is of Filipino descent, was terminated in less than a year. Trivedi Depo., p. 79-80.

Plaintiff contends that he again requested that a partner be hired, but the search was called off without explanation. Trivedi Depo., p. 80-81. Anna Bauer, Director of Human Resources testified that such a search would be done through a search committee (of which she felt Dr. Trivedi should be a part of as well as their senior

SPA-5

leadership team). There was a separate physician recruitment team for this task. Bauer Depo., p. 65-66.

Plaintiff acknowledges that following his request, a national search was conducted, which included collecting resumes that were eventually narrowed down to two or three candidates. Trivedi Depo., p. 80.  Plaintiff contends that he was hoping to meet these candidates but, before he had that opportunity, the search was called off and he does not know why. *Id.*, p. 81.  Defendant points out that Plaintiff acknowledged during his deposition that aside from simply asking for a partner, he never took any action to help with this request.  Def. SMF ¶ 107 (citing Trivedi Depo., pp. 83–85). Plaintiff admits  at he "did not have a name to suggest" but contends that "this was why the P.C. had a recruiting department and the plaintiff was involved in reviewing CVs and advising of his interest in two particular candidates." Pl. Resp. SMF ¶ 107 (citing Trivedi Depo., pp. 80–81).  Defendant also contends that Plaintiff admitted at his deposition that he never identified any potential candidates, contacted any other bariatric surgeons, nor did anything other than ask the P.C. to find a partner for him. Def. SMF ¶ 108 (citing Trivedi Depo., pp. 83–85).  Plaintiff again admits that he did not have a name to suggest, but rather contends that he was relying on the P.C.'s recruiting department and was involved in that process by reviewing CVs and advising of his interest in two particular candidates. Pl. Resp. SMF ¶ 108 (citing Trivedi Depo., pp. 80-81).  Plaintiff also notes that while the search for a partner for him was unilaterally canceled, the P.C. hired not only a second bariatric surgeon into Dr. Matthew McDonald's practice, but also hired multiple mid-level providers for Dr. McDonald's practice as well. *Id.* (citing Trivedi Depo., pp. 80-81).

Plaintiff points out that Eric Baier, President of the P.C., acknowledged that Dr. Trivedi was having difficulty with finding backup on-call coverage because general surgeons could not provide backup coverage for a bariatric surgeon. Baier Depo, p. 75. However, Plaintiff also points out, Baier testified that, in his opinion, there was not enough business in Albany to warrant hiring a second physician. Baier Depo., p. 14-15. Plaintiff takes issue with this explanation.

Plaintiff contends that in 2016, Defendant hired another bariatric surgeon, Dr. McDonald, a Caucasian, and placed him in direct competition with Plaintiff in a practice in Troy, mere minutes away from Dr. Trivedi's practice. Trivedi Depo., pp. 28-30. Plaintiff contends that in 2017, Dr. McDonald was provided with almost unlimited resources, including hiring an additional Caucasian doctor, and Dr. McDonald grew his practice to some seventeen (17) employees, as opposed to Dr. Trivedi's seven (7) employees.  Nevertheless, Plaintiff asserts that he consistently had more income and surgeries than Dr. McDonald, despite the fact he had ten (10) less people in his practice.  He further contends that his Albany program had a higher profit/loss then the Troy program for the years 2016, 2017 and 2018, and performed more surgeries than Dr. McDonald.  Defendant points out that while Dr. McDonald's practice was based out of Troy, and he operated at Samaritan Hospital, Plaintiff's practice was based out of Albany and he operated out of St. Peter's Hospital.  Hanks Dec., ¶ 11.

In Fall 2018, a second bariatric surgeon, another Caucasian, Dr. Samuel Hykin, was hired into Dr. McDonald's practice. *See* Baier Depo., p. 12.  Plaintiff points out that Baier claimed Dr. Hykin was hired because it was felt there was enough business to warrant hiring a second bariatric surgeon.  *See* Baier Depo., p. 13. However, Plaintiff

contends, he was performing more procedures at this time, *see* Pl. Ex. 4, even though Dr. McDonald's practice now had three (3) physicians, two (2) bariatric surgeons, and a nutritionist (Dr. Carol Santoro); compared to Dr. Trivedi being solo. Further, Plaintiff contends, Dr. McDonald's program was provided with multiple support staff and mid-level providers whereas he was not. *See* Trivedi Depo., p. 108, Pl. Ex. 4. Moreover, Plaintiff points out that the P.C. marketed Dr. McDonald's program as a comprehensive metabolic care service site even though that program had no awards in contrast to Dr. Trivedi's office.  *See* Baier Depo., p. 51.

Plaintiff asserts that he expressed to Dr. Hanks, on multiple occasions, that he would be willing to collaborate with Dr. McDonald to establish them as peers, but that never materialized. Trivedi Depo., p. 75-71.  Plaintiff points out that the P.C's President, Rik Baier ("Mr. Baier") noted that he was sure that Plaintiff would have been happy to collaborate with Dr. McDonald and to grow the program with him, but that Dr. McDonald informed Baier he did not want to collaborate with Dr. Trivedi or grow the program with him. *See* Baier Depo, p. 63-64.  Plaintiff contends that, while he was still employed, Dr. McDonald never received any repercussions for what Plaintiff deemed to be these breaches of professional and collegial behavior.  Trivedi Depo., p. 108-09.  However, Defendant points out that Dr. McDonald was terminated by the P.C. on May 6, 2021 as a result of concerns regarding his clinical quality and collegiality. Hanks Dec., ¶ 25.

### Oversight of Plaintiff's Employment with Defendant

All general surgeons, thoracic surgeons, bariatric surgeons, and colorectal surgeons employed by the P.C. are managed and overseen by a Joint Operating Committee (the "Surgery JOC"). The Surgery JOC is a management committee

SPA-8

of physicians that oversees the day-to-day administration of the various surgical practices within the P.C. umbrella. Importantly, the Surgery JOC's authority is limited to the surgeons employed by the P.C.; it does not oversee or manage other physicians or practice groups affiliated with the P.C.

Defendant presents evidence that while the Surgery JOC is responsible for day-to-day operations, the surgeons employed by the P.C. are ultimately subject to the oversight of the P.C.'s Board, through its Executive Committee. Def. SMF ¶ 7.  Plaintiff admits "that the P.C. is subject to the P.C.'s Board, and further notes, that in [his] experience the Board reviewed termination decisions, not a rubber stamp by the Executive Committee." Pl. Resp. SMF ¶ 7 (citing Trivedi Dec., ¶¶ 20-22, 108). Defendant presents evidence that the Executive Committee makes ultimate decisions with respect to, among other things, terminating physicians employed by the P.C. Def. SMF ¶ 8.  Plaintiff denies this contention, again stating that in his experience "the Board reviewed termination decisions, not a rubber stamp by the Executive Committee."  Pl. Resp. SMF ¶ 8 (citing Trivedi Dec., at 20-22, 108).

Defendant asserts that from time to time, as appropriate, the Surgery JOC makes recommendations to the President of the P.C. regarding termination of surgeons employed by the P.C.  Def. SMF ¶ 9.  It further maintains that after such a recommendation is made, the President presents the recommendation to the Executive Committee, which then considers and discusses the Surgery JOC's recommendation and ultimately votes to determine whether to approve the termination. Id. ¶ 10. Defendant also asserts that the Surgery JOC is responsible for the general oversight of the P.C.'s surgeons, and the P.C.'s Board, through its Executive Committee, makes the

SPA-9

ultimate decision on whether to terminate a surgeon's employment. *Id.* ¶ 11.  Plaintiff admits these facts with the explanation that in his case in 2017, the Surgery JOC recommended Plaintiff s termination to the Board which rejected the recommendation, and in 2019 recommended Plaintiff's termination to Mr. Baier which ultimately resulted in Plaintiff's termination. Pl. Resp. SMF ¶¶ 10-11 (citing Trivedi Dec.  ¶¶ 20-22, 58-65). Thus, Plaintiff contends that in 2019, "the Surgery JOC opted to bypass the Board after Plaintiff was exonerated by the Board in 2017." *Id.* (citing Trivedi Dec., ¶¶ 20-22, 58-65, 108).

### Physician Employment Agreement

At the time Plaintiff' was terminated, he was employed by the P.C. pursuant to a Physician Employment Agreement executed on October 22, 2018, which governed the terms of Plaintiff's employment through his separation. The Agreement set an initial term of two years, unless terminated by either party in accordance with the "Termination" provisions set forth in Section IX.  The Agreement specifically included a "no cause" Termination for Convenience provision, which provided in relevant part: "The Agreement may be terminated for any or no reason by either party on at least 120 days' prior written notice."  The Agreement also provided that it could be terminated in various other ways by the P.C., Plaintiff, or by their mutual agreement.  Finally, the Agreement stated that it "constitutes the entire Agreement between the Parties with respect to the subject matter herein and supersedes all prior agreements, arrangements and/or understandings between the Parties with respect to the subject matter herein."

### Plaintiff's Clinical Skills and Peer Relationships

9

SPA-10

Defendant presents evidence that throughout Plaintiff's employment, there were multiple documented issues with his clinical skills, patient outcomes and complications, and peer relationships. *See, e.g.*, Declaration of Steven Hanks, M.D., sworn to on December 22, 2022 ("Hanks Dec."), ¶¶ 6–16;  Declaration of Alan Sanders, M.D., sworn to on December 20, 2022 ("Sanders Dec."), ¶¶ 3– 6. As an example of Plaintiff difficulties with peer relationships, Defendant points to Dr. Hanks concern for patient safety due to Plaintiff's inability to obtain on-call coverage when he was unavailable. *See* Hanks Decl. ¶ 7-8.  Plaintiff contends that this was not a legitimate concern because he  provided on-call coverage and denies any inference that he ever failed to provide such coverage. Trivedi Dec., ¶ 15, 111. In fact, he contends, he also provided on-call coverage for general surgery and emergency. *Id.* Plaintiff asserts: "It should be noted that in spite of having no coverage most of my ten years there, I took call 24/7, in addition to emergency room and general surgery call. Most surgeons would not tolerate this. I did this because I loved the solid program that I had built from scratch and felt loyalty to my well over three thousand patients and to St. Peter's. I hoped that at some point they would respond positively to my long-standing request for a partner as my ever-increasing workload and revenue certainly justified this." Trivedi Dec., ¶ 111.

In addition to concerns about Plaintiff's peer relationships, Defendant notes that in 2017, Dr. Santoro, a physician employed by the P.C. who was responsible for treating Hospital patients on total parenteral nutrition ("TPN"), provided Dr. Hanks with a list of ten of Plaintiff's patients who were on TPN. Hanks Decl. ¶ 9.  The number of Plaintiff's patients who required long-term TPN appeared to be excessive. *Id.*

SPA-11

Plaintiff asserts that the number of his patients on TPN was not excessive given that they were bariatric patients who routinely need to be on TPN after surgery, as compared to general surgery patients. Trivedi Dec., ¶ 83.  Plaintiff also asserts that Dr. Santoro, a Caucasian, made the complaint by "cherry-picking" a list of Plaintiff's patients spanning seven years who had required TPN, but by that time Plaintiff had already conducted over 1,500 bariatric operations. *Id.* Therefore, Plaintiff contends, "the actual percentage of my patients requiring TPN was very low, a fact conveniently ignored." *Id.* Plaintiff also contends that "that Dr. Santoro was working with Dr. McDonald's practice and was actively colluding with him." *Id.* ¶ 85.

Plaintiff also contends that prior to Dr. Santoro and Dr. McDonald (who subsequently raised the same concerns) presenting lists of Plaintiff's patients on TPN, his bariatrics program:

> underwent a full review in preparation for accreditation as a Center of Excellence. It was a thorough and comprehensive review. They looked at every aspect of the Program, including Dr. Trivedi's preoperative protocol, his post-operative protocol, and his operative techniques. They also looked at his outcomes across the 1,500 plus bariatric patients. They looked at specific complications and an independent, outside Bariatric Surgeon reviewed the complications in detail between the office and the hospital records. They looked at x-rays, radiology reports, the totality of the situation, and they deemed that the overall mortality and morbidity rate was well below the national noms and standards and that the cases had been managed within the standard ofcare. [Trivedi Depo., p. 38-39]. This was in addition to a Top Doctor Award that Dr. Trivedi had already received in 2015 [Ex. 6].

Pl. MOL, at 4.

The facts indicate that an internal review of the cases on Dr. Santoro's list was conducted by the Hospital's Department of Surgery. Hanks Decl. ¶ 10. This review was solely internal and not performed by a bariatric surgeon. *Id.*  Plaintiff contends that Dr. Garber, then-Chief of Staff, requested that Dr. Hanks review the cases directly with Dr.

11

Trivedi. Trivedi Depo., p. 37.  Plaintiff maintains that he responded to all of the

complaints with Dr. Hank and John Taggert, M.D. ("Dr. Taggert"), the Hospital's Chief of

Surgery, with detailed case explanations as to each one of the patients with

explanations of any complications. Trivedi Depo., p. 40-41.  Plaintiff asserts that it was

determined that his complication rate was low, better than national standards, and that

all the identified cases were managed within the standard of care. Trivedi Depo., p. 41.

Plaintiff asserts that both Dr. Taggert and Dr. Hanks expressed that they were satisfied

and determined that there was no need for further action. Trivedi Depo., p. 41-42.

There is no dispute that the review did not lead to any further action relating to Plaintiff's

surgical privileges at the Hospital. Hanks Decl. ¶ 10.

At some point after this initial review was conducted, Dr. McDonald

independently raised concerns to Dr. Hanks about Plaintiff's patient outcomes. Hanks

Decl. ¶ 11. Dr. McDonald operated at Samaritan Hospital in Troy, and from time to time

would treat patients who were previously treated by Plaintiff.  *Id.*  Dr. McDonald

identified several additional surgical cases that he felt resulted in unacceptable

complications. *Id.*, ¶ 12. It was Dr. McDonald's opinion that Plaintiff's cases should be

reviewed in more detail, and he communicated his concerns to Dr. Hanks. *Id.*, ¶ 12.

Plaintiff contends that Dr. McDonald simply re-presented the original list

presented by Dr. Santoro with four additional cases. Trivedi Dec., ¶  85.  He asserts that

Dr. Hanks "conveniently fails to mention that Dr. Santoro was working with Dr.

McDonald's practice and was actively colluding with him in pursuing this matter because

they were not satisfied with the first  review as it was not the outcome they wanted." *Id.*

Plaintiff also asserts that at times he also saw Dr. McDonald's patients and that "most of

these patients either had a bad interaction with him or actually had an adverse outcome due to him." *Id.*

As a result of the complaints relative to Plaintiff's patients, Drs. Hanks and Taggert decided to retain an outside bariatric surgeon to conduct an independent external review of Plaintiff's cases. Hanks Decl., ¶ 13. Plaintiff notes that the selected bariatric surgeon was in the Trinity Health system, of which St. Peter's is a part. Trivedi Decl., ¶ 27.  Plaintiff also contends that, as indicated in the eventual report from the reviewer, the reviewer "spoke to the bariatric surgeon who cared for the patients (namely, Dr. McDonald), but never gave [Plaintiff] the opportunity to speak to the allegations." *Id.* ¶ 28. Thus, Plaintiff contends, the reviewer was not independent. *Id.* Further, Plaintiff contends that the review was flawed and ignored facts well known and verifiable in the surgical literature.  *See id.* ¶¶ 28-30.

In or around June 2018, the external reviewer produced a report regarding the fourteen cases he reviewed. Hanks Dec., ¶ 15. The reviewer's report included multiple critiques of Plaintiff's technique and identified significant issues with Plaintiff's patient outcomes and complications. *Id.*  The reviewer recommended Plaintiff undergo several remedial actions, including observing other bariatric surgeries. *Id.* Plaintiff was provided with a copy of this report, and was offered a chance to respond, which he did. *Id.*, ¶ 16. Plaintiff disagreed with the reviewer's findings. *Id.*  Plaintiff contends that the report contained critiques that were incomplete and false, and he pointed out the discrepancies to Dr. Taggert. Trivedi Decl., ¶ 28-31, Pl. Ex. 9.

Plaintiff also contends that he met with Drs. Hanks, Taggert, Sudeep Ross, Chief Medical Officer of the P.C ("Dr. Ross"), Braziz, and Taylor Chenel on July 11, 2018 to

SPA-14

discuss the review. Trivedi Depo., p. 56; Trivedi Dec. ¶ 32.  He contends they agreed

that the complication rate was an invalid conclusion, Trivedi Depo., p. 56, and that they

expressed that they believed the report was flawed and that no further action would be

taken. *Id.* at  p. 57.  Plaintiff also contends that Drs. McDonald and Hykin had much

higher complication rates than he did, and that he advised someone named Tyler[2] "that

the difference between me and them is obviously race" but "in spite of that they were

given a pass." *Id.*, p. 148.

In October 2018, one of Plaintiff's post-operative patients passed away at the

Hospital. Sanders Decl., ¶ 4. Because there were internal questions about Plaintiff's

care of this patient, the Hospital commissioned a second independent external review

specifically related to this patient.  *Id.*  Plaintiff requested a different reviewer because of

what he deemed to be the flaws in the first report, but that request was denied and the

same reviewer conducted the second review. *See* Trivedi Decl., ¶ 35-37, 96. Like the

first external review, the second external review found additional errors with the care

and treatment provided by Plaintiff.  Sanders Dec., ¶ 5.

Defendant contends that neither Plaintiff's race, color, nor national origin played

any role in the Hospital's decision to obtain independent external reviews of Plaintiff's

cases. Def. SMF at ¶ 58 (citing  Sanders Dec., ¶ 11; Taggert Dec., ¶ 10; Hanks Dec., ¶

20). Plaintiff denies this allegation as an improper legal conclusion, and further contends

that a reasonable inference can be drawn that Plaintiff's race, color, and/or national

---

[2] Given that the parties have each provided only excerpts from the respective deposition transcripts, it is difficult to determine who this person is or what role the person played in bringing any employment actions against Drs. McDonald and Hykin.

origin played a role in the determination to obtain independent external reviews of Plaintiff's cases.

Defendant presents evidence that the decision to retain the third-party reviewer in both situations was based upon significant patient safety concerns, which, Defendant contends, were ultimately validated by the reviewer's detailed conclusions. Def. SMF ¶ 59 (citing Sanders Dec., ¶ 11; Taggert Dec., ¶ 10; Hanks Dec., ¶ 20).  Further, Defendant notes that the independent external physician who performed the reviews is not Caucasian. *Id.* (Citing Hanks Dec., ¶ 20).  Plaintiff contends that the reviewer's conclusions were not detailed, but flawed and inaccurate and based upon the reviewer's coordination with Dr. McDonald while refusing to allow Plaintiff to respond before conclusions were made. Pl. Resp. SMF ¶ 59 (citing Trivedi Dec. ¶ 28-31, Pl. Ex. 9).

Following the second external review, the Hospital determined that it needed to take action to address the issues with Plaintiff's skills, outcomes and peer relationships. Sanders Decl., ¶ 6. To that end, Plaintiff was provided with a letter dated January 10, 2019 from the Hospital's Chief Medical Officer, Alan Sanders, M.D. ("Dr. Sanders"), and Chief of Surgery, Dr. Taggert. *Id.*, Ex. A.  This letter highlighted the Hospital's significant concerns with Plaintiff's clinical skills as well as concerns regarding Plaintiff's lack of peer relationships and inability to obtain backup call coverage for his patients. *Id.* To address these numerous concerns, the letter provided specific action items that Plaintiff was required to complete to retain surgical privileges at the Hospital. *Id.*

Plaintiff contends that he was presented the letter by Drs. Ross and Sanders. Trivedi Depo., p. 69, Ex. 1.  Plaintiff asserts that afterwards, he had a conversation with Dr. Ross wherein Dr. Ross told him he believed the letter was unjust and was "likely due

SPA-16

to discrimination" based on Plaintiff's skin color.  Trivedi Depo., pp. 87-88.  Dr. Trivedi responded to the letter on February 4, 2019 by email. Ex. 12.  Dr. Trivedi began to fulfill the action points that had been requested, including observing another surgeon. Trivedi Depo., p. 97.

After receiving this letter, Plaintiff claims that he asked Dr. Hanks whether his treatment was related to the color of his skin. Complaint, ¶ 65. Dr. Hanks, who played no role in drafting the letter or overseeing Plaintiff's employment, does not recall Plaintiff asking this question, and he did not report the question to anyone at the P.C. Hanks Decl., ¶ 19.  Plaintiff points out that Dr. Hanks stated at his deposition that he had a vague recollection that Plaintiff might have raised the issue that the actions taken against him was because of his race, but stated that he did not have a specific recollection of that. Hanks Depo., p. 54.  Plaintiff also points out that St. Peter's Health Partners has an EEOC/Non-Discrimination Policy that prohibits discrimination, and states: "Managers are responsible for complying with all aspects of this policy, for investigating and addressing issues in a timely manner and consulting with Human Resources, as necessary" and "[c]olleagues are required to address any matter of concern with their immediate supervisor or a member of the Human Resources Department." Pl. Ex. 13,  p. 2. Plaintiff contends that Dr. Hanks did not investigate, address the issue, or consult with Human Resources. Anna Bauer, the Director of Human Resources for the P.C., testified that she first discussed Dr. Trivedi with Dr. Hanks in March 2019, after she contacted him about Dr. Trivedi's complaint to her about Dr. McDonald. Bauer Depo., p. 28.

Defendant points out that the January 10, 2019 letter was not from the P.C., and the conditions stated therein were unrelated to Plaintiff's employment with the P.C. Sanders Dec., ¶ 8. Rather, Defendant contends, the letter addressed Plaintiff's ability to retain surgical privileges at the Hospital. *Id.*, Ex. A. Defendant maintains that this is an important distinction given that Plaintiff was not employed by the Hospital, and neither Dr. Sanders nor Dr. Taggert had authority to take any action related to Plaintiff's employment. *Id.*, ¶ 8. Plaintiff admits that the letter was not signed by an individual from the P.C., and that neither Dr. Sanders or Dr. Taggert could directly terminate his employment. But Plaintiff denies that the letter was unrelated to his employment because it was presented to him by the Chief Medical Officer of the P.C., Dr. Ross, and was then used as a basis for concluding that Plaintiff should be terminated from his employment. Trivedi Dec., ¶ 39. Plaintiff further contends that a loss of privileges would result in his termination under the Employment Agreement.

In response to the January 10, 2019 letter, Plaintiff sent an email to Dr. Sanders and Dr. Taggert dated February 4, 2019. Sanders Dec., ¶ 8, Ex. B. In this email, Plaintiff expressed a willingness to comply with the enumerated action items required to retain surgical privileges at the Hospital. *Id.* Plaintiff's email did not claim that Plaintiff felt he was being treated differently because of his race, color and/or national origin. *Id.* Defendant asserts that Plaintiff testified at his deposition that he intentionally omitted any reference to race or color from the email. Def SMF ¶ 54 (citing Trivedi Depo., p. 94). Plaintiff admits that he did not raise these issues as he was attempting to be "a team player" and had already raised the issues directly with Drs. Hanks and Ross in person, but no action was taken in response to his complaints. Pl. Resp. SMF ¶ 54 (citing

SPA-18

Trivedi Decl., ¶ 40-47). There is no dispute that this email did not claim that Plaintiff felt he was being retaliated against for any reason. Def. SMF ¶ 55.

Defendant also presents evidence that Plaintiff never expressed to either Dr. Sanders or Dr. Taggert that he felt he was being treated differently because of his race, color and/or national origin. Def. SMF ¶ 56 (citing Sanders Dec., ¶ 10; Taggert Dec., ¶ 9). Plaintiff denies this contention, stating that he raised issues with Dr. Taggert that showed that he was being treated differently from Dr. McDonald.  Pl. Resp. SMF ¶ 56 (citing Trivedi Dec., ¶ 32, 86, 88, 104).  However, none of these paragraphs from Plaintiff's declaration specifically indicate that he felt he was being treated differently from Dr. McDonald because of Plaintiff's race, color, and/or national origin.

Defendant also asserts that although the Complaint alleges that Plaintiff sent a letter to Dr. Sanders and Dr. Taggert dated January 18, 2019 alleging that Plaintiff was treated differently because of his race and/or national origin (*see* Complaint, ¶ 64), this letter was drafted by Plaintiff's attorney and never sent. Def. SMF ¶ 57 (citing Sanders Decl., ¶ 12; Taggert Decl., ¶ 11).  Plaintiff denies this allegation, contending that the letter was sent as an email on February 4, 2019 to Dr. Sanders. Pl. Resp SMF ¶ 57 (citing Pl. Ex. 12).  However, a review of Plaintiff's Exhibit 12 reveals no indication that Plaintiff alleged that he was treated differently because of his race and/or national origin.

On April 26, 2018, Plaintiff wrote an email to Dr. Hanks in which he voiced a concern about "anonymous" physicians questioning his bariatric practice.  Def. SMF ¶ 82. During Plaintiff's deposition, he confirmed that this email was about Dr. McDonald and Dr. Santoro.  *Id.* ¶ 83. According to the email, Plaintiff believed the quality of his

SPA-19

practice was excellent and that the anonymous individuals making allegations about his clinical skills were wrong. *Id.* ¶ 84. Plaintiff notes that the email states, in part: "At this time it really appears that this person has selected isolated issues with the objective of targeting me with their malicious agenda. To make matters worse this has become a pattern of behavior and contradicts the 'core values' of St. Peters health partners in every sense. This is wrong morally, ethically, legally or otherwise. This has become a classic case of workplace harassment and bullying." Pl. Ex. 17.  Plaintiff's email did not make any allegation that he felt targeted by Dr. McDonald or Dr. Santoro because of his race, color and/or national origin, or that he was being treated differently because of his race, color or national origin. Def. SMF ¶ 85.  Following Plaintiff's April 26,2018 email, and in response to Plaintiff's concerns, Mr. Baier spoke with Dr. McDonald and instructed him not to publicly discuss Plaintiff's clinical skills. Def. SMF ¶ 87.

In or around March 2019, Plaintiff met with the P.C.'s Human Resources Director, Anna Bauer ("Ms. Bauer"), to discuss his concerns regarding Dr. McDonald. Def. SMF ¶ 88.  During this meeting, Plaintiff voiced his concern about Dr. McDonald continuing to speak negatively about Plaintiff's bariatric practice.  Def. SMF ¶ 89.

After their meeting, Plaintiff followed up in an email to Ms. Bauer dated March 17, 2019.  Def. SMF ¶ 90.  Like Plaintiff's April 26, 2018 email to Dr. Hanks, the March 17, 2019 email states Plaintiff's belief that Dr. McDonald and Dr. Dr. Santoro were disparaging his clinical skills.  He also expresses his exasperation that Dr. McDonald's and Dr. Dr. Santoro's conduct and statements were negatively affecting his practice. *See* Pl. Ex 14.[3]  A review of this email reveals no indication that Plaintiff was alleging

---

[3] ("[F]or the last two years and for unclear reasons Dr. McDonald with the help of Dr. Santoro (who tried to remain anonymous) has been engaging in setting an ever-increasing negative narrative on

SPA-20

that he was treated differently because of his race, color, and/or national origin, or that

he felt Dr. McDonald or Dr. Santoro were engaging in any racially motivated conduct.

Defendant contends that Plaintiff never made any complaint based upon race,

color or national origin to Ms. Bauer, at any time. Def. SMF ¶ 93 (citing  Bauer Depo.,

pp. 36-37, 72).  Plaintiff denies this statement of fact by arguing that he "raised

concerns from which discrimination could be inferred, Ms. Bauer limited the

investigation to the narrowest scope possible, and all of the notes of the investigation,

including any notes of this meeting, were lost by the P.C." Pl. Resp. SMF ¶ 93 (citing

Bauer Depo., pp. 23 -24, 64).  Plaintiff contends that he raised concerns from which

discrimination could be inferred because Ms. Bauer was aware that he and Dr.

McDonald were of different races, colors, and national origins. *See* Trivedi Dec., ¶¶ 69-

70.

After meeting with Plaintiff and reviewing his March 17, 2019 email, Ms. Bauer

began an investigation into Plaintiff's concerns. Def. SMF ¶ 94 (citing Bauer Depo., p.

22).  Plaintiff admits this statement but with the explanation that Ms. Bauer claims she

did an investigation but could not produce any documentation of her investigation, and

Plaintiff contends that she never investigated claims of libel and slander by Drs.

McDonald and Santoro.  Pl. Resp. SMF ¶ 94. This last fact, Plaintiff contends, "would

---

my practice, our outcomes, and my professional ability and character. Dr. McDonald has engaged in libel,
slander, and harassment against me. He has conducted this behavior openly and publicly both to staff at
Samaritan Hospital and outside to other employees, medical staff and other physicians. . . . He has
falsely made accusations that we have had a very high rate of surgical complications, that I have 'no idea
what I am doing'; that we have been manipulating our surgical outcomes data base which is impossible to
do even if one desired to. . . . He continues to spread misinformation about our surgical outcomes and
has made statements in the open with sheer glee that 'I am going down' and will be 'fired' soon. He has
gone on to say that he wishes to recruit the Ellis bariatric surgeons to replace me here at St. Peter's. He
has also publicly gloated that I will be made to travel to an outside institution for remedial training. . . .
This has become a classic and clear-cut case of workplace harassment and bullying and is clear to
objective and fair-minded individuals who have witnessed and are aware of the situation.")

SPA-21

have shown that their claims against Dr. Trivedi were specious such that they would not have been relied upon as a reason for his termination." *Id.* (citing Trivedi Dec., ¶ 23-24, 64). Plaintiff contends that he learned of the allegedly narrow scope of Ms. Bauer's investigation through his review of discovery materials. *See* Trivedi Dec., ¶ ¶ 67-68 ("I only learned from the discovery in this pending complaint that Human Resources conducted an investigation only into whether Dr. McDonald was speaking negatively about me in public.  Based on my review of the discovery, the [Human Resources Department's] investigation did not explore whether the allegations against me [by Dr. McDonald] were false, libelous or slanderous and did not address any issues regarding my concerns and my allegations of discrimination or harassment.").

Ms. Bauer interviewed several witnesses in connection with her investigation, which continued after Plaintiff's Agreement was terminated. Def. SMF ¶ 95.  At the conclusion of her investigation, Ms. Bauer recommended that Dr. McDonald be counseled regarding his behavior. Def. SMF ¶ 96.

Defendant notes that Ms. Bauer played no role in the decision to terminate Plaintiff's agreement and was unaware of who participated in that decision. Def. SMF ¶ 97.  Plaintiff admits this fact but asserts that the Executive Committee was aware that a complaint was pending at the time it "rubber-stamped" the decision to terminate the Plaintiff.  Pl. Resp. SMF ¶ 97.

Defendant also contends that although Plaintiff claims that he was treated differently than Dr. McDonald, Dr. McDonald was ultimately terminated by the P.C. on May 6, 2021. Def. SMF ¶ 98 (citing Hanks Dec., ¶ 25).  Plaintiff admits that Dr. McDonald was ultimately terminated by the P.C., but contends that this was "not until

SPA-22

after Dr. McDonald's Caucasian partner made complaints about his quality of care, disagreeable personality and difficulty to work with." Pl. Resp. SMF ¶ 98. Defendant asserts that Dr. McDonald's termination was based upon issues with his clinical skills and collegiality. Def. SMF ¶ 99. Plaintiff admits this fact, but contends that "Dr. McDonald's shortcomings were known to the P.C. during the time he targeted Dr. Trivedi and Dr. Trivedi's concerns were ignored, despite the fact he was a long-term employee with a successful practice. These were the same purported concerns made against Dr. Trivedi, which he demonstrated were false, yet were used as a basis for terminating Dr. Trivedi." Pl. Resp. SMF ¶ 99 (citing Trivedi Dec., ¶ 71, 94, 110). The cited pages from Plaintiff's declaration indicate that he believed that Dr. McDonald was treated preferentially to him even though, he asserts, it was "well known" that Dr. McDonald had "issues with collegiality and clinical competence." *See* Trivedi Dec., ¶ 71, 94, 110. But in these paragraphs, Plaintiff does not state the basis upon which Defendant was purportedly aware of these facts.

**The Surgery JOC Recommends Termination of Plaintiff's Agreement, Without Cause, which is Voted on and Approved by the P.C. Executive Committee**

Defendant presents evidence that as part of its obligation to oversee surgeons employed by the P.C., the Surgery JOC had several discussions regarding Plaintiff's performance and fit within the practice. In particular, the Surgery JOC discussed issues relating to Plaintiff's clinical competence as well as his difficulty fostering positive peer relationships. Def. SMF ¶¶ 60, 61 (citing Heckman Dec., ¶ 10). Plaintiff contends that this occurred without notice to him, and the Surgery JOC engaged in "secret discussions" about him and without the benefit of his input. Pl. Resp. SMF ¶ 60 (citing

Trivedi Dec., ¶ 58); *see also* Trivedi Dec., ¶ 109 ("As a member of the JOC, I was entitled to attend these meetings. However, they met in complete secrecy in a process that lacked any transparency or due process.").  Defendant presents evidence that in or around 2018 and early 2019, the Surgery JOC became aware of the external review of Plaintiff's cases referenced above and became aware of Plaintiff's care of a post-operative patient at the Hospital who passed away in late 2018.  The Surgery JOC was also aware of Plaintiff's difficulty in maintaining positive peer relationships and obtaining backup call coverage for his patients. Def. SMF ¶¶  62-64 (citing Heckman Dec., ¶ 11). Plaintiff denies that he had difficulty maintaining positive peer relationships, and contends that the inability to obtain backup call coverage was solely due to the P.C.'s refusal to provide him with a partner.  Pl. Res. SMF ¶ 64 (citing Trivedi Dec., ¶ 14, 15, 81).

Defendant presents evidence that as a result of the above-mentioned concerns, in early 2019 the Surgery JOC recommended to P.C. President Rik Baier ("Mr. Baier") that the P.C. should move forward with removing Plaintiff from the Surgery JOC and/or terminating Plaintiff's Physician Employment Agreement. Def. SMF ¶ 65 (citing Heckman Dec., ¶ 12). Accordingly, on March 25, 2019, Mr. Baier presented the Surgery JOC's recommendation to the Executive Committee during a regularly scheduled meeting. Def. SMF ¶ 66. Defendant presents evidence that Mr. Baier notified the Executive Committee about the ongoing concerns regarding Plaintiff, including concerns with clinical quality, patient outcomes, and Plaintiff's peer relationships. Def. SMF ¶ 67 (citing Heckman Dec., ¶ 13; Declaration of William Kowal, M.D., sworn to December 21, 2022 ("Kowal Dec."), ¶ 6.).  Based upon the information provided, the Executive

Committee voted to approve the termination of Plaintiff's Agreement. Def. SMF ¶ 68 (citing Kowal Dec., ¶ 7, Ex. B; Heckman Dec., ¶ 13).

Defendant presents evidence that during the March 25, 2019, Executive Committee meeting, the attendees also discussed the fact that Plaintiff had made a complaint to the P.C.'s director of human resources about Dr. McDonald. Def. SMF ¶ 69 (citing Kowal Dec., Ex. B).  Defendant notes that in his internal complaint, Plaintiff claimed that Dr. McDonald had disparaged Plaintiff's clinical skills and bariatric program, but did not complain to Human Resources that he felt he was being treated differently because of his race, color and/or national origin, or that Dr. McDonald's treatment of him was motivated by his race, color and/or national origin. Def. SMF ¶ ¶ 70-71 (citing Kowal Dec., Ex. C).  Defendant presents evidence that Plaintiff's race, color and/or national origin were never discussed at any time by either the Surgery JOC or Executive Committee, and that Plaintiff's complaint to Human Resources about Dr. McDonald – which was entirely unrelated to his race, color, or national origin – did not play any role in the Executive Committee's decision. Def. SMF ¶¶ 73-74 (citing Heckman Dec., ¶ 14; Kowal Dec., ¶ 11).

Plaintiff contends that Mr. Baier went to the Executive Committee "as soon as possible" after the Surgery JOC's decision, and did so without notice to Plaintiff or allowing him to address any concerns addressed by the Surgery JOC.  Thus, he contends, Baier bypassed the Board and allowed the Executive Committee to merely rubber stamp the Surgery JOC's decision.  Plaintiff maintains that while the Executive Committee "may have discussed a truncated version" of Plaintiff's complaint about Dr.

24

McDonald, he believes "it did not encapsulate Plaintiff's full concerns." Pl. Resp. SMF ¶

65-69.  Plaintiff contends :

> I understand that the Executive Committee was aware of my pending
> complaint to Human Resources, but rushed ahead with decision to
> terminate me. I only learned from the discovery in this pending complaint
> that Human Resources conducted an investigation only into whether Dr.
> McDonald was speaking negatively about me in public.  Based on my
> review of the discovery, the [Human Resources Department's] investigation
> did not explore whether the allegations against me [by Dr. McDonald] were
> false, libelous or slanderous and did not address any issues regarding my
> concerns and my allegations of discrimination or harassment. I had raised
> concerns from which discrimination could be inferred. Anna Bauer, the
> Surgery JOC and Executive Committee were all aware of mine [sic] and
> McDonald's race, color, and national origin.  The contrast between the
> manner in which Dr. McDonald was treated versus the manner in which I
> was treated certainly showed a preference to Dr. McDonald, who was only
> recently hired, over me. The only difference was that Dr. McDonald was
> Caucasian, not my same race, skin color or national origin. He was allowed
> a partner, and provided with far more staff than I, despite the fact I had far
> greater volume and a higher profit/loss. I was [sic] consistently had higher
> rates of surgeries than Dr. McDonald. Eric Baier's claim that my practice did
> not warrant a partner is false as my practice had more surgeries than Dr.
> McDonald's practice at the time Dr. McDonald's partner was hired. Further,
> the P.C. undermined my program by advertising the Troy location as the
> premiere location for bariatric surgery, despite the fact Troy had no awards
> and I had Top Doctor, Center of Excellence, and Women's Choice awards. I
> was never told the results of the alleged investigation. I was told I was being
> terminated because I was "not a good fit." A bariatric surgery practice no
> longer exists in Albany as my program could not exist once I was
> terminated. I understand that Dr. McDonald has since been terminated, but
> only after his Caucasian partner made complaints about his clinical skills
> and collegiality, and not because of the protected complaints I lodged.

Trivedi Dec., ¶¶ 66-80.

## IV.  DISCUSSION

### *McDonnell Douglas Corp. v. Green*

Plaintiff's claims of discrimination and retaliation under Title VII, Section 1981,

and the NYSHRL are all subject to the burden-shifting framework set forth in *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 802–03 (1973).  See *Johnson v. Andy Frain*

*Servs., Inc.*, 638 Fed. Appx. 68, 70 (2d Cir. 2016) ("Discrimination claims under Title VII[,] . . . § 1981, and the [HRL] are analyzed under the burden-shifting framework in *McDonnell Douglas*."); *Dobbs v. NYU Langone Medical Center*, No. 18-cv-1285, 2021 WL 1177767 (S.D.N.Y. March 29, 2021) ;*Wright v. City of Syracuse*, 611 Fed. App'x. 8, 10 (2d Cir. 2015) ("New York courts require the same standard of proof for claims brought under the NYSHRL as for those brought under Title VII.") (quotations and citations omitted); *Coleman v. Nonni's Foods, LLC*, No. 15 CV 2791 (VB), 2015 WL 8773467, at *5 (S.D.N.Y. Dec. 14, 2015) ("Discrimination claims under the HRL are evaluated under the same standards applicable to claims under Section 1981 and Title VII.").

"To survive a motion for summary judgment, a plaintiff must carry [his] initial burden to establish a prima facie case of discrimination." *Dobbs*, 2021 WL 1177767, *5 (citations omitted). "If the plaintiff satisfies this initial burden, the burden of production (but not persuasion) shifts to the employer to articulate a legitimate, non-discriminatory reason for the action." *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 350 (S.D.N.Y. 2006). If the employer meets this burden, the burden of production shifts back to the plaintiff to demonstrate that the legitimate reasons offered are pretextual. *See id.* "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff, and if the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate." *Id.*

### Prima Facie Case Of Discrimination

To establish a prima facie case of discrimination based upon race, color or national origin, Plaintiff must demonstrate "(1) that he is a member of a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse action took place under circumstances giving rise to an inference of discrimination." *Wright*, 611 Fed. App'x. at 11. A plaintiff's burden at this stage is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  Defendant challenges Plaintiff's prima facie case on the third and fourth elements.

### Adverse Employment Action

"An adverse employment action is a materially adverse change in the terms and conditions of employment ... [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir. 2005) (internal quotation marks and citations omitted), *abrogated on other grounds by Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199 (2d Cir. 2006). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (internal quotation marks and citation omitted).

Plaintiff argues that he was subject to several adverse employment actions, including: (1) the P.C.'s decision to hire Dr. McDonald, a Caucasian bariatric surgeon who was purportedly "provided with almost unlimited resources;" (2) the

P.C's decision to end the search for a partner for Plaintiff while allowing a bariatric surgeon to join Dr. McDonald's practice; (3) St. Peter's Hospital's decision to conduct independent reviews of Plaintiff's surgical cases based on the complaints of Drs. Santoro and McDonald, both Caucasians; and (4) the termination of Plaintiff's Agreement. Plaintiff's Memo of Law, pp. 13-14.  The Court finds that only the termination of Plaintiff's Agreement amounts to an adverse employment action.

The P.C.'s decision to hire Dr. McDonald and provide him resources had no impact on Plaintiff's employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (holding that "conduct must be extreme to amount to a change in the terms and conditions of employment"); *Islamic Society of Fire Dept. Personnel v. City of New York*, 205 F. Supp.2d 75, 85 (E.D.N.Y. 2002)("[C]ourts in this circuit have universally rejected attempts by plaintiffs to show an adverse employment action based simply on the plaintiff's personal feelings about the employer's actions." )(collecting cases).

The same conclusion is reached as to the P.C's decision to end the search for a partner for Plaintiff. As Defendant points out, the P.C. hired Dr. Folek and the fact that the P.C. did not thereafter provide a partner was not a material change in the terms or conditions of Plaintiff's employment. Plaintiff does not claim that he was entitled to a partner under any contract or other obligation. Rather, Plaintiff claims that he asked for something that he thought would be helpful, and that the P.C. failed to provide what he asked for.  Again, Plaintiff's personal feelings about the P.C.'s action or alleged inaction do not constitute an adverse employment action. *Islamic Society*, 205 F. Supp.2d at 85. (citations omitted). Further, Plaintiff asserts that he provided his own on-call coverage,

Case 1:20-cv-00609-TJM-DJS   Document 62   Filed 09/29/23   Page 29 of 48

denies any inference that he ever failed to provide such coverage, and contends he also provided on-call coverage for general surgery and emergency.  Trivedi Dec., ¶ 15, 111.

Finally, Plaintiff argues that the Hospital's two independent reviews of his surgical cases were "analogous to reprimands as they drew negative conclusions." Plaintiff's Memo of Law, p. 14.  "Reprimands or negative evaluation letters may, in some circumstances, constitute adverse employment action ... and whether they do is typically a question of fact for the jury[.]" *Lawrence v. Mehlman*, 389 F. App'x 54, 56 (2d Cir. 2010) (internal quotation marks and citations omitted).  Here, the Hospital's two independent reviews do not amount to adverse employment actions.  First, the independent reviews were arranged for by the Hospital, not the P.C.  Second, the conclusions of an independent, third-party reviewer do not constitute a reprimand of Plaintiff by the P.C.  Third, neither the P.C. nor the Hospital had any control over the reviewer's findings. Fourth, even if the P.C. had conducted the review and criticized Plaintiff's performance, it is well established that "an employer's excessive scrutiny of an employee, without more, fails to satisfy the requirements for an adverse employment action." *Colton v. New York Division of State Police*, No. 5:14-cv-00801, 2017 WL 5508911, *16 (N.D.N.Y. Feb. 8, 2017) (quotations and citations omitted).

### An Inference of Discrimination

In opposition to the P.C.'s motion, Plaintiff argues that the termination of his Agreement occurred under circumstances giving rise to an inference of discrimination because: (1) he was treated differently than Dr. McDonald; (2) the manner in which the P.C. decided to terminate his Agreement was improper;  (3) the P.C.'s alleged

spoliation of evidence raises an inference of discrimination; and (4) Dr. McDonald's and/or Dr. Santoro's alleged discriminatory motivation played a meaningful role in the decision to terminate Plaintiff's Agreement, and therefore Defendant is liable under a "cat's paw" theory. The Court will address each of these in turn.

In the absence of direct evidence of discriminatory intent, a plaintiff may "raise an inference of discrimination by demonstrating the disparate treatment of similarly situated employees." *Kosack v. Entergy Enters., Inc.*, No. 14-CV-9605, 2019 WL 330870, *6 (S.D.N.Y. Jan. 25, 2019). "But in order to do so, the plaintiff 'must show []he was similarly situated in all material respects to the individuals with whom []he seeks to compare [himself].'" *Cooper v. Templeton*, 629 F. Supp. 3d 223, 230–31 (S.D.N.Y. 2022), *aff'd sub nom. Cooper v. Franklin Templeton Invs.*, No. 22-2763-CV, 2023 WL 3882977 (2d Cir. June 8, 2023)(quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotations omitted), and citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) ("To be 'similarly situated,' the individuals with whom [a plaintiff] attempts to compare herself must be similarly situated in all material respects.")).  Employees are similarly situated if they are "'(1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct.'" *Wood v. New York Transit Authority*, 699 Fed. Appx. 76, 78 (2d Cir. 2017) (quoting *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493-94 (2d Cir. 2010)).  "In addition to identifying similarly situated employees who are subject to the same performance evaluation and discipline standards, a plaintiff must also show that those employees engaged in acts of comparable seriousness but were not punished as severely as plaintiff." *Risco v. McHugh*, 868 F.Supp.2d 75, 100 (S.D.N.Y. June 14, 2012).

SPA-31

Plaintiff contends that he was terminated "while Dr. McDonald was only counseled, despite both were accused of the same purported issues." Pl. Mem. L. at 29. Plaintiff misconstrues the facts which indicate that Dr. McDonald was counseled after Ms. Bauer's investigation into Plaintiff's complaint that McDonald was bullying and disparaging him. By contrast, the facts indicate that the P.C. Executive Committee approved the termination of Plaintiff's Agreement due to significant concerns regarding Plaintiff's clinical skills, patient outcomes and complications, as well as Plaintiff's lack of peer relationships. Plaintiff has submitted insufficient evidence to establish that Dr. McDonald was subject to the same quality and/or peer relationship concerns at the time the decision was made to terminate Plaintiff's Agreement. While Plaintiff has pointed to evidence indicating that he told someone named Tyler that Dr. McDonald had a much higher complication rate than Plaintiff, he does not indicate whether Tyler was in a position to discipline Dr. McDonald for this conduct, or even that an investigation was conducted into Dr. McDonald's conduct at the time the decision was made to terminate Plaintiff. Rather, the evidence indicates that Plaintiff had been the subject of multiple reviews, including an internal review and two independent external reviews in the year preceding his termination, which revealed significant concerns with Plaintiff's technique, patient outcomes and complications.

There is insufficient evidence that Dr. McDonald was subject to the same reviews or concerns by the Surgery JOC, the Executive Committee, or the P.C. at the time the decision was made to terminate Plaintiff's Agreement. While Plaintiff contends that he complained to Dr. Hanks and Ms. Bauer about Dr. McDonald, those complaints appeared to be concerned with McDonald's treatment of Plaintiff-not about McDonald's

clinical quality. Plaintiff's personal dispute with Dr. McDonald does not raise an inference of discrimination by the P.C. *Cf. Neratko v. Frank*, 31 F. Supp. 2d 270, 284 (W.D.N.Y. 1998)("'Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of sex discrimination and is not proscribed by Title VII. The plaintiff cannot turn a personal feud into a sex discrimination case by accusation.'")(quoting *McCollum v. Bolger*, 794 F.2d 602, 609–10 (11th Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S. Ct. 883, 93 L.Ed.2d 836 (1987)(internal citations omitted)).

Further, even if Dr. McDonald was similarly situated to Plaintiff, Plaintiff's claim that he was treated differently than Dr. McDonald is without merit. Dr. McDonald was terminated by the P.C. on May 6, 2021 as a result of concerns regarding his clinical quality and collegiality. Accordingly, even assuming Dr. McDonald was subject to the same clinical criticisms as Plaintiff, and assuming Dr. McDonald had similar issues with peer relationships, the P.C. did not treat him any differently than Plaintiff. Both physicians' contracts were terminated. In the end, the P.C.'s treatment of Dr. McDonald does not raise an inference of discrimination.

Plaintiff claims that discriminatory motivation can be inferred from the fact that the P.C. did not offer Plaintiff an opportunity to refute the reports or conclusions of the independent outside reviewer, and "rushed" to terminate his Agreement. These reasons are insufficient to create a material question of fact as to whether his termination occurred under circumstances giving rise to an inference of discrimination. Plaintiff does not claim that the Surgery JOC was motivated by any discriminatory animus when it first recommended the termination of his agreement in 2017, and he appears to rely

SPA-33

on speculation that the Surgery JOC's second recommendation to terminate his Agreement, less than two years later and after more troubling issues with Plaintiff's performance came to light, was motivated by discriminatory animus.  This, by itself, is insufficient to establish an inference of discrimination.

Further, Plaintiff has not alleged that the Surgery JOC, Board, or P.C. Executive Committee were required by any contract, rule, or policy to provide him with an opportunity to refute the findings of the independent third-party reviewer.  Moreover, as explained in the Declarations of Jason Heckman, M.D. and William Kowal, M.D.,  the Surgery JOC and P.C. Executive Committee followed a permissible process. *See* Heckman Dec., ¶¶ 2-14; Kowal Dec., ¶¶ 6–11.  The evidence indicates that the Surgery JOC was legitimately concerned about Plaintiff's skills, patient outcomes, patient safety, and collegiality. *Id.* The evidence also indicates that those concerns were raised through the appropriate channels – to the President of the P.C. – and then discussed during a meeting of the Executive Committee. *Id.*  The unrefuted evidence indicates that based upon the information presented, the Executive Committee voted to terminate Plaintiff's Agreement. *Id.*  Plaintiff does not dispute, except by speculation, the sworn testimony from Dr. Heckman and Dr. Kowal that the Surgery JOC and Executive Committee never discussed Plaintiff's race, color or national origin at any time. *Id.* Thus, as Defendant contends, there is no evidence that the process followed by the Surgery JOC or Executive Committee was flawed or inappropriate, and Plaintiff's attempt to point to an inference of discrimination based upon the process utilized is insufficient.

Plaintiff also asks the Court to infer discriminatory motivation based upon a spoliation argument. Plaintiff claims that because the notes from Ms. Bauer's

33

investigation into Plaintiff's complaint about Dr. McDonald are not available, the Court should infer that the P.C.'s decision to terminate his Agreement was racially motivated. The argument is without merit.

"Before a court may sanction a party for spoliation of evidence, the moving party must show that (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the party having control over the evidence acted with a culpable state of mind; and (3) the missing evidence is relevant to the moving party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Gaffield v. Wal-Mart Stores East, LP*, 616 F.Supp.2d 329, 337 (N.D.N.Y. Mar. 31, 2009) (quoting *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

Here, the missing documents have little bearing on Plaintiff's claims in this case. Plaintiff's verbal statements to Ms. Bauer, as well as his written complaint on March 17, 2019, do not allege that he was being treated differently because of his race, color or national origin, and did not claim that Dr. McDonald was motivated by any discriminatory animus in raising concerns about  Plaintiff's clinical skills. *See* Kowal Dec., Ex. C; Bauer Depo., p. 72.  As such, Ms. Bauer was not investigating a race discrimination complaint, and it appears that Plaintiff's race was wholly unrelated to the interviews she conducted or her ultimate conclusion. *Id.* Further, Ms. Bauer was able to provide testimony regarding her conclusion that Dr. McDonald had made comments about Plaintiff's clinical skills, and she was also able to recall that she recommended that Dr. McDonald receive formal counseling to address this issue. Bauer Depo., pp. 33-34.  Moreover, Plaintiff indicates that he was aware of the scope of Ms. Bauer's

34

SPA-35

investigation based upon the discovery he received in this case. *See* Trivedi Dec., ¶¶ 67-68.

The case cited by Plaintiff, *Sanders v. The Univ. of Idaho*, No. 3:19-cv-00225, 2022 WL 6160165 (D. Idaho Oct. 7, 2022), fails to support his argument on spoliation. There, the investigation in question was conducted to address multiple complaints of gender bias and sex discrimination. *See id.* at 939.  The employer in that case was aware of the potential for litigation before the investigation was started. *See id.* at 941-942.  As such, the employer's duty to preserve began before the investigation began. *Id.*  Here, by contrast, Ms. Bauer's investigation was unrelated to race, color, and/or national origin discrimination.

Further, even assuming the interview notes showed some individuals believed that race, color, or national origin was behind Dr. McDonald's complaints about Plaintiff, the evidence here shows that the Surgery JOC's decision was based on the external reviewer's conclusions.  And, the evidence is essentially undisputed - save Plaintiff's speculation - that the Surgery JOC and the Executive Committee did not consider Plaintiff's race, color, or national origin in making their decisions.

Finally, even assuming that Plaintiff is entitled to a spoliation finding regarding Ms. Bauer's interview notes, for the reasons discussed below Plaintiff is unable to meet his ultimate burden to demonstrate that the employer's proffered legitimate nondiscriminatory reason for his discharge was a pretext for unlawful discrimination.

At several points in Plaintiff's opposition, he refers to the "cat's paw" theory to establish an inference of discrimination.  Plaintiff argues that Dr. McDonald's and/or Dr. Santoro's alleged discriminatory motivation played a meaningful role in the decision to

35

SPA-36

terminate Plaintiff's Agreement. *Id.,* p. 27.  This argument fails to rise to an inference

that discrimination motivated Defendant's decision to termination Plaintiff's Agreement.

Some courts "have held that 'an employer cannot shield itself from liability ... by

using a purportedly independent person or committee as the decisionmaker where th[at]

decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another

achieves his or her unlawful design.'" *Nagle v. Marron*, 663 F.3d 100, 117 (2d Cir. 2011)

(quoting *Dedmon v. Staley,* 315 F.3d 948, 949 n. 2 (8th Cir. 2003)).  "Under this so-

called 'cat's paw' theory, a final decisionmaker that relies entirely on an improperly

motivated recommendation from a subordinate may render the [employer] liable

because the subordinate, although not formally delegated the power to make decisions,

acts as the [employer's] agent." *Id.*[4]

Here, there is no evidence in the record that Dr. McDonald or Dr. Santoro were

motivated by discriminatory animus toward Plaintiff.  Plaintiff does not allege that either

physician made any race-related comments at any time. Plaintiff's Depo., p. 118. During

his deposition, Plaintiff stated that he thought Dr. McDonald and Dr. Santoro were

motivated by race because he was a very good doctor and there was no other possible

explanation for why they would be critical of his work. *Id.*, pp. 118–119, 39–40.  Aside

---

[4] The Second Circuit stated in a footnote in *Nagel:*

The term "cat's paw" is apparently drawn from a La Fontaine poem (perhaps itself drawn from an Aesop fable) about a monkey who convinces a cat to get chestnuts roasting in a fire. As the cat pushes the chestnuts out one by one, the monkey eats them; the monkey gets the chestnuts while the cat gets only burnt paws. *See Staub v. Proctor Hosp.,* ⸺ U.S. ⸺, 131 S.Ct. 1186, 1190 n. 1, 179 L.Ed.2d 144 (2011). "'Today the term 'cat's paw' refers to one used by another to accomplish his purposes." *Arendale v. City of Memphis,* 519 F.3d 587, 604 n. 13 (6th Cir.2008) (quoting *EEOC v. BCI Coca–Cola Bottling Co.,* 450 F.3d 476, 484 (10th Cir.2006)).

663 F.3d at 117, n. 15.

SPA-37

from Plaintiff's unsubstantiated speculation, Plaintiff does not point to any evidence that implies that Dr. McDonald or Dr. Santoro were motivated by discriminatory animus.

Further, Dr. McDonald's and/or Dr. Santoro's opinions regarding Plaintiff's skills did not play any meaningful role in the decision to terminate Plaintiff's Agreement. As Defendant argues, the Hospital did not rely on Dr. McDonald's and/or Dr. Santoro's alleged criticisms of Plaintiff. Instead, it hired an outside bariatric surgeon to conduct a review of Plaintiff's cases. Moreover, Plaintiff fails to present evidence that the Surgery JOC or P.C. Executive Committee considered Dr. McDonald's and/or Dr. Santoro's critiques of Plaintiff's skills at any time when making the decision to terminate Plaintiff's Agreement. Rather, as Defendant contends, they were aware of the negative outside reviews and the death of Plaintiff's patient in in October 2018.

### Conclusion: Prima Facie Case Of Discrimination

Even when considering the totality of the facts in the light most favorable to Plaintiff, and drawing reasonable inferences on his behalf, he has failed to present a prima facie case of discrimination.

### Prima Facie Case Of Retaliation

To establish a prima facie case of retaliation under Title VII, Section 1981 and the NYSHRL, Plaintiff must establish that: (1) he engaged in protected activity; (2) his employer was aware of the protected activity; (3) he suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse action. *Kelly v. Howard I. Shapiro & Assocs.*, 716 F.3d 10, 14 (2d Cir. 2013); *see also Santos v. Costco Wholesale, Inc.*, 271 F. Supp. 2d 565, 574 (S.D.N.Y. 2003) (the elements required to state a retaliation claim under Section 1981 "are the same as

those required to make out such a claim under Title VII."). In addition, Plaintiff must establish that his protected activity was the "but for" cause of his termination. *Dobbs*, 2021 WL 1177767, at *6 (citations omitted).

Defendant argues that Plaintiff cannot establish a prima facie case of retaliation because: (a) he cannot establish that he engaged in protected activity that his employer was aware of; and (b) there is no causal connection between Plaintiff's alleged protected activity and his termination. Plaintiff contends that he engaged in protected activity (1) when he said to Dr. Hanks in January 2019 that he felt that the January 10, 2019 letter he received was about his skin color; (2) when he met with Dr. Ross and they discussed that the January 10, 2019 letter was because of Dr. Trivedi's skin color; and (3) when he reported that he had been undergoing workplace harassment and bullying for two years. Plaintiff also contends that there was a causal connection between his protected activity and the termination of his Agreement.  The Court will address these issues in turn.

**Employer Aware of the Protected Activity**

On the second element of the prima facie case, Plaintiff must establish that the employer was aware of her protected activity.  "To constitute 'protected activity,' a plaintiff's complaint must include 'sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race ... or any other characteristic protected by" a relevant statute. *Morales v. Bottling Grp., LLC*, 374 F. Supp. 3d 257, 274 (W.D.N.Y. 2019), *aff'd sub nom. Campbell v. Bottling Grp., LLC*, 814 F. App'x 630 (2d Cir. 2020)(quoting *Lehman v. Bergmann Assocs., Inc.*, 11 F.Supp.3d 408, 417-18 (W.D.N.Y. 2014) (citation omitted)). "'The onus

is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.'" *Id.* (quoting *Hanfland v. Brennan*, 2015 WL 6134177, *11 (W.D.N.Y. 2015) (citation omitted); *see McKenzie v. Big Apple Training Inc.*, No. 1:22-CV-9554-GHW, 2023 WL 4866041, at *9 (S.D.N.Y. July 31, 2023)("'Mere complaints of unfair treatment are not protected speech in the employment retaliation context,' and it is the speaker's responsibility 'to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.'")(quoting *Benzinger v. Lukoil Pan Ams.*, LLC, 447 F. Supp. 3d 99, 124 (S.D.N.Y. 2020) (quotation and ellipsis omitted)); *Chauhan v. MM Hotel Mgmt. LLC*, No. 18 CV 5963, 2019 WL 6118006, at *9 (E.D.N.Y. Nov. 18, 2019)("To qualify as protected activity, a plaintiff must clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.") (quoting *Sletten v. LiquidHub, Inc.*, No. 13 Civ. 1146, 2014 WL 3388866, at *5 (S.D.N.Y. July 10, 2014)) (internal quotations and citations omitted); *Hanfland v. Brennan*, 2015 WL 6134177, *11 (W.D.N.Y. 2015) (citation omitted) ("The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally.").

     "[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited" by a particular statute. *Jackson v. Syracuse Newspapers,* No. 10-CV-1362 (NAM), 2013 WL 5423711, at *20

SPA-40

(N.D.N.Y. Sept. 26, 2013) (citation omitted). "[G]eneralized complaints of unfair treatment do not qualify as a protected activity." *Eckhart v. Fox News Network, LLC*, No. 20-CV-5593 (RA), 2021 WL 4124616, at \*20 (S.D.N.Y. Sept. 9, 2021) (internal quotation marks and citation omitted). Similarly, "'ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity.'" *McKenzie*, 2023 WL 4866041, at \*9 (quoting *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (citations omitted), and citing *Venezia v. Luxoticca Retail N. Am. Inc.*, No. 13-cv-4467 (RJS), 2015 WL 5692146, at \*12 (S.D.N.Y. Sept. 28, 2015)).

Regarding Plaintiff's statement to Dr. Hanks, Plaintiff concedes that although the policy in effect at the time required managers and colleagues to either investigate or report claims of unlawful discrimination, Dr. Hanks did neither. *See* Pl. Mem. L. at 21. Thus, Plaintiff fails to establish that the P.C. was aware of his complaint to Dr. Hanks.

Regarding Plaintiff's conversation with Dr. Ross, Plaintiff concedes that the concerns related to the January 10, 2019 letter were not reported to the Human Resources Department. *See* Pl. Mem. L. at 22. This, by itself, does not necessarily mean that the P.C. was not aware of Plaintiff's complaint because Dr. Ross was the Chief Medical Officer for the P.C. in early 2019. However, as Defendant points out, Dr. Ross's purported statement that he believed the content of the January 10, 2019 letter was due to Plaintiff's skin color is inadmissible hearsay which is insufficient to oppose summary judgment. *See Lawrence v. Mehlman*, 389 Fed. Appx. 54, 56 n. 2 (2d Cir. 2010)("In his brief, Lawrence also cites his own deposition testimony that 'there was a discussion in the group' during which other doctors expressed their view that Lawrence

40

SPA-41

received worse shift assignments because of his race.  . . .  In reviewing the district court's award of summary judgment, Lawrence's hearsay account of doctors' statements of opinion is not admissible in evidence.")(citing Fed .R. Civ. P. 56(e)(1); Fed. R. Evid. 802)).  Furthermore, even if the alleged statement is admissible, Plaintiff does not identify why Dr. Ross allegedly felt this way, or the basis for the alleged statement.  Finally, Plaintiff presents insufficient evidence upon which a reasonable factfinder could conclude that the Surgery JOC or the Executive Committee considered Plaintiff's complaint to Dr. Ross, or any other evidence that Plaintiff had been discriminated against on the basis of a protected classification, when they determined to terminate Plaintiff's employment.

Regarding Plaintiff's reports about enduring two years of workplace harassment and bullying, he points to his email complaints to Dr. Hanks on April 26, 2018, and to Ms. Bauer on March 17, 2019.  As stated above, Plaintiff's April 26, 2018 email to Dr. Hanks in which he voiced a concern about "anonymous" physicians (who Plaintiff later identified as Drs. McDonald and Santoro) questioning his bariatric practice did not mention any allegation that he felt the physicians were targeting him because of his race, color and/or national origin, or that he was being treated differently because of these characteristics. Thus, this email does not constitute protected activity.  *See, e.g.,* *Bain v. Wal-Mart Stores, Inc.*, 585 F. Supp.2d 449, 453 (W.D.N.Y. Nov. 12, 2008) ("In order for an employee's complaints to be a 'protected activity' they must relate to an alleged violation of Title VII, i.e., the complaints must relate to race or gender. Otherwise, any employee who is disgruntled or dissatisfied with any aspect of his or her

41

SPA-42

employment would ultimately find relief in Title VII even when race or gender was not an issue.")(citations and quotations omitted).

Furthermore, the use of the words "bullying" and "harassment" in this email does not make it protected activity because the underlying complaint was not related to race, color, or national origin. *See, e.g., Malone v. Town of Clarkstown,* No. 19 CV 5503 (VB), 2022 WL 2834105, at *8 (S.D.N.Y. July 20, 2022) ("Similarly, plaintiff's complaints about harassing conduct . . . are not protected activity because they complain of general bullying and harassment that plaintiff does not claim are linked to or motivated by her sex."); *Johnson v. City Univ. of New York,* 48 F. Supp. 3d 572, 577 (S.D.N.Y. 2014) (plaintiff's "complaints about his boss's bullying and harassment" did not constitute protected activity where there was no allegation that the complained of treatment was because of plaintiff's membership in a protected class); *cf. Lynch v. Nat'l Fuel Gas Distribution Corp.*, 25 F. Supp. 3d 358, 367 (W.D.N.Y. 2014) ("plaintiff has produced no evidence of any complaint, formal or informal, sufficient to have placed [employer] on notice that by complaining about [supervisor]'s 'bullying' she was referring to discriminatory activity").  Finally, as indicated above, Plaintiff concedes that Dr. Hanks never conveyed Plaintiff's complaint to the P.C.

Turning to Plaintiff's March 17, 2019 email to Ms. Bauer, this email did not allege that he was being treated differently because of his race, color, or national origin, and did not claim that Dr. McDonald was motivated by any discriminatory animus in raising concerns about Plaintiff's clinical skills. Thus, even though members of the Surgery JOC and the Executive Committee were aware of Plaintiff's complaint to Ms. Bauer, there was no reason for them to conclude that that Plaintiff had complained about race, color

SPA-43

or national origin discrimination.  Indeed, other than Plaintiff's speculation, it is not

refuted that Plaintiff's race, color and/or national origin were never discussed at any

time by either the Surgery JOC or Executive Committee, or that Plaintiff's complaint to

Human Resources about Dr. McDonald – which was unrelated to his race, color, or

national origin – played any role in the Executive Committee's decision.

### Causal Connection

To establish a causal connection between Plaintiff's alleged protected activity

and the P.C.'s decision to terminate his agreement, Plaintiff points to (1) the timing of

his termination; and (2) the fact that the Executive Committee knew the P.C.'s Human

Resources department was investigating Plaintiff's complaint about Dr. McDonald when

it voted to terminate his Agreement.  As Defendant argues, neither of these arguments

establishes that any alleged protected activity was the "but for" cause of Plaintiff's

termination. *See University of Texas Southwestern Medical Center v. Nassar*, 570 U.S.

338, 360 (2013).

It is well-settled that temporal proximity alone is insufficient to overcome an

employer's legitimate, nondiscriminatory reason for terminating a plaintiff's

employment." *Bain*, 585 F. Supp.2d at 454.  The P.C. has articulated a legitimate, non-

retaliatory basis for Plaintiff's termination, namely, Plaintiff's poor clinical skills and lack

of peer relationships.  Thus, even if Plaintiff made the alleged statement to Dr. Hanks,

the timing of the statement in relation to the termination decision is insufficient to create

a question of fact, particularly where the Surgery JOC and Executive Committee were

not aware of Plaintiff's alleged statement to Dr. Hanks.

43

SPA-44

The fact that the Executive Committee knew that there was an investigation into Plaintiff's March 17, 2019 email complaint does not support Plaintiff's retaliation claim. As discussed above, Plaintiff's March 17, 2019 complaint was unrelated to race, color or national origin. Rather, the complaint addressed Plaintiff's concerns that Dr. McDonald was making derogatory statements about Plaintiff's clinical skills. The Executive Committee's knowledge of this investigation does support the conclusion that the Executive Committee was motivated by retaliatory animus when it voted to terminate Plaintiff's Agreement.

Further, as also discussed above, Plaintiff does not sufficiently refute that the Surgery JOC and P.C. Executive never discussed or had knowledge of any claim by Plaintiff that he was being treated differently because of his race, color and/or national origin at any time. *See* Kowal Dec., ¶ 10–11; Heckman Dec., ¶ 14. Plaintiff cannot rely on conclusory assertions of retaliatory motive to satisfy the causal link. *See Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004) (noting "that a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link . . . Instead, he must produce some tangible proof to demonstrate that his version of what occurred was not imaginary.")(quotations and citations omitted). Under the circumstances, even if Plaintiff engaged in protected activity as alleged, there is insufficient evidence that his activity was a "but for" cause of the decision to terminate Plaintiff's Agreement.

### Conclusion: Prima Facie Case Of Retaliation

Even when considering the totality of the facts in the light most favorable to Plaintiff, and drawing reasonable inferences on his behalf, he has failed to present a prima facie case of retaliation.

44

**Pretext**

As stated above, the P.C. has articulated a legitimate, non-retaliatory basis for Plaintiff's termination, namely, Plaintiff's poor clinical skills and lack of peer relationships.  Even assuming *arguendo* that Plaintiff has established a prima facie case of discrimination or retaliation, he fails to satisfy his ultimate burden of proving that the P.C.'s stated reasons for his termination were pretextual.

Courts in this Circuit have explained that "a reason [for termination] cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Isaac v. City of New York*, 701 F. Supp. 2d 477, 488 (S.D.N.Y. 2010) (quotations and citations omitted). "The burden of establishing pretext is a higher burden than that required to establish the prima facie case," and the Second Circuit has instructed that a plaintiff's initial allegations of discrimination "must be 'increasingly sharpened and focused' at this stage." *Id.* at 488 (quoting *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985) (affirming summary judgment in favor of defendant)).  Although the "trier of fact may still consider the evidence establishing plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual," *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142–43, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Burdine*, 450 U.S. at 255 n. 10), "[t]o get to the jury, '[i]t is not enough ... to disbelieve the employer; the fact finder must [also] believe the plaintiff's explanation of intentional discrimination.'" *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000)(quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)). "The plaintiff's opportunity to demonstrate that the employer's proffered reason was false now merges

with [his] ultimate burden to persuade the trier of fact that [he] has been the victim of intentional discrimination (i.e., that an illegal discriminatory reason played a motivating role in the adverse employment decision)." *Bickerstaff v. Vassar College*, 196 F.3d 435, 446–47 (2d Cir.1999) (citations omitted); *see also Reeves*, 530 U.S. at 142–43 (Plaintiff bears the burden of demonstrating that the defendant's reasons are a pretext for a racial motivation for its actions).

As Defendant argues, Plaintiff appears to claim that the P.C.'s stated reasons for terminating the Agreement were pretextual because the concerns articulated by Dr. McDonald, Dr. Santoro, Dr. Hanks, Dr. Sanders, Dr. Taggert, and the independent bariatric surgeon who reviewed his cases, were wrong.  Plaintiff's argument misses the mark for purposes of a pretext analysis because it is immaterial whether the P.C. was correct in its conclusion that Plaintiff had significant issues with technique, patient outcomes and peer relationships. *See Dobbs*, 2021 WL 1177767, at *7 ("Third, and most important, it does not matter if Defendant was correct in its conclusion that Plaintiff took the money. It matters only that Defendant's conclusion that Plaintiff took the money, rather than unlawful discrimination, was the reason for her termination.")(citing *Toussaint v. NY Dialysis Servs.*, 706 F. App'x 44, 45-46 (2d Cir. 2017) (courts are "not interested in the truth of the allegations against [the] plaintiff" but rather "in what motivated the employer"); *Borzon v. Green*, 778 F. App'x 16, 19 (2d Cir. 2019) (a court is not "'a super-personnel department that reexamines an entity's business decisions'")(quoting *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014)); *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009) ("Where a plaintiff has been terminated for misconduct, the question is not 'whether the

employer reached a correct conclusion in attributing fault [to the plaintiff] ..., but whether the employer made a good-faith business determination.'")(quoting *Baur v. Rosenberg, Minc, Falkoff & Wolff,* No. 07–Civ.–8835(GEL), 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008), and citing *McPherson v. New York City Dep't of Educ.,* 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case ... we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what *motivated* the employer...." (emphasis in original) (internal quotation omitted); *Agugliaro v. Brooks Bros., Inc.,* 927 F. Supp. 741, 747 (S.D.N.Y.1996) ("Even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status.")). Instead, the evidence need only demonstrate that the P.C. had a reasonable, good-faith belief that Plaintiff's skills were lacking, complications were unacceptable, and peer relationships were poor. *See Kolesnikow,* 622 F. Supp. 2d at 111*; see also Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010) ("Only where an employer's business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual.").

While Plaintiff may believe that the reasons stated by the Surgery JOC and Executive Committee for his termination were wrong, the evidence indicates that they were based on rational, objective evidence indicating that Plaintiff's performance was poor and that his peer relationships were inadequate.  Further, Plaintiff fails to present sufficient evidence that his race, color and/or national origin, or his alleged protected activity, played a role in the P.C.'s decision to terminate his employment.  While Plaintiff

SPA-48

may believe that the P.C. treated Dr. McDonald more favorably in terms of  supporting

their respective practices because McDonald is Caucasian, Plaintiff supplies insufficient

evidence upon which to conclude that the P.C.'s decision to terminate him was

motivated by his race, color, or national origin, or because the P.C. wanted to retaliation

against him.  Accordingly, Defendant is entitled to summary judgment. *See Kolesnikow,*

622 F. Supp. 2d at 111  ("Therefore, in the absence of evidence undermining HVHC's

assertion that it believed in good faith that Kolesnikow's conduct merited discipline and

termination, or of any other evidence of pretext or discriminatory intent, HVHC is entitled

to summary judgment.").

## V.      CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment,

ECF No. 45, is **GRANTED**. The Clerk is respectfully directed to entered judgment for

Defendant and close the file in this matter.

**IT IS SO ORDERED.**

Thomas J. McAvoy
Senior, U.S. District Judge

Dated:  September 29, 2023

SPA-49

# *UNITED STATES DISTRICT COURT*
## *NORTHERN DISTRICT OF NEW YORK*

## JUDGMENT IN A CIVIL CASE

**Mehul Trivedi**
      Plaintiff(s)

    vs.                                                 **CASE NUMBER: 1:20-cv-609 (TJM/DJS)**

**St. Peter's Health Partners Medical Associates, P.C.**

      Defendant(s)


**Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED, Defendant's motion for summary judgment, is GRANTED. The Clerk is respectfully directed to enter judgment for Defendant and close the file in this matter.


All of the above pursuant to the order of the Honorable **Thomas J. McAvoy**, dated September 29, 2023.


DATED: September 29, 2023


Clerk of Court

s/ M. Gallup-Hughes
Deputy Clerk

SPA-50

# Federal Rules of Appellate Procedure
## Rule 4. Appeal as of Right

**(a) Appeal in a Civil Case.**

1. (1) *Time for Filing a Notice of Appeal.*

(A) In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

(B) The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

(i) the United States;

(ii) a United States agency;

(iii) a United States officer or employee sued in an official capacity; or

(iv) a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf — including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.

(C) An appeal from an order granting or denying an application for a writ of error *coram nobis* is an appeal in a civil case for purposes of Rule 4(a).

(2) *Filing Before Entry of Judgment.* A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry.

(3) *Multiple Appeals.* If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.

(4) *Effect of a Motion on a Notice of Appeal.*

(A) If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:

(i) for judgment under Rule 50(b);

(ii) to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;

(iii) for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;

(iv) to alter or amend the judgment under Rule 59;

(v) for a new trial under Rule 59; or

(vi) for relief under Rule 60 if the motion is filed no later than 28 days after the judgment is entered.

(B)(i) If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

(ii) A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal—in compliance with Rule 3(c)—within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

(5) *Motion for Extension of Time.*

(A) The district court may extend the time to file a notice of appeal if:

(i) a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and

(ii) regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause.

(B) A motion filed before the expiration of the time prescribed in Rule 4(a)(1) or (3) may be ex parte unless the court requires otherwise. If the motion is filed after the expiration of the prescribed time, notice must be given to the other parties in accordance with local rules.

(C) No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.

(6) *Reopening the Time to File an Appeal.* The district court may reopen the time to file an appeal for a period of 14 days after the date when its order to reopen is entered, but only if all the following conditions are satisfied:

(A) the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77 (d) of the entry of the judgment or order sought to be appealed within 21 days after entry;

(B) the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77 (d) of the entry, whichever is earlier; and

(C) the court finds that no party would be prejudiced.

(7) *Entry Defined.*

(A) A judgment or order is entered for purposes of this Rule 4(a):

(i) if Federal Rule of Civil Procedure 58 (a) does not require a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79 (a); or

(ii) if Federal Rule of Civil Procedure 58 (a) requires a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs:

• the judgment or order is set forth on a separate document, or

• 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79 (a).

(B) A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58 (a) does not affect the validity of an appeal from that judgment or order.