# 23-7608-cv

## United States Court of Appeals

### *for the*

## Second Circuit

MEHUL TRIVEDI,

*Plaintiff-Appellant,*

— v. —

ST. PETER'S HEALTH PARTNERS MEDICAL ASSOCIATES, P.C.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

ADAM MASTROLEO
HANNAH K. REDMOND
BOND, SCHOENECK & KING, PLLC
*Attorneys for Defendant-Appellee*
One Lincoln Center
110 West Fayette Street
Syracuse, New York 13202
(315) 218-8139

CP COUNSEL PRESS (800) 4-APPEAL • (513557)

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee St. Peter's Health Partners Medical Associates, P.C. certifies that its parent company is St. Peter's Health Partners, whose parent company is Trinity Health Corporation, and that no publicly traded company owns 10% or more of its stock.

i

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

ISSUES ON APPEAL ................................................................................3

STATEMENT OF THE CASE....................................................................4

    A.    The P.C. and its Surgery Joint Operating Committee...........................4

    B.    Plaintiff's Employment with the P.C. ...................................................5

        1.    Documented Issues with Plaintiff's Clinical Skills and Peer Relationships ...................................................................................7

        2.    The Surgery JOC Recommends Termination of Plaintiff's Agreement, Without Cause, which is Voted on and Approved by the P.C. Executive Committee ......................................................12

        3.    Plaintiff's Personal Dispute with Dr. Matthew McDonald and Dr. Carol Santoro...................................................................................16

        4.    Plaintiff's Request for the P.C. to Find a Partner ..........................19

    C.    Procedural History...............................................................................20

STANDARD FOR SUMMARY JUDGMENT.........................................21

ARGUMENT ...........................................................................................22

POINT 1

    PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE OF DISCRIMINATION .................................................................................24

    A.    The Only Adverse Action Upon which Plaintiff could Possibly Base a Discrimination Claim is his Termination............................................25

    B.    Plaintiff's Agreement Was Not Terminated Under Circumstances Giving Rise to an Inference of Discrimination ...................................30

        1.    Plaintiff Was Not Similarly Situated to Dr. McDonald................32

ii

2. The Process Used by the P.C. to Terminate Plaintiff's Agreement was Proper and Appropriate.............................................................35

3. The P.C. Did Not Engage in Spoliation .........................................37

4. Plaintiff Cannot Rely on a "Cat's Paw" Theory to Establish an Inference of Discrimination ............................................................41

POINT II

PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF RETALIATION...........................................................................................43

A. The P.C. was Not Aware that Plaintiff Engaged in any Protected Activity ..........................................................................................43

B. There is No Causal Connection between Plaintiff's Alleged Protected Activity and the Decision to Terminate his Agreement......................49

POINT III

PLAINTIFF WAS TERMINATED FOR LEGITIMATE,  NON-DISCRIMINATORY AND NON-RETALIATORY REASONS......................53

POINT IV

PLAINTIFF CANNOT PREVAIL AT THE THIRD STAGE OF THE *MCDONNELL DOUGLAS* BURDEN-SHIFTING ANALYSIS ......................56

A. Plaintiff Has Presented No Evidence Of Pretext ................................56

B. There is No Evidence That Plaintiff's Race, Color or National Origin Played Any Role in the Decision to Terminate His Agreement .........59

CONCLUSION ....................................................................................622

17755197.3 5/10/2024

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ahmed v. American Museum of National History*,
  787 Fed. Appx. 37 (2d Cir. 2019)..........................................................48

*Bain v. Wal-Mart Stores, Inc.*,
  585 F. Supp.2d 449 (W.D.N.Y. Nov. 12, 2008)..........................................44, 45

*Bart v. Golub Corp.*,
  96 F.4th 566 (2d Cir. 2024) ..........................................................59, 60

*Blanc v. Sagem Morpo, Inc.*,
  No. 09-3762, 2010 WL 3836155 (2d Cir. 2010)..............................................22

*Boun v. Spindler*,
  65 F.4th 64 (2d Cir. 2023) ..........................................................28, 29

*Campbell v. Bottling Group, LLC*,
  814 Fed. Appx. 630 (2d Cir. 2020)..........................................................32, 33

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..........................................................22

*Cobb v. Pozzi*,
  363 F.3d 89 (2d Cir. 2004) ..........................................................50, 53, 54

*Coleman v. Nonni's Foods, LLC*,
  No. 15 CV 2791 (VB), 2015 WL 8773467 (S.D.N.Y. Dec. 14, 2015).............23

*Colton v. New York Division of State Police*,
  No. 5:14-cv-00801, 2017 WL 5508911 (N.D.N.Y. Feb. 8, 2017) ....................28

*Cross v. N.Y.C. Transit Auth.*,
  417 F.3d 241 (2d Cir. 2005) ..........................................................55

*Davis v. Avaya, Inc.*,
  295 F. App'x 380 (2d Cir. 2008)..........................................................55

*Dobbs v. NYU Langone Medical Center*,
  No. 18-cv-1285, 2021 WL 1177767 (S.D.N.Y. March 29, 2021)...............23, 57

iv

*Fleming v. MaxMara USA, Inc.*,
   371 F. App'x 115 (2d Cir. 2010) ........................................................57

*Gaffield v. Wal-Mart Stores East, LP*,
   616 F.Supp.2d 329 (N.D.N.Y. Mar. 31, 2009)....................................38

*Galabya v. New York City Bd. of Educ.*,
   202 F.3d 636 (2d Cir. 2000) ..............................................................25

*Graham v. Long Island RR.*,
   230 F.3d 34 (2d Cir. 2000) ................................................................34

*Hale v. Vidal*,
   2023 WL 7211909 (2d Cir. 2023) ................................................56, 58

*Hanfland v. Brennan*,
   No. 10-CV-6106-FPG, 2015 WL 6134177 (W.D.N.Y. Oct. 16, 2015) .............44

*Hawkins v. New York State Office of Mental Health*,
   845 Fed. Appx. 9 (2d Cir. 2021)........................................................56

*Hill v. Rayboy-Brauestein*,
   467 F. Supp. 2d 336 (S.D.N.Y. 2006) ..........................................23, 24

*Holcomb v. Iona College*,
   521 F.3d 130 (2d Cir. 2008) ..............................................................30

*Islamic Society of Fire Dept. Personnel v. City of New York*,
   205 F. Supp.2d 75 (E.D.N.Y. 2002) ..................................................26

*Johnson v. Andy Frain Servs., Inc.*,
   638 Fed. Appx. 68 (2d Cir. 2016)......................................................23

*Johnson v. City Univ. of New York*,
   48 F. Supp. 3d 572 (S.D.N.Y. 2014) .................................................45

*Kelly v. Howard I. Shapiro & Assocs.*,
   716 F.3d 10 (2d Cir. 2013) ................................................................43

*La Grande v. DeCrescente Distributing Co., Inc.*,
   370 F. App'x 206 (2d Cir. 2010) .......................................................26

v

*Lawrence v. Mehlman*,
    389 Fed. Appx. 54 (2d Cir. 2010)........................................................47

*Malone v. Town of Clarkstown*,
    No. 19 CV 5503 (VB), 2022 WL 2834105 (S.D.N.Y. July 20, 2022)..............45

*McDonnell Douglas Corp. v. Green*.
    411 U.S. 792 (1973).............................................................23, 56

*Meiri v. Dacon*,
    759 F.2d 989 (2d Cir. 1985) .............................................................22

*Mudrow v. City of St. Louis, Missouri*,
    144 S.Ct. 967 (2024)........................................................................25

*Neratko v. Frank*,
    31 F. Supp.2d 270 (W.D.N.Y. Nov. 19, 1998)....................................35

*Nikolakopoulos v. Macy's Inc.*,
    No. 20 CIV. 1641 (KPF), 2022 WL 3903595 (S.D.N.Y. Aug. 30, 2022)..........58

*Panchishak, v. County of Rockland*,
    No. 20-CV-10095 (KMK), 2021 WL 4429840 (S.D.N.Y. Sept. 27, 2021).30, 31

*Patterson v. County of Oneida*,
    375 F.3d 206 (2d Cir. 2004) .............................................................47

*Risco v. McHugh*,
    868 F.Supp.2d 75 (S.D.N.Y. June 14, 2012)................................33, 42

*Sanders v. The Univ. of Idaho*,
    No. 3:19-cv-00225, 2022 WL 6160165 (D. Idaho Oct. 7, 2022)................40, 41

*Santos v. Costco Wholesale, Inc.*,
    271 F. Supp. 2d 565 (S.D.N.Y. 2003) .............................................43

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013).....................................................43, 50, 59

*Varno v. Canfield*,
    664 Fed. Appx. 63 (2d Cir. 2016)........................................................56

*Vasquez v. Empress Ambulance Serv., Inc.*,
  835 F.3d 267 (2d Cir. 2016) ...................................................................52

*Venezia v. Luxottica Retail N. Am. Inc.*,
  699 F. App'x 53 (2d Cir. 2017) ...........................................................46

*Walsh v. N.Y. City Housing Auth.*,
  828 F.3d 70 (2d Cir. 2016) ...................................................................30

*Wood v. New York Transit Authority*,
  699 Fed. Appx. 76 (2d Cir. 2017)........................................................32

*Wright v. City of Syracuse*,
  611 Fed. App'x. 8 (2d Cir. 2015) ....................................................23, 24

*Ying Jing Gan v. City of New York*,
  996 F.2d 522 (2d Cir. 1993) .................................................................22

*Zaziiz S. L. Dinkins v. Alejandro Mayorkas*,
  2024 WL 1806174 (S.D.N.Y. Apr. 25, 2024) ....................................27

**Statutes**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981............................*passim*

New York State Human Rights Law ...................................................*passim*

42 U.S.C. § 1981 .....................................................................................23

**Other Authorities**

Fed. R. Civ. Pro. 56(c) ....................................................................21, 22

Fed. R. Civ. Pro. 12(b)(6) ...............................................................28, 29

17755197.3 5/10/2024

## INTRODUCTION

Plaintiff-Appellant Mehul Trivedi ("Plaintiff") was a bariatric surgeon employed by Defendant-Appellee St. Peter's Health Partners Medical Associates, P.C. (the "P.C.") from approximately 2009 through August 2019. On or about May 1, 2019, Plaintiff was notified by the P.C. that it was terminating his Physician Employment Agreement (the "Agreement"), without cause, pursuant to the Agreement's "Termination for Convenience" provision.

The P.C. made the decision to terminate Plaintiff's Agreement due to repeated and ongoing concerns regarding Plaintiff's inadequate clinical skills and patient outcomes, as well as his lack of peer relationships. The concerns regarding Plaintiff's clinical skills were so significant that the hospital where Plaintiff performed surgeries engaged an independent bariatric surgeon to review Plaintiff's surgical cases two different times in the year preceding his termination. Both times, the independent external reviewer identified significant issues with Plaintiff's skills and technique, leading the hospital to threaten to remove Plaintiff's surgical privileges.

In spite of the overwhelming evidence, Plaintiff filed the underlying Complaint, which alleges that his termination was discriminatory and/or retaliatory in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and the New York State Human Rights Law ("NYSHRL").

1

However, as explained by the District Court in its decision granting the P.C.'s motion for summary judgment, Plaintiff failed to meet either his initial or ultimate burden on either claim, for several reasons.

Initially, as explained by the District Court, Plaintiff's discrimination claim is not supported by, and is completely inconsistent with, the undisputed material facts in this case. The evidence demonstrates that the P.C.'s decision to terminate Plaintiff's Agreement without cause was wholly unrelated to his race, color or national origin, but was instead based upon well-documented ongoing concerns about Plaintiff's surgical skills and patient outcomes, as well as concerns regarding Plaintiff's lack of peer relationships.

Likewise, Plaintiff's retaliation claim fails because the P.C. was not aware that Plaintiff had engaged in protected activity and, even assuming it was, there is no evidence to support Plaintiff's claim that protected activity played any role in his termination. In fact, there is no dispute that the individuals responsible for the termination of Plaintiff's Agreement had no knowledge that Plaintiff engaged in any protected activity at any time and therefore could not possibly have based the decision to terminate his Agreement on that activity.

Accordingly, the District Court properly concluded that Plaintiff has not stated, and cannot establish, an actionable discrimination or retaliation claim under Title VII, Section 1981, or the NYSHRL, and its decision should be affirmed.

2

## ISSUES ON APPEAL

1.  Whether the court below correctly held that Plaintiff failed to establish a *prima facie* case of discrimination.

2.  Whether the court below correctly held that Plaintiff failed to establish a *prima facie* case of retaliation.

3.  Whether the court below correctly held that that P.C. articulated legitimate, non-discriminatory, and non-retaliatory reasons for its decision to terminate Plaintiff's Agreement.

4.  Whether the court below correctly held that Plaintiff failed to establish that the P.C.'s stated reasons for terminating his Agreement were merely a pretext for discrimination or retaliation.

## STATEMENT OF THE CASE

**A.** **The P.C. and its Surgery Joint Operating Committee**

St. Peter's Health Partners Medical Associates, P.C., is a multi-specialty physician group with various medical practices operating under its corporate umbrella. (JA-58). The P.C. employs many physicians, including but not limited to surgeons with differing specialties such as general surgeons, thoracic surgeons, colorectal surgeons, and bariatric surgeons. *Id.* The P.C.'s surgeons see patients in private office locations and also perform surgeries at different hospitals within the Albany area, including at St. Peter's Hospital in Albany, New York, and Samaritan Hospital in Troy, New York. *Id.*

All general surgeons, thoracic surgeons, bariatric surgeons, and colorectal surgeons employed by the P.C. are managed and overseen by a Joint Operating Committee (the "Surgery JOC"). *Id.* The Surgery JOC is a management committee of physicians that oversees the day-to-day administration of the various surgical practices within the P.C. umbrella. *Id.* Importantly, the Surgery JOC's authority is limited to the *surgeons* employed by the P.C.; it does not oversee or manage other physicians or practice groups affiliated with the P.C. *Id.*

While the Surgery JOC is responsible for day-to-day operations, the surgeons employed by the P.C. are ultimately subject to the oversight of the P.C.'s board, through its Executive Committee. (JA-59). Indeed, the Executive Committee makes

4

ultimate decisions with respect to, among other things, terminating physicians employed by the P.C. without cause. *Id.*

From time to time, as appropriate, the Surgery JOC makes recommendations to the President of the P.C. regarding termination of surgeons employed by the P.C. *Id*. After such a recommendation is made, the President presents the recommendation to the Executive Committee, which then considers and discusses the Surgery JOC's recommendation and ultimately votes to determine whether to approve the termination. *Id*.

It is important to emphasize that while the Surgery JOC is responsible for the general oversight of the P.C.'s surgeons, the P.C.'s board, through its Executive Committee, makes the ultimate decision on whether to terminate a surgeon's employment without cause. *Id*.

**B.**      **Plaintiff's Employment with the P.C.**

At all times relevant to the Complaint, Plaintiff was a bariatric surgeon employed by the P.C. (JA-107 – 108). In this role, Plaintiff performed surgeries at St. Peter's Hospital in Albany, New York (the "Hospital"), and also saw patients at a private medical office located in Albany.

At the time that Plaintiff's Agreement was terminated, Plaintiff was employed by the P.C. pursuant to a Physician Employment Agreement executed on October

5

22, 2018, which governed the terms of Plaintiff's employment through his separation. (JA-72).

The Agreement set an initial term of two years, unless terminated by either party in accordance with the "Termination" provisions set forth in Section IX. (JA-77). The Agreement specifically included a "no cause" Termination for Convenience provision, which provided in relevant part, that:

> The Agreement may be terminated **for any or no reason** by either party on at least 120 days' prior written notice**.**

(JA-78) (emphasis added). The Agreement also provided that it could be terminated in various other ways by the P.C., Plaintiff, or by their mutual agreement. *Id*.

Finally, the Agreement stated that it "constitutes the entire Agreement between the Parties with respect to the subject matter herein and supersedes all prior agreements, arrangements and/or understandings between the Parties with respect to the subject matter herein." (JA-82). In other words, the Physician Employment Agreement constitutes the only contractual agreement between Plaintiff and the P.C. regarding Plaintiff's employment. *Id*.

Because Plaintiff was a bariatric surgeon employed by the P.C., at all times relevant to the Complaint, he was subject to oversight by the Surgery JOC.

6

1. <u>Documented Issues with Plaintiff's Clinical Skills and Peer Relationships</u>

Throughout his employment, there were multiple documented issues with Plaintiff's clinical skills, patient outcomes and complications, and peer relationships. (*See, e.g.,* JA-35 – 37, 43 – 44).

For instance, when former Hospital Chief Medical Officer, Steven Hanks, M.D. ("Dr. Hanks"), was first hired into the role of Chief Medical Officer in 2016, the outgoing Chief Medical Officer informed Dr. Hanks about concerns regarding Plaintiff. (JA-35). More specifically, Dr. Hanks was made aware that Plaintiff had difficulty getting along with his peers and that as a result, Plaintiff had difficulty finding other surgeons to provide backup call coverage for his patients at the Hospital. *Id.*

This was particularly concerning because all physicians who have patients admitted to the Hospital are required to ensure that there is coverage for those patients twenty-four hours per day/365 days per year. (JA-36). Plaintiff's difficulty in obtaining backup coverage therefore created potential patient safety concerns. *Id.*

According to Plaintiff, the Surgery JOC recommended terminating his Agreement in 2017, but the P.C. ultimately decided not to terminate at that time. (JA-265). Plaintiff does not provide any substantive information regarding why the Surgery JOC wanted to terminate him at that time. In any event, Plaintiff does not claim that the Surgery JOC was motivated by any discriminatory or retaliatory

7

animus in 2017, which was apparently the first time it recommended his termination. *Id*.

In addition, in 2017, Carol Santoro, M.D. ("Dr. Santoro"), a physician employed by the P.C. who was responsible for treating Hospital patients on total parenteral nutrition ("TPN"), provided Dr. Hanks with a list of Plaintiff's patients who were on TPN. (JA-36). The number of Plaintiff's patients who required long-term TPN appeared to be excessive. *Id*. As a result, an internal review of the cases on Dr. Santoro's list was conducted by the Hospital's Department of Surgery. *Id*. This review was solely internal and not performed by a bariatric surgeon. *Id*. The review did not lead to any further action relating to Plaintiff's surgical privileges at the Hospital. *Id*.

At some point after this initial review was conducted, Matthew McDonald, M.D. ("Dr. McDonald"), another bariatric surgeon employed by the P.C., independently raised concerns to Dr. Hanks about Plaintiff's patient outcomes. *Id*. Dr. McDonald operated at Samaritan Hospital, in Troy, New York and from time to time would treat patients who were previously treated by Plaintiff. *Id*. Dr. McDonald identified several new surgical cases that he felt resulted in unacceptable complications. (JA-37). It was Dr. McDonald's opinion that Plaintiff's cases should be reviewed in more detail and he communicated his concerns to Dr. Hanks. *Id*.

8

As a result of these complaints, Dr. Hanks and John Taggert, M.D. ("Dr. Taggert"), the Hospital's Chief of Surgery, decided to retain an outside bariatric surgeon to conduct an independent external review of Plaintiff's cases. *Id*. Accordingly, fourteen of Plaintiff's cases were provided to an independent, well-qualified bariatric surgeon who was not affiliated with St. Peter's Hospital or any hospital in the Albany, New York area. *Id*. Plaintiff was notified that this review would be taking place, and he welcomed the review.[1] *Id*. The external reviewer has been identified by Plaintiff as Dr. Prashanth Ramachandra, who, upon information and belief, is also of Indian descent. (Plaintiff's Brief, p. 11).

In or around June 2018, Dr. Ramachandra produced a report regarding these fourteen cases. (JA-37). Dr. Ramachandra's report included multiple critiques of Plaintiff's technique and identified significant issues with Plaintiff's patient outcomes and complications. *Id*. Dr. Ramachandra's concerns were so significant that he recommended Plaintiff undergo several remedial actions, including observing other bariatric surgeries. *Id*. Plaintiff was provided with a copy of Dr. Ramachandra's report, and was offered a chance to respond, which he did. *Id*. Although the report was detailed and thorough, Plaintiff disagreed with Dr. Ramachandra's findings. *Id*.

---

[1] During his deposition, Plaintiff claimed that he felt Dr. Hanks and Dr. Taggert's decision to have his cases reviewed was motivated by discriminatory animus. (JA-112, 131-132). However, Plaintiff was not able to provide **any** evidence to substantiate this claim.

9

Only a few months after the independent external review was completed, in October 2018, a post-operative patient of Plaintiff's passed away at the Hospital. (JA-43). Because there were internal questions about Plaintiff's care of this patient, the Hospital commissioned a second independent external review specifically related to this patient. *Id.* Like the first external review, Dr. Ramachandra's second external review found additional errors with the care and treatment provided by Plaintiff. (JA-44).

Following the second external review, the Hospital determined that it needed to take action to address the issues with Plaintiff's skills, outcomes and peer relationships. *Id.* To that end, Plaintiff was provided with a letter dated January 10, 2019, from the Hospital's Chief Medical Officer, Alan Sanders, M.D. ("Dr. Sanders"), and Chief of Surgery, Dr. Taggert.[2] (JA-48 – 49).

This letter highlighted the Hospital's significant concerns with Plaintiff's clinical skills as well as concerns regarding Plaintiff's lack of peer relationships and inability to obtain backup call coverage for his patients. *Id.* To address these numerous concerns, the letter provided specific action items that Plaintiff was required to complete to retain surgical privileges at the Hospital. *Id.* After receiving this letter, Plaintiff claims that he asked Dr. Hanks whether his treatment was related

---

[2] During his deposition, Plaintiff also claimed that Dr. Sanders and Dr. Taggert's decision to write the January 10, 2019 letter was motivated by discriminatory animus. (JA-112). Again, however, Plaintiff was not able to provide ***any*** evidence to substantiate this claim.

10

to the color of his skin. (JA-18). Dr. Hanks, who played no role in drafting the letter or overseeing Plaintiff's employment does not recall Plaintiff asking this question, and he did not report the question to anyone at the P.C. (JA-38).

Importantly, the January 10, 2019 letter was not from the P.C., and the conditions stated therein were unrelated to Plaintiff's employment with the P.C. (JA-44). Rather, the letter addressed Plaintiff's ability to retain surgical privileges at the Hospital. (JA-48 – 49). This is an important distinction given that Plaintiff was not employed by the Hospital, and neither Dr. Sanders nor Dr. Taggert had authority to take any action related to Plaintiff's employment. (JA-44).

In response to the January 10, 2019 letter, Plaintiff sent an email to Dr. Sanders and Dr. Taggert (copying Dr. Sudeep Ross), dated February 4, 2019. (JA-52 – 53). In this email, Plaintiff expressed a willingness to comply with the enumerated action items required to retain surgical privileges at the Hospital. *Id*. Plaintiff's email did not claim that Plaintiff felt he was being treated differently because of his race, color and/or national origin. *Id*. In fact, Plaintiff testified at his deposition that he intentionally omitted any reference to race or color from the email. (JA-121). The email similarly did not claim that Plaintiff felt he was being retaliated against for any reason. (JA-52 – 53). In fact, Plaintiff never expressed to either Dr. Sanders or Dr. Taggert that he felt he was being treated differently because of his race, color and/or national origin, at any time. (JA-45, 55).

11

As confirmed by Drs. Sanders, Taggert, and Hanks, Plaintiff's race, color, and/or national origin did not play any role in the Hospital's decision to obtain independent external reviews of Plaintiff's cases or send the January 10, 2019 letter. (JA-38, 45, 55). Rather, the decision to retain a third-party reviewer in both situations was based upon significant patient safety concerns, which were ultimately validated by Dr. Ramachandra's detailed conclusions. *Id*.

2. The Surgery JOC Recommends Termination of Plaintiff's Agreement, Without Cause, which is Voted on and Approved by the P.C. Executive Committee

As part of its obligation to oversee surgeons employed by the P.C., the Surgery JOC had several discussions regarding Plaintiff's performance and fit within the practice. (JA-60). In particular, the Surgery JOC discussed issues relating to Plaintiff's clinical competence as well as his difficulty fostering positive peer relationships. *Id*.

In or around late 2018 and early 2019, the Surgery JOC became aware of the external reviews of Plaintiff's cases referenced above, which identified significant issues with his clinical skills, patient outcomes, and complications. *Id*. The Surgery JOC was also aware of issues with Plaintiff's care of a post-operative patient at the Hospital who passed away in late 2018. *Id*. Further, the Surgery JOC was also aware of Plaintiff's difficulty in maintaining positive peer relationships and obtaining backup call coverage for his patients. *Id*.

12

As a result of these ongoing concerns, in early 2019, the Surgery JOC recommended to P.C. President, Rik Baier ("Mr. Baier"), that the P.C. should move forward with terminating Plaintiff's Physician Employment Agreement. *Id*.

Accordingly, on March 25, 2019, Mr. Baier presented the Surgery JOC's recommendation to the Executive Committee during a regularly scheduled meeting. *Id*., Ex. A. Mr. Baier notified the Executive Committee about the ongoing concerns regarding Plaintiff, including concerns with clinical quality, patient outcomes, and Plaintiff's peer relationships. (JA-60, 68). Based upon the information provided, the Executive Committee voted to approve the termination of Plaintiff's Agreement, without cause. (JA-60-61, 68-66, 68).

Mr. Baier's presentation of the Surgery JOC's recommendation to the Board's Executive Committee was entirely appropriate and consistent with the P.C.'s established procedures. As explained by Jason Heckman, M.D. who was simultaneously a member of the Surgery JOC, the P.C. Executive Committee, and the P.C. Board, the Surgery JOC from time-to-time made recommendations to the P.C. President regarding termination of surgeons employed by the P.C. (JA-59). After such a recommendation is made, the President presents the recommendation to the Executive Committee, which then considers and discusses the recommendation and votes to determine whether to approve the termination without cause. *Id*. This process was also confirmed by Mr. Baier during his deposition and

13

was exactly the process that was followed to vote on and approve the termination of Plaintiff's Agreement without cause. (JA-372).

In his Brief, Plaintiff argues the Surgery JOC's recommendation could have been brought to the full P.C. Board. However, as explained by Mr. Baier at his deposition, the Executive Committee is a part of the Board, and is explicitly authorized to vote on and approve physician terminations without cause. (JA-375 – 376).

During the March 25, 2019 Executive Committee meeting, the attendees also discussed the fact that Plaintiff had made a complaint to the P.C.'s Director of Human Resources about Dr. McDonald. (JA-63 – 66). In his internal complaint, Plaintiff claimed that Dr. McDonald had disparaged Plaintiff's clinical skills and bariatric program. (JA-97 – 98). Notably, Plaintiff did not complain to Human Resources that he felt he was being treated differently because of his race, color and/or national origin, or that Dr. McDonald's treatment of him was motivated by his race, color and/or national origin. *Id*.

It is clear from the record evidence that Plaintiff's race, color and/or national origin played no role in the Surgery JOC's recommendation to terminate Plaintiff's Physician Employment Agreement or the Executive Committee's vote to approve the Surgery JOC's recommendation. (JA-61 – 69). In fact, Plaintiff's race, color and/or national origin were never discussed at any time by either the Surgery JOC

14

or Executive Committee. *Id.* Similarly, Plaintiff's complaint to Human Resources about Dr. McDonald – which was entirely unrelated to his race, color, or national origin – did not play any role in the Executive Committee's decision. *Id.*

After the Executive Committee voted to approve the termination of Plaintiff's Agreement, a meeting was held on or about May 1, 2019, with Plaintiff, Mr. Baier, and Executive Committee President, William Kowal, M.D. ("Dr. Kowal"). (JA-70). During this meeting, Mr. Baier and Dr. Kowal informed Plaintiff that his employment was being terminated, without cause, pursuant to the Termination for Convenience Provision in the Agreement. *Id.* Pursuant to the terms of Plaintiff's Agreement, Plaintiff was provided with 120 days written notice of his termination at that meeting. *Id.* Plaintiff then received full pay and benefits for the next 120 days. *Id.*

In Plaintiff's Brief, Plaintiff's counsel alleges that Plaintiff was permitted to continue seeing patients after May 1, 2019, during the 120-day notice period. (Plaintiff's Brief, pp. 17, 37). This is simply not true. It appears that this allegation is based on Plaintiff's deposition testimony where he states that he was paid during the 120-day notice period following May 1, 2019. (JA-321). However, even a cursory reading of this testimony demonstrates that Plaintiff did not testify that he was permitted to continue working during this period. Rather, Plaintiff only stated that he continued to be paid during the notice period. *Id.*

15

In fact, Plaintiff *did not* continue to see patients after May 1, 2019. Plaintiff confirms as much in the Complaint where he states, "On May 1, 2019, Trivedi was terminated from SPHPMA. On May 8, 2019, a memorandum was issued to 'All SPHP Medical Staff and Management' informing them that Trivedi was no longer working for SPHPMA and providing contact information for other SPHPMA bariatric surgery practices." (JA-16). This May 8, 2019 memorandum, which is referenced in the Complaint and was marked as an exhibit during the deposition of Mr. Baier clearly states that "Dr. Trivedi has ceased providing services as of May 1, 2019." Plaintiff therefore acknowledges that he did not continue to see patients after May 1, 2019, and any allegation that he did is therefore false. (*See also* JA-275, where Dr. Trivedi states, "[a]fter the passing of my patient in October 2018, I operated at full schedule right up until I was informed of my termination on May 1, 2019.")

3. <u>Plaintiff's Personal Dispute with Dr. Matthew McDonald and Dr. Carol Santoro</u>

It is apparent that Plaintiff had ongoing personal disputes with Dr. McDonald and Dr. Santoro. As noted above, Dr. McDonald, like Plaintiff, was a bariatric surgeon employed by the P.C. (JA-36). However, while Dr. McDonald's practice was based out of Troy, New York, and he operated at Samaritan Hospital, Plaintiff's practice was based out of Albany and he operated at St. Peter's Hospital. *Id*. Dr.

16

Santoro was also employed by the P.C. *Id*. As noted above, Dr. Santoro managed patients who were receiving TPN at the Hospital. *Id*.

On or about April 26, 2018, Plaintiff wrote an email to Dr. Hanks, in which he voiced a concern about "anonymous" physicians questioning his bariatric practice. (JA-41). During Plaintiff's deposition, he confirmed that this email was about Dr. McDonald and Dr. Santoro. (JA-127 – 128). According to the email, Plaintiff believed the quality of his practice was excellent and that the anonymous individuals making allegations about his clinical skills were wrong. (JA-41 – 42). Plaintiff's email did not mention any allegation that he felt targeted by Dr. McDonald or Dr. Santoro because of his race, color and/or national origin, or that he was being treated differently because of his race, color or national origin. *Id*. Rather, Plaintiff felt that his skills were being improperly questioned. *Id*.

Following Plaintiff's April 26, 2018 email, and in response to Plaintiff's concerns, Mr. Baier spoke with Dr. McDonald and instructed him not to publicly discuss Plaintiff's clinical skills. (JA-39).

In or around March 2019, Plaintiff met with the P.C.'s Human Resources Director, Anna Bauer ("Ms. Bauer"), to discuss concerns regarding Dr. McDonald. (JA-146). During this meeting, Plaintiff voiced his concern about Dr. McDonald continuing to speak negatively about Plaintiff's bariatric practice. *Id*. After their meeting, Plaintiff followed up with an email to Ms. Bauer dated March 17, 2019.

17

(JA-97 – 98). Like Plaintiff's April 26, 2018 email to Dr. Hanks, the March 17, 2019 email states Plaintiff's belief that Dr. McDonald and Dr. Santoro were disparaging his clinical skills. *Id.* Consistent with his prior email to Dr. Hanks, Plaintiff did not make any allegation in his complaint to Ms. Bauer that he felt Dr. McDonald or Dr. Santoro were engaging in any racially motivated conduct or that he was being discriminated against based upon his race, color or national origin. *Id.* Plaintiff was simply complaining about what he felt was a lack of professional respect from colleagues.[3] *Id.* Indeed, Plaintiff never made any complaint based upon race, color or national origin to Ms. Bauer, at any time. (JA-170 – 171).

After meeting with Plaintiff and reviewing his March 17, 2019 email, Ms. Bauer began an investigation into Plaintiff's concerns. (JA-156 – 157). Ms. Bauer interviewed several witnesses in connection with her investigation, which continued after Plaintiff's Agreement was terminated. *Id.* At the conclusion of her investigation, Ms. Bauer recommended that Dr. McDonald be counseled regarding his behavior. (JA-158). Notably, Ms. Bauer played no role in the decision to terminate Plaintiff's Agreement and was unaware of who participated in that decision. (JA-207).

---

[3] During his deposition, Plaintiff claimed that he felt Drs. McDonald and Santoro's alleged critiques of his skills and performance were motivated by race. (JA-112, 124). Again, Plaintiff was not able to provide ***any*** evidence to substantiate this claim.

18

Finally, although Plaintiff makes the baseless claim that he was treated differently than Dr. McDonald, it is worth noting that Dr. McDonald was ultimately terminated by the P.C., without cause, on or about May 6, 2021. (JA-39). Dr. McDonald's termination was based upon issues with his clinical skills and collegiality. *Id*.

### 4. Plaintiff's Request for the P.C. to Find a Partner

In the Complaint, Plaintiff alleges that he asked the P.C. to find him a partner, but that it never did anything to grant his request. (JA-13, 16). Plaintiff's allegation is misleading and inaccurate.

As an initial matter, Plaintiff admitted during his deposition that the P.C. did, in fact, take steps to hire another bariatric surgeon to assist Plaintiff with his caseload. (JA-114). Plaintiff testified that he asked the Hospital's Chief Medical Officer, Robert Cella, M.D. (Dr. Hanks' predecessor), for a partner and that in response to this request, in 2016, Jessica Folek, M.D. ("Dr. Folek"), a bariatric surgeon, was hired to provide cross-coverage for Plaintiff. (JA-114 – 117). Dr. Folek provided coverage for Plaintiff's patients throughout her employment, which, according to Plaintiff, lasted less than one year. *Id*.

Plaintiff also claimed that after Dr. Folek left the practice, he asked Dr. Hanks to help locate another partner. (JA-115). Plaintiff acknowledged that following his request, a national search was conducted, which included collecting resumes that

19

were eventually narrowed down to two or three candidates. *Id*. Plaintiff claimed that the search was then called off and that he did not know why. (JA-116).

Further, Plaintiff acknowledged during his deposition that aside from simply asking for a partner, he never took any action to help with this request. (JA-117 – 119). Indeed, Plaintiff admitted that he never identified any potential candidates, contacted any other bariatric surgeons, or did anything other than ask the P.C. to find a partner for him. *Id*.

Accordingly, contrary to Plaintiff's allegation, the P.C. took steps to respond to Plaintiff's request for a partner, which included hiring Dr. Folek to provide cross-coverage, and conducting a national search for a partner after Dr. Folek left.

## C. <u>Procedural History</u>

Plaintiff commenced the present lawsuit on June 20, 2020. (JA-10). Based upon the facts alleged in the Complaint, Plaintiff asserted discrimination and retaliation claims under Title VII, Section 1981, and the NYSHRL. (JA-16 – 20). At the conclusion of discovery, the P.C. moved for summary judgment and sought dismissal of the Complaint in its entirety. Plaintiff responded to the P.C.'s motion and fully briefed his arguments relating to the P.C.'s alleged discrimination and retaliation.

On September 29, 2023, the United States District Court for the Northern District of New York, District Judge Thomas J. McAvoy, issued a Decision and

20

Order granting the P.C.'s Rule 56 motion for summary judgment and dismissing Plaintiff's Complaint in its entirety. (JA-467).

After an extensive discussion of the facts, the District Court first held that Plaintiff failed to state a *prima facie* case of discrimination. (JA-503). In reaching this conclusion, the District Court rejected Plaintiff's arguments and noted that Plaintiff failed to present any evidence demonstrating that his termination was, in any way, related to his race, color, or national origin. (JA-495 – 503).

The District Court then held that Plaintiff also failed to state a *prima facie* case of retaliation. (JA-510). Again, the District Court rejected Plaintiff's arguments and noted that Plaintiff failed to provide any evidence that his alleged protected activity was a "but for" cause of the decision to terminate his Agreement. *Id*.

Finally, the District Court also held that the P.C. articulated legitimate, non-discriminatory and non-retaliatory reasons for its decision to terminate Plaintiff's Agreement, and that Plaintiff failed to demonstrate that the P.C.'s stated reasons were pretextual. (JA-511- 514). The District Court correctly noted that Plaintiff's disagreement with the P.C.'s decision, no matter how sincere, did not constitute discrimination or retaliation. *Id*.

## STANDARD FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment when it shows that "there is no genuine issue as to any material

21

fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To establish a genuine issue of material fact, a plaintiff "may not rely simply on conclusory statements or on contentions that the [evidence] supporting the motion [is] not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993). The federal courts have repeatedly held that "[c]onclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion." *Blanc v. Sagem Morpo, Inc.*, No. 09-3762, 2010 WL 3836155, at *1 (2d Cir. 2010) (*quoting Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002)).

This Court has followed these principles and has granted summary judgment in many employment discrimination cases like this one where the plaintiff is unable to present specific facts, based upon competent evidence, sufficient to show that a genuine issue of material fact exists requiring a trial. *Id.*; *see also Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) (observing that "[g]iven the ease with which [employment discrimination suits] may be brought and the energy and expense required to defend such actions," a party opposing summary judgment must present "concrete particulars" of discrimination).

## <u>ARGUMENT</u>

Plaintiff's claims of discrimination and retaliation under Title VII, Section 1981, and the NYSHRL are all subject to the familiar burden-shifting framework set

22

forth in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792, 802–03 (1973). *Johnson v. Andy Frain Servs., Inc.*, 638 Fed. Appx. 68, 70 (2d Cir. 2016) ("Discrimination claims under Title VII[,] . . . § 1981, and the [HRL] are analyzed under the burden-shifting framework in *McDonnell Douglas*."); *Wright v. City of Syracuse*, 611 Fed. App'x. 8, 10 (2d Cir. 2015) ("New York courts require the same standard of proof for claims brought under the NYSHRL as for those brought under Title VII.") (quotations and citations omitted); *Dobbs v. NYU Langone Medical Center*, No. 18-cv-1285, 2021 WL 1177767 (S.D.N.Y. March 29, 2021); *Coleman v. Nonni's Foods, LLC*, No. 15 CV 2791 (VB), 2015 WL 8773467, at *5 (S.D.N.Y. Dec. 14, 2015) ("Discrimination claims under the HRL are evaluated under the same standards applicable to claims under Section 1981 and Title VII.").

"To survive a motion for summary judgment, a plaintiff must carry [his] initial burden to establish a *prima facie* case of discrimination or retaliation." *Dobbs*, 2021 WL 1177767, at *5 (citations omitted). "If the plaintiff satisfies this initial burden, the burden of production (but not persuasion) shifts to the employer to articulate a legitimate, non-discriminatory reason for the action." *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 350 (S.D.N.Y. 2006). If the employer meets this burden, the burden of production shifts back to the plaintiff to demonstrate that the legitimate reasons offered are pretextual. *See id*. It is important to note that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated

23

against the plaintiff remains at all times with the plaintiff, and if the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate." *Id*.

Here, the District Court correctly held that Plaintiff cannot meet either his initial or ultimate burden of proof. As discussed below, there is no evidence to support Plaintiff's claim that the P.C. took any adverse action against him based upon his race, color and/or national origin or in retaliation for Plaintiff engaging in any protected activity. In fact, it is clear that the P.C.'s decision to terminate Plaintiff's employment was made for legitimate, non-discriminatory and non-retaliatory reasons including substantial issues with Plaintiff's clinical skills, patient outcomes and lack of peer relationships.

## POINT I

### PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE OF DISCRIMINATION

To establish a *prima facie* case of discrimination based upon race, color or national origin, Plaintiff must demonstrate "(1) that he is a member of a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse action took place under circumstances giving rise to an inference of discrimination." *Wright*, 611 Fed. App'x. at 11.

24

A. **The Only Adverse Action Upon which Plaintiff could Possibly Base a Discrimination Claim is his Termination**

In his Brief, Plaintiff alleges that the termination of his Agreement constitutes an adverse employment action. (JA-16). The P.C. does not dispute that termination constitutes an adverse employment action. *See, e.g., Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000). However, Plaintiff also argues that he was subjected to several other adverse employment actions, including: (1) the P.C.'s decision to hire and provide resources to Dr. McDonald; (2) the P.C.'s alleged failure to locate a partner for Plaintiff; and (3) the Hospital's decision to conduct independent reviews of Plaintiff's surgical cases. (Plaintiff's Brief, pp. 39 – 43).

To satisfy the third *prima facie* element of a discrimination claim, Plaintiff must show that he endured a "'disadvantageous' change in an employment term or condition." *Mudrow v. City of St. Louis, Missouri*, 144 S.Ct. 967, 974 (2024). As recently explained by the Supreme Court, Title VII targets practices that "'treat[ ] a person worse' because of" some protected characteristic. *Id*. "To make out a Title VII discrimination claim, [a plaintiff] must show some harm respecting an identifiable term or condition of employment." *Id*. Here, as discussed below, none of these alleged actions constitute adverse employment actions because Plaintiff cannot establish that he suffered any harm with respect to a term or condition of his employment.

As an initial matter, it is not clear how the P.C.'s decision to hire an additional bariatric surgeon in a different location constituted an adverse employment action against Plaintiff. Although Plaintiff was apparently bothered by this decision, that certainly did not cause Plaintiff any harm with respect to the terms and conditions of Plaintiff's employment. In fact, the decision to hire Dr. McDonald had no impact on the terms and conditions of Plaintiff's employment whatsoever. Dr. McDonald worked out of a different office and performed surgeries in a different hospital.

Plaintiff's disappointment with the decision to hire Dr. McDonald does not make it an adverse employment action. Indeed, "courts in this circuit have universally rejected attempts by plaintiffs to show an adverse employment action based simply on the plaintiff's personal feelings about the employer's actions." *Islamic Society of Fire Dept. Personnel v. City of New York*, 205 F. Supp.2d 75, 85 (E.D.N.Y. 2002) (collecting cases) (citations omitted). The reason for this rule is clear: "if a plaintiff's subjective feelings regarding his employer's actions controlled, 'every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Id*. at 84 (citation omitted); *see also La Grande v. DeCrescente Distributing Co., Inc.*, 370 F. App'x 206, 211 (2d Cir. 2010) ("Everyday workplace grievances, disappointments, and setbacks do not constitute adverse employment actions within the meaning of Title VII.").

26

Similarly, here, the P.C.'s alleged failure to locate a partner for Plaintiff does not constitute an adverse employment action. Plaintiff does not (and cannot) claim that he was entitled to a partner under any contract or other obligation. Rather, Plaintiff claims that he asked for something that he thought would be helpful, and that the P.C. failed to provide what he asked for. Under these circumstances, the fact that Plaintiff was not provided a partner to his liking did not constitute a "change" in the terms or conditions of his employment. *See Zaziiz S. L. Dinkins v. Alejandro Mayorkas*, 2024 WL 1806174, *6 (S.D.N.Y. Apr. 25, 2024).

In any event, Plaintiff's allegation regarding the P.C.'s failure to find him a partner is factually incorrect. The competent evidence establishes that the P.C. took appropriate steps to respond to Plaintiff's request for a partner, which included hiring Dr. Folek, another bariatric surgeon, to provide cross-coverage for Plaintiff. In addition, after Dr. Folek left, the P.C. also conducted a national search for another partner. (JA-113 – 115).

Finally, Plaintiff argues that the Hospital's two independent reviews of his surgical cases were "analogous to reprimands as they drew negative conclusions." (Plaintiff's Brief, p. 41). This argument is disingenuous, at best. First, the independent reviews were arranged entirely by the Hospital, not the P.C. Second, the conclusions of an independent, third-party reviewer retained by the Hospital do not constitute a reprimand of Plaintiff by the P.C. Third, neither the P.C. nor the

27

Hospital had any control over the reviewer's findings, which is exactly why an external independent review was obtained. Fourth, even if the P.C. had conducted the review and criticized Plaintiff's performance (it did not), it is well established that "an employer's excessive scrutiny of an employee, without more, fails to satisfy the requirements for an adverse employment action." *Colton v. New York Division of State Police*, No. 5:14-cv-00801, 2017 WL 5508911, *16 (N.D.N.Y. Feb. 8, 2017) (quotations and citations omitted).

Plaintiff's reliance on this Court's decision in *Boun v. Spindler*, 65 F.4th 64 (2d Cir. 2023) is misplaced. In *Boun*, the Court considered whether the defendant-employer's decision to refuse the plaintiff's request to participate in specific programs that would have directly led to an increase in her salary constituted adverse employment actions. There, the plaintiff alleged that "due to defendants' actions, she was unable to substantially increase her income and was subject to a loss of her then-current income." *Id*. at 82. The plaintiff in *Boun* provided specific information regarding how each specific decision would have increased her earnings by a specific amount. *Id*.

In holding that the plaintiff had plausibly alleged an adverse employment action to survive a Rule 12(b)(6) motion to dismiss, the Court stated, "[i]n short, under our precedent, the denial of a lateral transfer or additional assignment can qualify as an adverse employment action if that transfer or additional assignment

28

would have materially changed the terms and conditions of employment, such as by materially increasing the employee's pay or materially increasing the employee's opportunity for advancement." *Id*.

This is not the case here. Plaintiff has not alleged the denial of a lateral transfer or additional assignment. Perhaps realizing the flaws in his argument, Plaintiff now claims, for the first time, that he lost compensation and prestige because the P.C. did not provide him with a partner. (Plaintiff's Brief, pp. 41 – 42). Plaintiff provides absolutely no information to substantiate this claim other than conclusory allegations. Plaintiff's speculation regarding what could have potentially increased his income, by some unknown amount, is certainly not sufficient to demonstrate an adverse employment action. In contrast, in *Buon*, the plaintiff specifically asserted that if she had been given the requested administrator position or other training opportunities, she would have earned a specific amount of additional salary or compensation per year. 65 F.4th at 82.

Accordingly, the District Court correctly held that the *only* adverse employment action taken by the P.C. against Plaintiff upon which a discrimination claim could possibly be based is the termination of Plaintiff's Agreement. Nevertheless, even if these alleged actions amount to adverse employment action (they do not), Plaintiff has not and cannot demonstrate that any occurred because of his race, color, or national origin. For this additional reason, none of the alleged

29

actions provide a basis for a discrimination claim under Title VII, Section 1981, and/or the NYSHRL.

**B.      Plaintiff's Agreement Was Not Terminated Under Circumstances Giving Rise to an Inference of Discrimination**

To satisfy the fourth *prima facie* element, a plaintiff must show that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008). "'In assessing the record to determine whether there is a genuine issue to be tried,' a court is obliged to 'carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.'" *Walsh v. N.Y. City Housing Auth.*, 828 F.3d 70, 87 (2d Cir. 2016) (citations omitted).   Indeed, it is well established that reliance on "feelings," without more, is simply not enough to state a *prima facie* claim of discrimination, nor are a plaintiff's subjective feelings sufficient to overcome a motion for summary judgment. *Panchishak, v. County of Rockland*, No. 20-CV-10095 (KMK), 2021 WL 4429840, at *5 (S.D.N.Y. Sept. 27, 2021) ("Plaintiff's unsupported feelings of discrimination are insufficient to create a plausible claim.").

Here, Plaintiff's discrimination claim fails because there is absolutely no evidence to support Plaintiff's claim that his termination was at all related to his race, color or national origin.   Instead, the competent evidence demonstrates that Plaintiff's termination was the result of several legitimate concerns, which

30

culminated in a decision to terminate his employment without cause pursuant to the Agreement. Plaintiff cannot point to *any* evidence in the record that supports his claim that the Surgery JOC or Executive Committee were motivated by discriminatory animus in recommending the termination of his Agreement or voting to approve that termination.

As stated in the Declarations of Dr. Heckman and Dr. Kowal, Plaintiff's race, color and/or national origin were not discussed by the Surgery JOC or Executive Committee at any time and played no role in the decision to terminate the Agreement. (JA-61, 69). As Plaintiff acknowledged during his deposition, he was not aware of the process followed for terminating his Agreement. (JA-122- 123). He also did not know who was responsible for making that decision. *Id*. Accordingly, Plaintiff cannot dispute Dr. Kowal or Dr. Heckman's recitation of the internal processes that led to his termination. In addition, Plaintiff further acknowledged that no racially motivated statements were ever made to him at any time. (JA-124 – 125).

Faced with the fact that there is no evidence to support his claim that race, color or national original played a role in the decision to terminate his Agreement, Plaintiff argues that the termination of his Agreement occurred under circumstances giving rise to an inference of discrimination because: (1) he was treated differently than Dr. McDonald; (2) the manner in which the P.C. decided to terminate his

Agreement was improper; and (3) the P.C.'s alleged spoliation of evidence raises an inference of discrimination. (Plaintiff's Brief, pp. 43 - 47). Each of these arguments fails for the reasons discussed below.

### 1. Plaintiff Was Not Similarly Situated to Dr. McDonald

Plaintiff's attempt to use Dr. McDonald as a "similarly situated" employee who was treated more favorably fails as a matter of law. To establish that Dr. McDonald was similarly situated, Plaintiff has the burden to provide evidence that "he and the alleged comparator employee(s) were 'similarly situated in all material respects.'" *Wood v. New York Transit Authority*, 699 Fed. Appx. 76, 78 (2d Cir. 2017) (quoting *Graham v. Long Island RR*., 230 F.3d 34, 39 (2d Cir. 2000)). Employees are similarly situated if they are "'(1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct.'" *Id*. (quoting *Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 493-94 (2d Cir. 2010)); *see also Campbell v. Bottling Group, LLC*, 814 Fed. Appx. 630, 533 (2d Cir. 2020) (holding that a "comparator must have engaged in 'comparable conduct' of 'comparable seriousness.'"). Accordingly, unless Plaintiff can establish that Dr. McDonald "engaged in 'comparable conduct' of 'comparable seriousness,'" Plaintiff's attempt to use Dr. McDonald as a comparator fails. *Campbell v. Bottling Group, LLC*, 814 Fed. Appx. 630, 632-33 (2d Cir. 2020) (quoting *Graham*, 230 F.3d at 40).

32

Here, the P.C. Executive Committee approved the termination of Plaintiff's Agreement due to significant and well-documented concerns regarding Plaintiff's clinical skills, patient outcomes and complications, as well as Plaintiff's lack of peer relationships. (JA-60, 68). Plaintiff has not submitted (and cannot submit) any evidence to establish that Dr. McDonald was subject to the same quality and/or peer relationship concerns at the time the decision was made to terminate Plaintiff's Agreement. Indeed, Plaintiff had been the subject of multiple reviews, including an internal review and two independent external reviews in the year preceding his termination, which revealed significant concerns with Plaintiff's technique, patient outcomes and complications. (JA-36 – 37, 43 – 44). There is certainly no evidence that Dr. McDonald was subject to the same reviews or concerns *at the time* the decision was made to terminate Plaintiff's Agreement.

As such, Dr. McDonald was not "similarly situated" for purposes of establishing a *prima facie* case and Plaintiff's attempt to compare himself to Dr. McDonald fails on this basis alone. *See Campbell*, 814 Fed. Appx. at 632 (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567-68 (2d Cir. 2000)); *Risco v. McHugh*, 868 F.Supp.2d 75, 100 (S.D.N.Y. June 14, 2012) ("In addition to identifying similarly situated employees who are subject to the same performance evaluation and discipline standards, a plaintiff must also show that those employees engaged in

33

acts of comparable seriousness but were not punished as severely as plaintiff.");
*Graham*, 230 F.3d at 40 (quotation marks omitted).[4]

Plaintiff's claim that he was treated differently than Dr. McDonald also fails because Dr. McDonald was ultimately terminated without cause, just like Plaintiff. Indeed, Dr. McDonald was terminated by the P.C. on or about May 6, 2021, as a result of concerns regarding his clinical quality and collegiality. (JA-39). Accordingly, even assuming Dr. McDonald was subject to the same clinical criticisms as Plaintiff, and assuming Dr. McDonald had similar issues with peer relationships, the P.C. did not treat him any differently than Plaintiff. Both physicians' contracts were terminated without cause. Plaintiff's claim that he was treated differently than Dr. McDonald is completely without merit.

It is apparent that Plaintiff and Dr. McDonald did not get along. However, it is well established that "Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of . . . discrimination and is not proscribed by Title VII. The plaintiff cannot turn a personal

---

[4] In his Brief, Plaintiff states that he observed other physicians of Middle Eastern dissent who were dismissed including Dr. Mane, Dr. Ali-Hasan, and a third unnamed surgeon. (Plaintiff's Brief, p. 46). Plaintiff also references the termination of an endocrine surgeon who was of Filipino descent. *Id*. It is not clear whether Plaintiff is attempting to claim that these physicians were similarly situated or appropriate comparators. To the extent Plaintiff is making that argument, it must be rejected. Plaintiff does not provide any information about these physicians, their conduct, when they were terminated, why they were terminated, why he believes they are of Middle Eastern dissent (Plaintiff is of Indian descent), or any information about them other than their last names. As a result, they are clearly not similarly situated and their alleged employment experiences cannot be used to create an inference of discrimination for purposes of Plaintiff's discrimination claims.

34

feud into a . . . discrimination case by accusation." *Neratko v. Frank*, 31 F. Supp.2d

270, 284 (W.D.N.Y. Nov. 19, 1998).

>   2.   The Process Used by the P.C. to Terminate Plaintiff's Agreement was
>        Proper and Appropriate

In his Brief, Plaintiff also claims that discriminatory motivation can be

inferred from the fact that the P.C. did not offer Plaintiff an opportunity to refute the

reports or conclusions of the independent outside reviewer and "rushed" to terminate

his Agreement. (Plaintiff's Brief, pp. 46 - 47). This argument also fails as a matter

of law.

Initially, Plaintiff alleges that the Surgery JOC recommended termination of

his Agreement in 2017, and that he was afforded an opportunity to defend himself

before the P.C.'s board at that time. (Plaintiff's Brief, p. 47). Plaintiff argues that

this Court can infer discriminatory intent because he was not permitted to defend

himself to the full board again, after the Surgery JOC recommended terminating his

Agreement for the second time. *Id.* Interestingly, Plaintiff does not claim that the

Surgery JOC was motivated by any discriminatory animus when it first

recommended the termination of his agreement in 2017. It is unclear why Plaintiff

believes that the Surgery JOC's second recommendation to terminate his

Agreement, less than two years later, and *after* more troubling issues with Plaintiff's

performance came to light, was motivated by discriminatory animus.

35

In any event, Plaintiff has not alleged, nor can he allege, that the Surgery JOC, Board, or P.C. Executive Committee were required by any contract, rule or policy to provide him with an opportunity to refute the findings of the independent third-party reviewer or be present for Executive Committee meetings. As clearly explained in the Declarations of Jason Heckman, M.D., William Kowal, M.D., and during the deposition of Erik Baier, the Surgery JOC and P.C. Executive Committee followed a very clear and permissible process. (JA-58 – 61, 68 – 69). The Surgery JOC was legitimately concerned about Plaintiff's skills, patient outcomes, patient safety, and collegiality. *Id*. Those concerns were raised through the appropriate channels – to the President of the P.C. – and then discussed during a meeting of the Executive Committee. *Id*. Based upon the information presented, the Executive Committee voted to terminate Plaintiff's Agreement without cause, which it was explicitly permitted to do. *Id*. Parties present at each step of this process have submitted declarations explaining what happened, which Plaintiff cannot dispute. *Id*.

Plaintiff also cannot dispute the sworn testimony from Dr. Heckman and Dr. Kowal that the Surgery JOC and Executive Committee never discussed Plaintiff's race, color or national origin at any time. *Id*. In sum, there is simply no evidence that the process followed by the Surgery JOC or Executive Committee was flawed

36

or inappropriate, and Plaintiff's attempt to manufacture an inference of discrimination based upon the process utilized fails.

Finally, it is worth pointing out that, according to Plaintiff, the Surgery JOC recommended terminating Plaintiff's Agreement in 2017 *before* the independent third-party reviewer found significant issues with Plaintiff's technique and outcomes in June 2018, *before* a post-operative patient of Plaintiff's passed away in October 2018, and *before* a second independent review found that Plaintiff failed to provide adequate care to his patient. The fact that the Surgery JOC made a termination recommendation in 2017 (apparently without any discriminatory motivation) before these facts arose further supports the P.C.'s argument that it had a legitimate, non-discriminatory, and non-retaliatory basis for deciding to terminate Plaintiff's Agreement.

### 3. The P.C. Did Not Engage in Spoliation

Faced with the fact that there is no evidence to support Plaintiff's claim that race, color or national origin played a role in the P.C.'s decision to terminate his Agreement, Plaintiff now asks the Court to infer discriminatory motivation based upon a futile spoliation argument. Plaintiff claims that because the notes from Anna Bauer's investigation into Plaintiff's complaint about Dr. McDonald are not available, this court should infer that the P.C.'s decision to terminate his Agreement

37

was racially motivated (Plaintiff's Brief, pp. 50 - 53). Like Plaintiff's other attempts to manufacture an issue of fact, this argument also fails.

"Before a court may sanction a party for spoliation of evidence, the moving party must show that (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the party having control over the evidence acted with a culpable state of mind; and (3) the missing evidence is relevant to the moving party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Gaffield v. Wal-Mart Stores East, LP*, 616 F.Supp.2d 329, 337 (N.D.N.Y. Mar. 31, 2009) (quoting *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

Notably, Plaintiff's Brief fails to address these required elements or whether they are satisfied in this case. It is apparent that Plaintiff fails to do so because his request for an adverse inference based on spoliation fails on all counts. Initially, and most importantly, the missing documents have no bearing on Plaintiff's claims in this case. As noted many times, Plaintiff's verbal statements to Ms. Bauer, as well as his written complaint on March 17, 2019, did not allege that he was being treated differently because of his race, color or nationality, and did not claim that Dr. McDonald was motivated by any discriminatory animus in raising concerns about Plaintiff's clinical skills. (JA-97 – 98, 170). As such, Ms. Bauer was not

38

investigating a race discrimination complaint and Plaintiff's race was wholly unrelated to the interviews she conducted or her ultimate conclusion. *Id*.

In addition, Ms. Bauer's investigation interviews, from which the missing notes were derived, did not begin in earnest until after the decision to terminate Plaintiff's Agreement was made and were not concluded until after Plaintiff was gone. (JA-193 – 196). The investigation therefore had no impact on the termination decision. Furthermore, Ms. Bauer's emails regarding her investigation, as well as documentation that she received as part of the investigation, were located and produced as part of the discovery process in this case. (JA-184 – 187). These emails do not indicate that any information was gathered that would be relevant to Plaintiff's current discrimination or retaliation claims. *Id*.

Moreover, Ms. Bauer was able to provide clear testimony regarding her conclusion that Dr. McDonald had made comments about Plaintiff's clinical skills. (JA-168). She was also able to clearly recall that she recommended that Dr. McDonald receive formal counseling to address this issue. (JA-167).

Plaintiff's spoliation argument also fails because there is no evidence that the notes were lost while the P.C. had an obligation to preserve them. At the time the investigation was ongoing (March – May 2019), litigation was not reasonably anticipated. Ms. Bauer was investigating a complaint that one physician was making derogatory statements about another physician's clinical skills. She certainly could

39

not have anticipated litigation based upon that complaint. In fact, the P.C. was not aware that Plaintiff was making a race discrimination claim until after Plaintiff's administrative charge with the Equal Employment Opportunity Commission was dismissed in March 2020, which was a year after the investigation concluded.[5] Accordingly, the P.C. did not have an obligation to preserve any documents and Plaintiff's spoliation claim fails on this basis as well.

Finally, Plaintiff has not submitted any evidence that Ms. Bauer or the P.C. had a culpable state of mind. Indeed, Ms. Bauer explained at her deposition that documents regarding the investigation were lost when she changed jobs. (JA-158).

Plaintiff's reliance on *Sanders v. The Univ. of Idaho*, No. 3:19-cv-00225, 2022 WL 6160165 (D. Idaho Oct. 7, 2022) is misplaced. There, the investigation in question was completed to address multiple complaints of gender bias and sex discrimination. The employer in that case was aware of the potential for litigation before the investigation was started. As such, the employer's duty to preserve began before the investigation began. In addition, the investigation was in response to claims of gender discrimination. Here, Ms. Bauer's investigation was wholly unrelated to race discrimination and was primarily conducted after the decision to

---

[5] It is worth pointing out that Plaintiff's counsel filed a charge of discrimination with the Equal Employment Opportunity Commission, which was dismissed before the P.C. was asked to participate in the claim. As a result, the P.C. was not notified that an administrative charge had been filed until it was already dismissed. (JA-463 – 466).

40

terminate Plaintiff's Agreement was made. *Sanders* is therefore inapposite and does not support Plaintiff's claims.

Plaintiff has therefore failed to show his entitlement to an inference of discriminatory motivation based upon the P.C.'s inability to locate Ms. Bauer's interview notes.

4.   Plaintiff Cannot Rely on a "Cat's Paw" Theory to Establish an Inference of Discrimination

At several points in Plaintiff's opposition, he refers to the "cat's paw" theory to try to establish an inference of discrimination. (*See, e.g.,* Plaintiff's Brief, pp. 45 - 46). Plaintiff argues that Dr. McDonald's and/or Dr. Santoro's alleged discriminatory motivation played a meaningful role in the decision to terminate Plaintiff's Agreement. This argument fails for several reasons.

First, there is no evidence in the record that Dr. McDonald or Dr. Santoro were motivated by discriminatory animus toward Plaintiff. Plaintiff does not allege that either physician made any race-related comments at any time. (JA-124). During his deposition, Plaintiff stated that he thought Dr. McDonald and Dr. Santoro were motivated by race because he was a very good doctor and there was no other possible explanation for why they would be critical of his work. (JA-124 – 125). Aside from Plaintiff's own unsubstantiated speculation, Plaintiff cannot point to *any* evidence that would even remotely imply that Dr. McDonald or Dr. Santoro were motivated by discriminatory animus.

41

Second, Dr. McDonald's and/or Dr. Santoro's opinions regarding Plaintiff's skills did not play any meaningful role in the decision to terminate Plaintiff's Agreement. Plaintiff cannot point to any evidence that would even imply that the Surgery JOC or P.C. Executive Committee considered Dr. McDonald's and/or Dr. Santoro's critiques of Plaintiff's skills at any time when making the decision to terminate Plaintiff's Agreement. Rather, they were aware of the negative independent external reviews and the death of Plaintiff's patient in October 2018. Plaintiff's attempt to utilize a cat's paw theory therefore fails.

In sum, it is clear from the record that Plaintiff cannot point to *any* evidence supporting his claim that race, color and/or national origin played a role in the P.C.'s decision to terminate his Agreement. Absent any evidence that these factors played any role in his termination, Plaintiff cannot satisfy his *prima facie* burden and his race, color and/or national origin discrimination claims fail as a matter of law. *See Risco*, 858 F. Supp.2d at 106 (holding that Plaintiff failed to establish a *prima facie* case of discrimination where "Plaintiff merely describe[d] her alleged mistreatment and ask[ed] the court to conclude that it must have been related to her race.") (quotations and citations omitted).

## POINT II

### PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF RETALIATION

To establish a *prima facie* case of retaliation under Title VII, Section 1981 and the NYSHRL, Plaintiff must establish that: (1) he engaged in protected activity; (2) his employer was aware of the protected activity; (3) he suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse action. *Kelly v. Howard I. Shapiro & Assocs.*, 716 F.3d 10, 14 (2d Cir. 2013); *see also Santos v. Costco Wholesale, Inc.*, 271 F. Supp. 2d 565, 574 (S.D.N.Y. 2003) (the elements required to state a retaliation claim under Section 1981 "are the same as those required to make out such a claim under Title VII."). In addition, Plaintiff must establish that his protected activity was the "but for" cause of his termination. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

Here, Plaintiff cannot establish a *prima facie* case of retaliation because: (A) he cannot establish that he engaged in protected activity that his employer was aware of; and (B) there is no causal connection between Plaintiff's alleged protected activity and his termination.

### A.   The P.C. was Not Aware that Plaintiff Engaged in any Protected Activity

In his Brief, Plaintiff argues that he engaged in protected activity when: (1) he made complaints about Dr. McDonald on April 26, 2018, and March 17, 2019; (2) he allegedly asked Dr. Hanks on January 16, 2019 if the Hospital threatened to

43

remove his surgical privileges because of the color of his skin; and (3) Dr. Ross allegedly stated that he believed the Hospital gave Plaintiff the January 10, 2019, letter because of his race and Plaintiff agreed with him. (Plaintiff's Brief, pp. 22 – 27). None of this alleged conduct can support a retaliation claim.

First, Plaintiff's April 26, 2018 and March 17, 2019 complaints about Dr. McDonald did not constitute protected activity. It is well-settled that protected activity does not encompass every workplace complaint. To the contrary, "[t]he term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Hanfland v. Brennan*, No. 10-CV-6106-FPG, 2015 WL 6134177, at *11 (W.D.N.Y. Oct. 16, 2015) (emphasis added). "To constitute protected activity, . . . an informal complaint must include 'sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, national origin, or any other characteristic protected by Title VII.'" *Id*. (emphasis added); *see also See, e.g., Bain v. Wal-Mart Stores, Inc.*, 585 F. Supp.2d 449, 453 (W.D.N.Y. Nov. 12, 2008) ("In order for an employee's complaints to be a 'protected activity' they must relate to an alleged violation of Title VII, i.e., the complaints must relate to race or gender. Otherwise, any employee who is disgruntled or dissatisfied with any aspect of his or her employment would ultimately find relief in Title VII even when race or gender was not an issue." (citations and quotations omitted)).

44

Plaintiff's emails to Dr. Hanks and Ms. Bauer plainly did not satisfy this standard. While these emails expressed Plaintiff's concern and frustration that colleagues were questioning his clinical skills, there is no allegation, in either email, that Plaintiff felt he was being treated differently because of his race, color or national origin. (JA-41, 97 – 98).

It is also important to note that Plaintiff's use of the words "bullying" and "harassment" in these emails does not make them protected activity where the complaints were clearly not related to race, color, national origin or any protected characteristic. *See, e.g., Malone v. Town of Clarkstown*, No. 19 CV 5503 (VB), 2022 WL 2834105, at *8 (S.D.N.Y. July 20, 2022) ("Similarly, plaintiff's complaints about harassing conduct . . . are not protected activity because they complain of general bullying and harassment that plaintiff does not claim are linked to or motivated by her sex."); *Johnson v. City Univ. of New York*, 48 F. Supp. 3d 572, 577 (S.D.N.Y. 2014) (plaintiff's "complaints about his boss's bullying and harassment" did not constitute protected activity where there was no allegation that the complained of treatment was because of plaintiff's membership in a protected class).

Finally, it is well established that generalized complaints about rude or confrontational behavior – *i.e.*, that a coworker caused "humiliation" – do not constitute activity protected by Title VII, Section 1981, or the NYSHRL. *See, e.g., Bain v. Wal-Mart Stores, Inc.*, 585 F. Supp. 2d 449, 453 (W.D.N.Y. 2008) (employee

did not engage in protected activity for purposes of a retaliation claim when she complained that her manager "told her to 'shut up' and 'count-down [her] till'"); *Venezia v. Luxottica Retail N. Am. Inc.*, 699 F. App'x 53 (2d Cir. 2017).

As such, Plaintiff's complaints about Dr. McDonald questioning his clinical competency or not being nice do not constitute protected activity.

Second, Plaintiff's alleged question to Dr. Hanks about whether Plaintiff was being treated differently because of his skin color was never reported to Plaintiff's employer, the P.C. (JA-38). As stated above, Dr. Hanks does not recall Plaintiff ever asking this question. *Id*. However, even assuming that he did, Dr. Hanks did not report Plaintiff's alleged question to anyone at the P.C. *Id*.

In addition, Plaintiff's question was allegedly asked in response to the January 10, 2019 letter from the Hospital. (JA-130). As such, Plaintiff's question related to the conditions imposed upon him by the Hospital regarding his surgical privileges and was wholly unrelated to Plaintiff's employment with the P.C. (JA-48 - 49). It is clear that the Surgery JOC and P.C. Executive Committee had no knowledge of this question when the decision was made to terminate Plaintiff's Agreement and could not have retaliated against Plaintiff on this basis. *Brantman*, 2017 WL 3172864, at *7.

Third, Plaintiff's claim that Sudeep Ross, M.D., who was the Chief Medical Officer for the P.C. in early 2019, told Plaintiff that Dr. Ross believed the Hospital

46

gave Plaintiff the January 10, 2019 letter because of his race, also does not constitute protected activity. Plaintiff's reliance on this alleged statement to establish protected activity likewise fails.

Initially, Dr. Ross' alleged statement constitutes hearsay and is not admissible to defeat summary judgment. *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (holding that "an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial.").

This Court addressed this same issue in *Lawrence v. Mehlman*, 389 Fed. Appx. 54, n. 2 (2d Cir. 2010). There, the plaintiff was a physician claiming race discrimination by his hospital employer. To support his claim, the plaintiff submitted an affidavit that stated there was a discussion among his group of physicians during which other doctors expressed their view that the plaintiff was treated differently because of his race. *Id*. The Court rejected the plaintiff's attempt to rely on this allegation and stated that the plaintiff's "hearsay account of doctors' statements of opinion is not admissible in evidence." *Id*. (citing Fed. R. Civ. P. 56(e)(1); Fed. R. Evid. 802). Similarly, here, Plaintiff's attempt to rely on the hearsay statement of Dr. Ross must be rejected because it is not admissible.

In addition, even if the alleged statement were admissible, Plaintiff does not identify why Dr. Ross allegedly felt this way, or the basis for the alleged statement.

47

Finally, as noted by the District Court in its decision, "Plaintiff presents insufficient evidence upon which a reasonable factfinder could conclude that the Surgery JOC or the Executive Committee considered Plaintiff's complaint to Dr. Ross, or any other evidence that Plaintiff had been discriminated against on the basis of a protected classification, when they determined to terminate Plaintiff's employment." (JA-507).

The District Court's holding is entirely consistent with this Court's decision in *Ahmed v. American Museum of National History*, 787 Fed. Appx. 37 (2d Cir. 2019). There, the plaintiff claimed that he was subjected to adverse employment actions because he raised concerns about sexual harassment at a work-related social function. In upholding summary judgment for the employer, the Court noted that "there is no evidence that any of the [employer's] employees involving in taking the adverse actions . . . were aware of the incident." *Id*. at 39. Similarly, here, there is no evidence that anyone involved in the decision to terminate Plaintiff's Agreement was aware of his alleged conversations with Dr. Hanks or Dr. Ross. Plaintiff's attempt to rely on his alleged conversation with Dr. Ross therefore cannot form the basis for a retaliation claim.

Plaintiff therefore fails to demonstrate that he engaged in any protected activity that the P.C. was aware of, at any time.

**B.**    <u>**There is No Causal Connection between Plaintiff's Alleged Protected Activity and the Decision to Terminate his Agreement**</u>

Even assuming Plaintiff could establish that he engaged in protected activity that was known by his employer, there is no evidence to support Plaintiff's claim that his protected activity was the "but for" cause of the P.C.'s decision to terminate the Agreement.

On March 25, 2019, the Executive Committee voted to accept the Surgery JOC's recommendation and terminate Plaintiff's Agreement. It is undisputed that the Surgery JOC and P.C. Executive Committee were unaware of Plaintiff's purported question to Dr. Hanks about "color," and never discussed or had knowledge of any claim by Plaintiff that he was being treated differently because of his race, color and/or national origin, at any time. (JA-61, 69). Furthermore, although Plaintiff claims he asked Dr. Hanks if he was being treated differently because of the color of his skin, Dr. Hanks did not participate in the decision to terminate Plaintiff's Agreement, was not consulted about it, and only found out about the termination after it occurred. (JA-38). Similarly, Plaintiff has presented no evidence that Dr. Ross participated in the decision to terminate his Agreement, raised any concerns about discrimination, or was even consulted about the termination decision.

As a result, even if Plaintiff engaged in protected activity as alleged, there is no evidence that his activity was *a* cause, let alone the "but for" cause of the decision

49

to terminate Plaintiff's Agreement. Plaintiff's retaliation claims fail on this basis as well. *See Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004) (noting that a plaintiff "may not rely on conclusory assertions of retaliatory motive to satisfy the causal link . . . Instead, he must produce some tangible proof to demonstrate that his version of what occurred was not imaginary.").

In his Brief, Plaintiff attempts to establish a causal connection between his alleged protected activity and the termination of his Agreement by pointing to: (1) the timing of the Executive Committee's vote to terminate his Agreement; (2) the manner in which the P.C. decided to terminate his Agreement; and (3) a cat's paw theory. None of these arguments establishes that any alleged protected activity was the "but for" cause of Plaintiff's termination. *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360 (2013).

First, Plaintiff's reliance on timing to establish his *prima facie* case fails as a matter of law. Plaintiff claims that the short period of time between his complaint to Ms. Bauer in March 2019 and the Executive Committee's decision to terminate his Agreement provides the requisite causation. However, as discussed above, Plaintiff's complaint to Ms. Bauer did not constitute protected activity because it was plainly not a complaint that Plaintiff was being treated differently based upon any protected characteristic. Realizing this flaw, Plaintiff also argues that the timing between his question to Dr. Hanks about the Hospital's decision to send the January

50

10, 2019 letter and the Executive Committee's decision to terminate his employment also provides a causal connection. However, as discussed above, Dr. Hanks (who was not employed by the P.C.) did not notify any of the individuals who participated in the decision to terminate Plaintiff about this question. As such, it could not possibly have been a cause of the Executive Committee's decision. Plaintiff's reliance on timing to establish his *prima facie* case therefore fails.

Second, the manner in which the P.C. decided to terminate Plaintiff's Agreement was entirely proper. Plaintiff repeatedly states in his Brief that the Executive Committee refused to follow its own procedures to terminate Plaintiff's contract. (*See, e.g.,* Plaintiff's Brief, p. 31). This is blatantly false. As discussed in Point I.B.2, *infra*, the Executive Committee followed its normal process in voting to terminate Plaintiff's Agreement without cause. Plaintiff also argues that "in the past" the full Board considered the Surgery JOC's recommendation to terminate his employment. But Plaintiff fails to articulate how the prior situation is in any way similar to the present case. Plaintiff does not identify why the Surgery JOC sought to terminate him in 2017, or whether there was some procedural or contractual requirement that allowed him to attend the vote. For example, pursuant to Plaintiff's Agreement, terminations for cause require additional procedural steps, whereas terminations for convenience do not. (JA-80).

As explained by Mr. Baier, where the Surgery JOC is seeking a termination without cause (as opposed to with cause), the Executive Committee is permitted to vote on the termination without the full Board. That is what happened on March 25, 2019, when the Executive Committee voted to terminate Plaintiff's Agreement. Without providing any context for why the Surgery JOC sought to terminate his employment in 2017, Plaintiff cannot compare that situation with what happened in 2019. Plaintiff's argument that there was some sort of ignored past practice therefore fails.

Third, Plaintiff's attempt to use the cat's paw theory to establish a retaliation claim fails for the same reasons discussed above in Point I.B.4, *infra*. Further, as noted by Plaintiff, the cat's paw theory can be utilized "so long as the individual shown to have the impermissible bias played a meaningful role in the decision-making process." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267 (2d Cir. 2016). Plaintiff has not submitted any evidence, circumstantial or otherwise, which would even imply that Dr. McDonald or Dr. Santoro had retaliatory animus toward him, or that Dr. McDonald or Dr. Santoro played any role, let alone a meaningful role, in the decision-making process. In fact, the evidence demonstrates the exact opposite. The decision to terminate Plaintiff's Agreement was made by the P.C. Board's Executive Committee based upon a recommendation of the Surgery JOC.

The two physicians with whom Plaintiff clearly had a personal dispute played no role in that process.

In sum, Plaintiff cannot refute the fact that the Surgery JOC and P.C. Executive Committee were unaware of Plaintiff's purported question to Dr. Hanks about "color" or his alleged conversation with Dr. Ross, and never discussed or had knowledge of any claim by Plaintiff that he was being treated differently because of his race, color and/or national origin at any time. (JA-61, 69).

As a result, even if Plaintiff engaged in protected activity as alleged (he did not), there is no evidence that his activity was *a* cause, let alone the "*but for*" cause of the decision to terminate Plaintiff's Agreement. Plaintiff's retaliation claims fail on this basis as well. *See Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004) (noting "that a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link . . . Instead, he must produce some tangible proof to demonstrate that his version of what occurred was not imaginary." (quotations and citations omitted)).

## POINT III

### PLAINTIFF WAS TERMINATED FOR LEGITIMATE, NON-DISCRIMINATORY AND NON-RETALIATORY REASONS

In contrast to Plaintiff's speculative, unsupported theories regarding the P.C.'s discriminatory and retaliatory animus, there is ample evidence in the record to establish that Plaintiff's termination resulted from ongoing concerns regarding his clinical performance and lack of peer relationships. (JA-60 -61, 68 – 70). These

53

legitimate, non-discriminatory, non-retaliatory reasons have absolutely nothing to do with Plaintiff's race, color and/or national origin, or any alleged protected activity.

As discussed in detail above, there were significant concerns with Plaintiff's clinical skills, patient outcomes, and lack of peer relationships. For example, in June 2018, Dr. Ramachandra, an independent bariatric surgeon, was retained to conduct a review of fourteen of Plaintiff's surgical cases. (JA-37). Dr. Ramachandra found significant issues with Plaintiff's technique and the complications experienced by Plaintiff's patients. *Id*.

In addition, only a few months after the first independent review was completed, one of Plaintiff's post-operative patients passed away at St. Peter's Hospital. (JA-43 - 44). Plaintiff's care and treatment of this patient prompted a second review by the same independent bariatric surgeon, who again found issues with Plaintiff's quality of care. *Id*. In addition to the myriad concerns regarding his standard of care and patient outcomes, Plaintiff also struggled to obtain backup coverage for his Hospital patients, which further jeopardized his provision of care.

These are all facts that Plaintiff cannot dispute. While Plaintiff may disagree with the independent reviewer's conclusions, he cannot dispute that the P.C.'s concerns were based on objective, well-documented evidence.

Based upon these issues, the Surgery JOC recommended to P.C. President, Mr. Baier, that Plaintiff's Physician Employment Agreement be terminated. (JA-60). Mr. Baier presented the Surgery JOC's recommendation to the P.C. Executive Committee, which then voted to approve the Surgery JOC's recommendation and terminate Plaintiff's Agreement.

This Court has repeatedly recognized that concern regarding performance constitutes a legitimate, non-discriminatory, non-retaliatory basis for an employer's decision to terminate an employee. *Davis v. Avaya, Inc.*, 295 F. App'x 380, 381-82 (2d Cir. 2008) (holding that poor performance is legitimate, nondiscriminatory reason for termination); *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 250 (2d Cir. 2005) (holding that a failure to "perform satisfactorily" is a legitimate, nondiscriminatory reason for dismissal).

It is also worth noting that Plaintiff acknowledged during his deposition that ensuring adequate clinical skills, good patient outcomes and patient safety, and ensuring that its physicians have good peer relationships and adequate call coverage are all legitimate concerns for a medical practice. (JA-109 – 110).

Accordingly, the P.C. clearly had legitimate, non-discriminatory and non-retaliatory bases for terminating Plaintiff's Physician Employment Agreement without cause.

## POINT IV

## PLAINTIFF CANNOT PREVAIL AT THE THIRD STAGE OF THE *MCDONNELL DOUGLAS* BURDEN-SHIFTING ANALYSIS

Even assuming *arguendo*, that Plaintiff satisfied his *prima facie* burden to state a claim of discrimination or retaliation, the District Court correctly held that Plaintiff cannot satisfy his ultimate burden at the third stage of the *McDonnell Douglas* burden-shifting analysis.

### A.    Plaintiff Has Presented No Evidence Of Pretext

With respect to Plaintiff's retaliation claims, it is well established that once the defendant articulates a legitimate, non-retaliatory reasons for its challenged actions, the plaintiff "must then show that the offered justification is pretext for retaliation." *Hale v. Vidal*, 2023 WL 7211909, *1 (2d Cir. 2023). "To this end, the plaintiff must show that the adverse action would not have occurred in the absence of the retaliatory motive." *Hawkins v. New York State Office of Mental Health*, 845 Fed. Appx. 9, 10 (2d Cir. 2021). Stated differently, Plaintiff must "present evidence that retaliation was the 'but for' cause of the action." *Varno v. Canfield*, 664 Fed. Appx. 63, 66 (2d Cir. 2016).

Plaintiff cannot meet this burden. Initially, Plaintiff cannot dispute that concerns regarding his peer relationships, skills and patient outcomes were repeatedly articulated by Dr. McDonald, Dr. Santoro, Dr. Hanks, Dr. Sanders, Dr. Taggert, and Dr. Ramachandra. Even if Plaintiff disagrees with the opinions of these

providers, his belief is irrelevant for the purpose of a pretext analysis. *See Dobbs*, 2021 WL 1177767, at *7 ("Third, and most important, it does not matter if Defendant was correct in its conclusion that Plaintiff took the money. It matters only that Defendant's conclusion that Plaintiff took the money, rather than unlawful discrimination, was the reason for her termination.").

Indeed, the evidence need only demonstrate that the P.C. had a reasonable, good-faith belief that Plaintiff's skills were lacking, complications were unacceptable, and peer relationships were poor. *Id.*; *see also Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010) ("Only where an employer's business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual.").

Plaintiff cannot dispute that the Surgery JOC and Executive Committee legitimately believed that his performance was poor and that his peer relationships were inadequate. Plaintiff may believe that the stated reasons are incorrect, but he cannot dispute that they were legitimate and based on rational, objective evidence.

In his Brief, Plaintiff claims that the P.C.'s documented and consistent reasons for terminating his Agreement were pretextual because: (1) the decision to terminate was made shortly after Plaintiff made a complaint to Anna Bauer about Dr. McDonald: (2) the P.C. treated Dr. McDonald differently than Plaintiff; and (3) Plaintiff was permitted to continue working until August 2019. (Plaintiff's Brief, pp.

57

35 – 38).  Each of these arguments fails.

First, as discussed in detail above, Plaintiff's complaint to Ms. Bauer did not constitute protected activity and his retaliation claim fails for this reason alone. However, even if it did, Plaintiff cannot utilize temporal proximity to satisfy his ultimate burden to demonstrate that the P.C.'s stated reasons for his termination were pretextual.  Indeed, at the summary judgment stage "mere temporal proximity between the protected activity and adverse employment action, 'without more,' is 'insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext.'" *Nikolakopoulos v. Macy's Inc.*, No. 20 CIV. 1641 (KPF), 2022 WL 3903595, at *15 (S.D.N.Y. Aug. 30, 2022) (quoting *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 801 (S.D.N.Y. 2020)); *see also Hale v. Vidal*, 2023 WL 7211909 at *1 (2d Cir. 2023) ("temporal proximity between [plaintiff's] protected activity and the [employer's] adverse actions, without more, is also insufficient to survive summary judgment.").  Thus, Plaintiff's attempt to rely on timing to establish pretext fails as a matter of law.

Second, as discussed in detail above, Dr. McDonald is not an appropriate comparator to Plaintiff.  *See* Point I.B.1, *supra*.  Indeed, Plaintiff has not submitted (and cannot submit) any evidence to establish that Dr. McDonald was subject to the same quality and/or peer relationship concerns at the time the decision was made to terminate Plaintiff's Agreement.  Plaintiff had been the subject of multiple reviews,

including an internal review and two independent external reviews in the year preceding his termination, which revealed significant concerns with Plaintiff's technique, patient outcomes and complications. (JA-36 – 37). There is certainly no evidence that Dr. McDonald was subject to the same reviews or concerns *at the time* the decision was made to terminate Plaintiff's Agreement.

Third, Plaintiff's allegation that he was allowed to continue seeing patients until August 2019 is factually incorrect. Although Plaintiff was paid for 120 days after his meeting with Mr. Baier and Dr. Kowal on May 1, 2019, he did not provide any medical services to patients after that date. Plaintiff's allegation to the contrary is simply wrong.

Plaintiff therefore cannot establish that the P.C.'s stated reasons for terminating his Agreement were pretextual.

## B. There is No Evidence That Plaintiff's Race, Color or National Origin Played Any Role in the Decision to Terminate His Agreement

This Court's recent decision in *Bart v. Golub Corp.*, 96 F.4th 566 (2d Cir. 2024) clarified that a plaintiff alleging a Title VII discrimination claim[6] may satisfy their third step burden under *McDonnell Douglass* by demonstrating pretext or "by adducing evidence that . . . the plaintiff's membership in a protected class was at least one motivating factor in the employer's adverse action." *Bart v. Golub Corp.*,

---

[6] The *Golub* decision was limited to the Title VII discrimination context, and does not apply to Plaintiff's retaliation claims, which are all governed by the heightened but-for standard of causation. *See, e.g. Nassar*, 570 U.S. at 352.

59

96 F.4th 566, 578 (2d Cir. 2024). Here, the District Court examined all of the evidence, and having done so, correctly concluded that Plaintiff failed to demonstrate pretext *and* that there was no evidence in the record from which a reasonable juror could find that Plaintiff's race, national origin or color played any role in the termination decision.

To this point, it bears repeating:

- In 2016, when Dr. Hanks was first hired into the role of Chief Medical Officer for the Hospital, he was notified by the outgoing Chief Medical officer that Plaintiff had difficulty getting along with his peers, and as a result, Plaintiff was not able to find other surgeons to provide backup call coverage for his patients at the Hospital. (JA-35).

- In 2017, the Surgery JOC recommended that Plaintiff's employment be terminated. Plaintiff does not claim that this recommendation was motivated by any discriminatory or retaliatory animus. (JA-273 – 274).

- In June 2018, Dr. Ramachandra conducted an independent review of fourteen of Plaintiff's surgical cases, which included multiple critiques of Plaintiff's technique and identified significant issues with Plaintiff's patient outcomes and complications. (JA-37).

- In October 2018, a post-operative patient of Plaintiff's died at the Hospital.  (JA-44).

- In late 2018, Dr. Ramachandra conducted a second independent review of Plaintiff's care and treatment of the post-operative patient, which again revealed additional errors with the care and treatment provided by Plaintiff.  *Id.*

- On January 10, 2019, the Hospital's Chief Medical Officer (Dr. Sanders), and Chief of Surgery (Dr. Taggert) issued a letter to Plaintiff that highlighted his issues with clinical competence and peer relationships.  (JA-48 – 49).

- In early 2019, due to ongoing concerns about Plaintiff's clinical competence and peer relationships, the Surgery JOC again made the recommendation to terminate Plaintiff's Agreement.  (JA-60).

- On March 25, 2019, P.C. President, Rik Baier, presented the Surgery JOC's recommendations to the P.C. Executive Committee.  Based upon the information provided, the Executive Committee voted to approve the termination of Plaintiff's Agreement, without cause. (JA-68 – 69).

61

- Plaintiff's race, color and/or national origin were never discussed at any time by either the Surgery JOC or Executive Committee. (JA-61, 69).

- Plaintiff was notified about the termination on May 1, 2019. (JA-70).

These facts are not in dispute. It is therefore clear that Plaintiff can provide nothing more than pure speculation to support his claim that race, color or national origin played any role in the P.C.'s decision to terminate his Agreement, which is insufficient to defeat the P.C.'s motion.

## **CONCLUSION**

Based upon the foregoing, the District Court's decision to grant the P.C.'s motion for summary judgment should be affirmed.

Dated: May 10, 2024      BOND, SCHOENECK & KING, PLLC

By:_____

    Adam P. Mastroleo, Esq.
    Hannah K. Redmond, Esq.
    Office and P.O. Address
    One Lincoln Center
    Syracuse, New York 13202-1355
    Telephone: (315) 218-8000
    Facsimile: (315) 218-8100
    Email: amastroleo@bsk.com

*Attorneys for Defendant-Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Adam P. Mastroleo, hereby certify as follows:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32.1(a)(4)(A) of the Court of Appeals for the Second Circuit, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,929 words.

2.     This brief complies with the typeface requirements of Fed R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.


Dated:  May 10, 2024                                      _____

                                                                             Adam P. Mastroleo

63