# 23-7608

## In the
## United States Court of Appeals
## For the Second Circuit

MEHUL TRIVEDI,

*Plaintiff-Appellant,*

– v. –

ST. PETER'S HEALTH PARTNERS MEDICAL ASSOCIATES, P.C.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK (SYRACUSE)

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

TULLY RINCKEY, PLLC
*Attorneys for Plaintiff-Appellant*
441 New Karner Road
Albany, New York 12205
(518) 218-7100
ashoikhetbrod@fedattorney.com

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ........................................................ ii

INTRODUCTION ................................................................. 1

POINT I

THERE ARE GENUINE ISSUES OF MATERIAL FACT IN
DISPUTE TO REQUIRE A TRIAL ................................................. 2

A. Dr. Trivedi Established Multiple Adverse Actions ....................... 2

B. Dr. Trivedi Was Terminated Under Circumstances Giving Rise To An
Inference Of Discrimination ............................................... 6

   *1. Dr. Trivedi Was Similarly Situated to Dr. McDonald* .................. 6

   *2. The Process to Terminate Dr. Trivedi's Employment
Deviated from Past Practice* .............................................. 7

   *3. St. Peter's Engaged in Spoliation by Destroying the Physical
and Electronic File of the Alleged Investigation* ......................... 8

   *4. Dr. Trivedi Properly Relies on the "Cat's Paw" Theory* ............. 11

C. Dr. Trivedi Engaged In Protected Activity And St. Peter's Was
Aware Of That Activity ................................................... 13

D. There Is A Causal Connection Between Dr. Trivedi's Protected
Activity And The Decision To Terminate ................................... 15

E. The Reasons Proffered By St. Peter's Are Pretexual .................... 17

CONCLUSION ................................................................. 19

i

# TABLE OF AUTHORITIES

**Page**

## Cases:

*Ahmed v. American Museum of Natural History,*
    787 Fed. Appx. 37 (2d Cir. 2019) ....................................................14

*Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.,*
    473 F.3d 450, 457 (2d Cir. 2007) .......................................................9

*Chattman v. Toho Tenax Am., Inc.,*
    636 F.3d 339 (6th Cir. 2012) ............................................................12

*Christian v. Wal-Mart Stores, Inc.,*
    252 F.3d 862 (6th Cir.), opinion supplemented on denial of reh'g,
    266 F.3d 407 (6th Cir. 2001) ............................................................12

*Dinkins v. Mayorkas,*
    2024 WL 1806174 (S.D.N.Y. Apr. 25, 2024)................................4, 5

*Fernbach v. Raz Dairy, Inc.,*
    881 F. Supp. 2d 452 (S.D.N.Y. 2012).........................................7, 16

*Gordon v. New York City Bd. Of Educ.,*
    232 F.3d 111 (2d Cir. 2000) .............................................................17

*Graham v. Long Island R.R.,*
    230 F.3d 34 (2d Cir. 2000) .................................................................6

*In re Terrorist Bombings of U.S. Embassies in E. Afr.,*
    552 F.3d 93 (2d Cir. 2008)............................................................ 8-9

*Marshall v. The Rawlings Co. LLC,*
    854 F.3d 368 (6th Cir. 2017)............................................................12

*McGuinness v. Lincoln Hall,*
    263 F.3d 49 (2d Cir. 2001)..................................................................6

*Muldrow v. City of St. Louis, Missouri,*
   601 U.S. ----, 144 S.Ct. 967 (Apr. 17, 2024) ...................................................2, 4

*Staub v. Proctor Hosp.,*
   562 U.S. 411 (2011) ..........................................................................................12

*Zann Kwan v. Andalex Group, LLC,*
   737 F.3d 834 (2d Cir. 2013)..............................................................................14

*Zimmerman v. Assocs. First Cap. Corp.,*
   251 F.3d 376 (2d Cir. 2001)................................................................................3

## **Other Authorities:**

*EEOC Guidance, Section 15, Race and Color Discrimination* ..........................7, 16

## **INTRODUCTION**

The district court improperly granted summary judgment in favor of the Defendant-Appellee, St. Peter's Health Partners Medical Associates, P.C. ("St. Peter's"). Plaintiff-Appellant, Dr. Mehul Trivedi ("Dr. Trivedi"), established a *prima facie* case of retaliation and discrimination. The district court failed to draw all reasonable inferences in favor of Dr. Trivedi, the non-moving party, ignoring evidence that disparate treatment was based upon race, color and national origin. The district court also ignored Dr. Trivedi's arguments under the cat's paw theory and an inference that must be drawn from the spoliation of documents related to an alleged investigation into Dr. Trivedi's complaints. The district court further misstated the content of Dr. Trivedi's conversation with a Chief Medical Officer for St. Peter's, and incorrectly dismissed it as inadmissible hearsay. The district court rewarded the actions of St. Peter's management in not reporting or investigating Dr. Trivedi's complaints, and it summarily justified St. Peter's unlawful actions in terminating Dr. Trivedi's long-tenured employment.

St. Peter's has proffered a truncated version of the facts by distorting the claims at issue and outright omitting material facts that support Dr. Trivedi's cause. By minimizing these material facts, St. Peter's concludes that Dr. Trivedi failed to meet his burden as a matter of law. The district court erred in accepting that conclusion, and its decision should be reversed.

1

## POINT I

## THERE ARE GENUINE ISSUES OF MATERIAL FACT IN DISPUTE TO REQUIRE A TRIAL.

A.   Dr. Trivedi Established Multiple Adverse Actions

St. Peter's takes a myopic view of what constitutes an adverse action. Although St. Peter's admits that Dr. Trivedi's termination is an adverse action, it asserts that all the other actions taken against Dr. Trivedi are not adverse actions, such as St. Peter's decision to divert resources to another provider; its failure to hire a partner; and its decision to conduct "independent reviews" of Dr. Trivedi's cases. [St. Peter's Br., p. 25].

In *Muldrow v. City of St. Louis, Missouri,* 601 U.S. ----, 144 S.Ct. 967, 974 (Apr. 17, 2024), the Supreme Court criticized district courts that were requiring a showing that worse treatment in the terms and conditions of employment were somehow significant, serious, substantial, "or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." (internal citation omitted). Specifically, the Supreme Court stated:

> What the transferee does not have to show, according to the relevant text, is that the harm incurred was 'significant.' Or serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar. 'Discriminate against' means treat worse, here based on sex. But neither that phrase nor any other says anything about how much worse. There is nothing in the provision to distinguish, as the courts below did, between transfers causing significant disadvantages and transfers causing not-so-

significant ones. And there is nothing to otherwise establish an elevated threshold of harm. To demand 'significance' is to add words—and significant words, as it were—to the statute Congress enacted. It is to impose a new requirement on a Title VII claimant, so that the law as applied demands something more of her than the law as written.

*Id.* at 974 (internal citations omitted).

Here, although it is undisputed that Dr. Trivedi was terminated, and such was an adverse action, the other actions also resulted in Dr. Trivedi being treated "worse" as he suffered a "disadvantageous change in an employment term or condition." *See id.* Further, evidence of a plaintiff being replaced by someone outside their protected class is sufficient to establish a *prima facie* case of discrimination. *See Zimmerman v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) ("[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis.").

The hiring of Dr. Matthew McDonald ("Dr. McDonald"), a competing Caucasian bariatric surgeon, had an immediate and detrimental impact on Dr. Trivedi and his employment with St. Peter's. Erik Baier ("Baier"), President, admitted that the base of patients for both practices was the same. [JA-365]. Hence, the practices were competing for the same pool of patients. Patients who went to Dr. McDonald necessarily were patients that Dr. Trivedi lost out on. The economic harm to Dr. Trivedi was immediate. St. Peter's actions in hiring Dr. Samuel Hykin ("Dr. Hykin")

and Dr. McDonald (both Caucasian), providing them with abundant resources, personnel, office space, and marketing, resulted in these similarly situated Caucasian doctors, who were hired a decade after Dr. Trivedi, competing with and then taking over the remnants of Dr. Trivedi's practice. Dr. Trivedi was denied the resources that were immediately bestowed upon a newly hired, similarly situated Caucasian counterpart. To claim there was no harm to Dr. Trivedi is disingenuous in that his bariatric practice was essentially taken over by his Caucasian counterpart.

St. Peter's relies on *Dinkins v. Mayorkas*, 2024 WL 1806174, *6 (S.D.N.Y. Apr. 25, 2024) for the proposition that a plaintiff, who was not provided a partner of his "liking," did not constitute a "change" in the terms and conditions of his employment. [St. Peter's Br., p. 27]. *Dinkins*, *supra*, which was decided a week after *Muldrow, supra,* concerned a *pro se* plaintiff, met with a motion to dismiss, which was granted with leave to amend the complaint. The pin citation provided by St. Peter's references to facts concerning an employer's decision to send two (2) of plaintiff's co-workers, but not plaintiff, on a work trip, which the court held was not an adverse action because plaintiff did not allege that the inability to attend the trip reflected a material adverse change in terms and conditions of employment. Nor did that plaintiff allege that attending such trips was a typical occurrence for the plaintiff. It is unclear how St. Peter's connects *Dinkins, supra,* to the facts of this matter. Dr. Trivedi is not claiming that St. Peter's did not hire a partner of his "liking" – facts

4

that do not appear in *Dinkins* at all. Rather, St. Peter's did not hire a partner at all, which impacted the terms and conditions of Dr. Trivedi's employment. [JA-313-314, JA-360-361, JA-367-368, JA-378].

St. Peter's claims that Dr. Jessica Folek ("Dr. Folek") was a bariatric surgeon who was hired to support Dr. Trivedi. [St. Peter's Br., p. 19]. Dr. Folek was hired as an endocrinologist, not as a bariatric surgeon, and, in any event, she was fired by St. Peter's. [JA-261]. Simply put, St. Peter's never hired anyone for the specific purpose of providing bariatric coverage for Dr. Trivedi. Once potential partners were identified, St. Peter's, unilaterally and without advising Dr. Trivedi, abruptly terminated the search. Dr. Trivedi has always maintained that he was denied resources that suddenly became available to similarly situated Caucasian doctors. As a result, Dr. Trivedi's practice suffered, he was terminated, and his practice was subsumed by his similarly situated Caucasian counterpart.

As for Dr. Trivedi being subjected to "two independent reviews," these were investigations of Dr. Trivedi based upon the complaints of Dr. McDonald and Dr. Carol Santoro ("Dr. Santoro") (both Caucasian). [JA-401-402]. These "independent reviews" were considered by St. Peter's when terminating Dr. Trivedi's employment insofar as it bypassed the Board to terminate Dr. Trivedi's employment. [JA-265, JA-380].

B.    Dr. Trivedi Was Terminated Under Circumstances Giving Rise To An Inference Of Discrimination

St. Peter's argues that Dr. Trivedi has no evidence but his feelings to support his claims of discrimination. [St. Peter's Br., pp. 30-31]. This, too, is simply not accurate as the district court ignored the genuine issues of material fact and did not view the facts in favor of the non-moving party, Dr. Trivedi.

1.    *Dr. Trivedi Was Similarly Situated to Dr. McDonald*

The Second Circuit has explained that a plaintiff must demonstrate that he is "similarly situated in all material respects" to the individuals with whom he seeks to compare himself. *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir. 2000). What constitutes "all material respects" varies from case to case, but "must be judged based on [ ] whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards . . ." *Id.* at 40. The standard requires "a reasonably close resemblance of facts and circumstances" and there must be an objectively identifiable basis for comparability. *Id.; see also McGuinness v. Lincoln Hall,* 263 F.3d 49, 54 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish the minimal *prima facie* case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination.").

Here, Dr. Trivedi and Dr. McDonald held the same position insofar they were both employees of St. Peter's as bariatric surgeons with bariatric practices in close geographic proximity. They were both subject to the same workplace standards, the same code of conduct, the same oversight, and they performed roughly the same number of surgeries. And while both Dr. Trivedi and Dr. McDonald were terminated, those terminations occurred two (2) years apart: Dr. Trivedi was terminated under false pretenses in May 2019 based on complaints lodged by Dr. McDonald, while Dr. McDonald was terminated two (2) years later in May 2021 based on his clinical quality and collegiality – issues of which Dr. Trivedi complained of on multiple occasions that were ignored. [JA-39, JA-309-310, JA-323-324].

### 2. The Process to Terminate Dr. Trivedi's Employment Deviated from Past Practice

Where there is a departure from past practice by an employer, an inference of discrimination may be drawn. *See Fernbach v. Raz Dairy, Inc.*, 881 F. Supp. 2d 452, 464 (S.D.N.Y. 2012) (noting that an employer's unlawful motive may be demonstrated, not only by direct evidence, but by circumstantial evidence, such as departure from past practice); *EEOC Guidance, Section 15, Race and Color Discrimination* ("Relevant personnel policies. An employer's deviation from an applicable personnel policy, or a past practice, can support an inference of a discriminatory motive. Conversely, acting in conformance with a consistently

7

applied nondiscriminatory policy or practice would suggest there is no such motive.").

Here, St. Peter's ignored its past practice in having Dr. Trivedi's termination reviewed by the Board, as opposed to the Executive Committee. [JA-265]. The justification presented for this deviation was that St. Peter's wished to implement the decision of the Joint Operating Committee ("JOC") as soon as possible. [JA-265, JA-376]. Despite claiming such, St. Peter's failed to notify Dr. Trivedi of his termination for another five (5) weeks. [JA-372, JA-375-376]. If timing was truly of the essence, Dr. Trivedi would have been notified immediately, removed immediately (rather than with 120 days' notice), and the termination would not have been "without cause" but "for cause" as specified in the Employment Agreement. [JA-78-81].

3.    *St. Peter's Engaged in Spoliation by Destroying the Physical and Electronic File of the Alleged Investigation*

St. Peter's claims it did not engage in spoliation when it destroyed not only the physical file, but also the electronic file of the alleged investigation into Dr. Trivedi's complaints conducted by Anne Bauer ("Bauer"). [St. Peter's Br., pp. 37-38]. "Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 148

(2d Cir. 2008) (internal quotation marks omitted) (quoting *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 457 (2d Cir. 2007)). Contrary to St. Peter's arguments, all the necessary elements have been shown.

The party having control over the evidence had an obligation to preserve it at the time it was destroyed. Here, Bauer confirmed that there were multiple notes, a final report, documents she accumulated relevant to her investigation, including a reprimand of Dr. McDonald in 2018. [JA-356, JA-359]. There was also an electronic file. Bauer searched for these records in response to this action, but they were all missing. [JA-158, JA-192, JA-193]. While it is possible that a physical file might have been misplaced, the deletion of the electronic file, with no explanation, infers a culpable state of mind. St. Peter's has not pointed to any policy that required such records to be destroyed after a short time after Dr. Trivedi's termination. St. Peter's has not pointed to any policy that would require that all references to a Human Resources investigation of harassment must be completely wiped from their system, with no back-up whatsoever, and the concurrent destruction of the physical file.

St. Peter's claims that the information contained therein could not possibly support Dr. Trivedi's claims. This is pure speculation. Bauer testified multiple times during her deposition that she had no recollection of various pertinent details of her investigation. [JA-165-167, JA-173, JA-178, JA-181, JA-183-184, JA-192, JA-195-196]. Yet, St. Peter's claims that Bauer's investigation interviews, from which the

admittedly missing notes were derived, did not begin until after the decision to terminate Dr. Trivedi's employment and were not concluded until Dr. Trivedi was gone from St. Peter's. [St. Peter's Br., p. 39]. Bauer's deposition does not support that contention. The timeline is simple: Dr. Trivedi lodged his harassment complaints in January 2019 to Dr. Sudeep J. Ross ("Dr. Ross"), Chief Medical Officer, Dr. Steven Hanks ("Dr. Hanks"), Chief Medical Officer, and again on March 17, 2019 when Dr. Trivedi contacted Human Resources. [JA-263-264, JA-316-317, JA-325, JA-333, JA-345, JA-407-408]. St. Peter's held an Executive Meeting on March 25, 2019, approximately one (1) week after Dr. Trivedi's complaint to Human Resources and recommended to terminate Dr. Trivedi at that meeting. [JA-33-36]. The timing and basis of that termination occurred after Dr. Trivedi's complaints and should have triggered St. Peter's obligation to preserve evidence under the circumstances. To claim that Bauer did not conduct interviews until after the decision to terminate Dr. Trivedi's employment further supports the fact that St. Peter's failed to comply with its own anti-discrimination policy, as discussed, *infra*.

St. Peter's claims that litigation was not reasonably anticipated to preserve these records. [St. Peter's Br., pp. 39-40]. That, too, is unsupported, considering St. Peter's had an attorney, Eric Farrell, present at the March 25, 2019 Executive Meeting where "[t]here was a discussion around HR investigating issues around Dr. Trivedi" and where Dr. Trivedi was recommended for termination. [JA-63-66, JA-

10

349-350]. Had there not been an anticipation of litigation concerning the circumstances of Dr. Trivedi's termination, it begs the question why an attorney would be present during the same meeting where it was determined to fire Dr. Trivedi – a week after he formally lodged his complaints to Human Resources.

### 4. Dr. Trivedi Properly Relies on the "Cat's Paw" Theory

St. Peter's claims that Dr. Trivedi cannot rely on a "cat's paw" theory as he fails to show an inference of discrimination because, for example, neither Dr. Santoro nor Dr. McDonald used racially derogatory terms toward Dr. Trivedi. It then claims Dr. Trivedi fails to point to any evidence that would imply that the JOC or Executive Committee considered Dr. Santoro's and/or Dr. McDonald's claims toward Dr. Trivedi. [St. Peter's Br., pp. 41-42].

Meanwhile, Dr. Santoro's and Dr. McDonald's alleged concerns were the impetus of the second investigation against Dr. Trivedi, which was adopted by the JOC and Executive Committee when they decided to terminate Dr. Trivedi's employment. St. Peter's tries to insulate itself from the actions of these two (2) doctors by claiming that an "independent" review breaks any chain. It is disputed whether there was any "independent" review. St. Peter's further ignores the fact that Dr. McDonald was allowed to participate and influence the review by having conversations with the reviewer, while Dr. Trivedi was not given the same option. This is exactly what the cat's paw theory is designed to thwart.

Under the "cat's paw" theory of liability, "if a supervisor performs an act motivated by [retaliatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable...." *See* S*taub v. Proctor Hosp*., 562 U.S. 411, 422 (2011) (emphasis in the original). Consequently, where the plaintiff can demonstrate a "causal nexus" between the final decision-maker's employment decision and the subordinate's retaliatory animus, the final decision-maker is liable under the cat's paw theory. *See Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 877 (6th Cir.), *opinion supplemented on denial of reh'g*, 266 F.3d 407 (6th Cir. 2001). Such a "causal nexus" exists where the decision-maker relied on a "discriminatory information flow" supplied by the subordinate, and thus "acted as a conduit of the [subordinate's animus]—his cat's paw." *Chattman v. Toho Tenax Am., Inc.*, 636 F.3d 339, 350 (6th Cir. 2012).

By allowing Dr. McDonald to participate in the review, while denying any such opportunity to the purported subject of the review, Dr. Trivedi, St. Peter's perpetrated the discriminatory intent of Dr. McDonald. *See Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 380 (6th Cir. 2017) ("Therefore, to avoid liability when acting on the recommendation of a subordinate, a final decision-maker must conduct an "in-depth and truly independent investigation" such that the decision-maker is "not being manipulated" by the subordinate making the recommendation"). "[A]n

independent investigation defeats a cat's paw claim only when the investigation determines that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.*

C.  Dr. Trivedi Engaged In Protected Activity And St. Peter's Was Aware Of That Activity

St. Peter's continues to minimize Dr. Trivedi's complaints. The district court erroneously agreed by finding, "as Defendant points out, Dr. Ross's purported statement that he believed the content of the January 10, 2019 letter was due to Plaintiff's skin color is inadmissible hearsay which is insufficient to oppose summary judgment." [JA-506]. The district court then noted, "[f]urthermore, even if the alleged statement is admissible, Plaintiff does not identify why Dr. Ross allegedly felt this way, or the basis for the alleged statement." [JA-507]. This entirely misses the point.

Dr. Trivedi had a discussion with Dr. Ross and Dr. Hanks in which Dr. Trivedi asserted that the January 10, 2019 letter was issued because of the color of his skin. [JA-34, JA-63, JA-263-264, JA-316-317, JA-325, JA-333]. Dr. Hanks testified that he had a recollection of Dr. Trivedi's complaining that these actions were being taken against him because of his race. [JA-407]. Dr. Hanks was the Chief Clinical Officer for St. Peter's and a member of the Executive Committee – the same Committee that decided to terminate Dr. Trivedi's employment. [JA-34, JA-63].

In *Zann Kwan v. Andalex Group, LLC*, 737 F.3d 834 (2d Cir. 2013), the Court determined that complaints to corporate officers satisfies the requirement of knowledge in the *prima facie* case:

> With respect to the knowledge prong, the District Court held that the plaintiff could not demonstrate Andalex's knowledge of her protected activity because Kwan had provided no evidence that Andrew Silverman had knowledge of Kwan's September 3 conversation with Alex Silverman when Andrew made the decision to terminate her. However, for purposes of a prima facie case, a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong of the prima facie case. Here, the plaintiff made her September 3 complaint to Alex Silverman, an officer of the corporation.

> This complaint was sufficient to impute to Andalex general corporate knowledge of the plaintiff's protected activity. Therefore, Kwan satisfied the knowledge prong of the prima facie case.

*Id.* at 844 (internal citations and footnote omitted).

St. Peter's instead relies on a nonprecedential, summary order, *Ahmed v. American Museum of Natural History*, 787 Fed. Appx. 37 (2d Cir. 2019), claiming that the Court found no evidence that any of the employer's employees involved in taking the adverse action were aware plaintiff's concerns about sexual harassment at a work-related function. In *Ahmed, supra*, that plaintiff did not lodge a complaint and nor assert that he had been subjected to discrimination. Here, Dr. Trivedi told Dr. Hanks and Dr. Ross that he was being subjected to adverse actions because of the color of his skin. Further, St. Peter's employees were aware of Dr. Trivedi's complaints. Dr. Ross and Dr. Hanks were at the highest level of management as

Chief Medical Officers. They were under an obligation "for complying with all aspects of this [St. Peter's EEOC/Non-Discrimination in Employment] policy, for investigating and addressing issues in a timely manner and consulting with Human Resources; as necessary." [JA-436]. The fact that "HR was investigating issues around Trivedi" was specifically raised in the Executive Committee meeting where Dr. Trivedi was terminated. [JA-64]. Dr. Ross, who was aware of Dr. Trivedi's complaints, was at the Executive Committee meeting where Dr. Trivedi was terminated. [JA-63].

St. Peter's EEOC/Non-Discrimination in Employment Policy also provides that "[c]olleagues arc to address any mailer of concern with their immediate supervisor or a member of the Human Resources Department." [JA-436]. It was thus appropriate for Dr. Trivedi to discuss the matter with Dr. Ross and Dr. Hanks. Understandably, when his complaints to Dr. Ross and Dr. Hanks were not acted on, Dr. Trivedi was justified when he complained directly to Human Resources. Such complaints were protected activities.

> D.    There Is A Causal Connection Between Dr. Trivedi's Protected Activity And The Decision To Terminate

St. Peter's claims that there is "no evidence that Dr. Ross participated in the decision to terminate [Dr. Trivedi's] agreement, raised any concerns about discrimination, or was ever consulted about the termination decision." [St. Peter's Br., p. 49]. The record supports otherwise and definitively establishes that Dr. Ross

was present at the Executive Committee meeting on March 25, 2019, where there was "discussion around HR investigating issues around Dr. Trivedi" and the Committee recommended, at that meeting, to terminate Dr. Trivedi. [JA-63-64]. Dr. Ross was under an obligation, pursuant to St. Peter's EEOC/Non-Discrimination in Employment Policy, to ensure compliance, investigate, and address Dr. Trivedi's concerns. This, coupled with the rush to terminate Dr. Trivedi and bypassing its past practices on how to terminate a provider, sufficiently raises an inference of unlawful animus.

St. Peter's then claims that Dr. Trivedi cannot rely on the past practices of the Executive Committee to create an inference of retaliation. [St. Peter's Br., p. 52]. As discussed, *supra*, a failure to follow past practices can be indicative of unlawful animus. *See Fernbach*, 881 F. Supp. 2d 464; *EEOC Guidance, Section 15, Race and Color Discrimination*. St. Peter's produced no evidence establishing some new procedure was implemented and, instead, relies solely on self-serving statements made by its employees.

Finally, the temporal proximity of Dr. Trivedi's complaints, specifically his complaint to Human Resources and being terminated one (1) week later during an Executive Committee meeting where there was a "discussion around HR investigating issues around Dr. Trivedi," is sufficient to establish a causal

connection. [JA-63-64]. *See Gordon v. New York City Bd. Of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

> E.    <u>The Reasons Proffered By St. Peter's Are Pretexual</u>

St. Peter's contends that Dr. Trivedi's termination was justified as "[t]hroughout [Dr. Trivedi's] employment, there were multiple documented issues with Plaintiff's clinical skills, patient outcomes and complications, and peer relationships." [St. Peter's Br., p. 7]. Contrary to this assertion, there remain genuine issues of material fact as to each of these purported deficiencies. It was only by accepting St. Peter's version of events as true, thus usurping the jury's function, that led the district court to improperly grant summary judgment in favor of St. Peter's.

Claims about Dr. Trivedi's clinical skills, patient outcomes, complications, and peer relationships are disputed. Dr. Trivedi was employed at St. Peter's for a decade. There were no concerns about his clinical skills, patient outcomes, and complications "throughout" Dr. Trivedi's decade-long employment. Had there been genuine concerns with Dr. Trivedi's clinical skills, patient outcomes, complications, and peer relationships, St. Peter's would not have waited five (5) weeks to inform Dr. Trivedi's of his termination, nor provided 120-days' notice of termination, nor would St. Peter's have terminated Dr. Trivedi "without cause." [JA-78-81]. Had St. Peter's proffered reasons been true, the Employment Agreement's termination provision would have triggered a "for cause" termination. As for Dr. Trivedi's

17

relationships, Bauer testified that she found Dr. Trivedi to be "very nice." [JA-173]. Baier found Dr. Trivedi to be a pleasant person. Dr. Alan Sanders could not recall any doctors complaining about Dr. Trivedi's collegiality. Jennifer McArdle, Dr. Trivedi's Office Manager, emailed Bauer, advising her of Dr. Trivedi's professionalism and courtesy. [JA-444].

In sum, Dr. Trivedi has shown that he engaged in protected activity when complaining to Dr. Ross, Dr. Hanks and Bauer. St. Peter's was aware of those complaints. Dr. Trivedi has shown, after he engaged in protected activity, that he was wrongfully terminated. He has demonstrated that relevant and material evidence in this case has disappeared. Dr. Trivedi has shown a clear pattern of preferential treatment to similarly situated Caucasian providers, like Dr. McDonald. He has shown that the supposedly "independent" review was anything but independent as Dr. McDonald was directly and intimately involved. Dr. Trivedi has shown that, despite showing that the first "review" was factually incorrect and biased, the same reviewer was used again during the second "review." Despite these "reviews," Dr. Trivedi has shown that St. Peter's offered him an Employment Agreement. Dr. Trivedi has shown that St. Peter's failed to follow its prior practices in its rush to terminate him. All of these issues, and more, are genuine issues of material fact that should have precluded summary judgment in favor of St. Peter's.

## <u>CONCLUSION</u>

**THE ORDER APPEALED FROM SHOULD BE REVERSED, WITH COSTS, AND THE MATTER SHOULD BE REMANDED FOR TRIAL.**

Dated:     May 31, 2024
           Albany, New York

Respectfully submitted,

*/s/ Allen Arthur Shoikhetbrod*

_____
Allen Arthur Shoikhetbrod
Tully Rinckey, PLLC
*Attorney for Plaintiff-Appellant*
441 New Karner Road
Albany, New York 12205
Tel: (518) 218-7100
Fax: (518) 218-0496
ashoikhetbrod@fedattorney.com

19

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed.R.App.P.32(a)(7)(B) because:
   This brief contains 4,285 words, excluding the parts of the brief exempted by Fed.R.App.32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type style requirements of Fed.R.App.P32(a)(6) because:
   This brief has been prepared in Proportionally-Space typeface using Microsoft Word, in Times New Roman, Font Size 14.

Dated: May 31, 2024